# EXHIBIT A



US006202052B1

(12) **United States Patent**     (10) **Patent No.:**     **US 6,202,052 B1**
Miller                            (45) **Date of Patent:**        **Mar. 13, 2001**

(54) **FULLY-AUTOMATED SYSTEM FOR TAX REPORTING, PAYMENT AND REFUND**

(75) Inventor: **David S. Miller**, New York, NY (US)

(73) Assignee: **Simplification, LLC**, New York, NY (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/073,027**

(22) Filed: **May 7, 1998**

**Related U.S. Application Data**

(60) Provisional application No. 60/045,945, filed on May 8, 1997.

(51) Int. Cl.[7] ............................................... G06F 17/60
(52) U.S. Cl. .................................... 705/31; 705/19
(58) Field of Search .................. 705/19, 31; 364/464.27

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,554,418 | 11/1985 | Toy | 179/2 DP |
| 4,713,761 | 12/1987 | Sharpe et al. | 364/406 |
| 4,727,243 | 2/1988 | Savar | 235/379 |
| 4,890,228 | * 12/1989 | Longfield | 705/31 |
| 4,961,158 | 10/1990 | Sussman | 364/709.04 |
| 5,117,355 | 5/1992 | McCarthy | 364/405 |
| 5,138,549 | * 8/1992 | Bern | 705/31 |

| | | | |
|---|---|---|---|
| 5,193,057 | * 3/1993 | Longfield | 705/31 |
| 5,202,826 | 4/1993 | McCarthy | 364/405 |
| 5,287,268 | 2/1994 | McCarthy | 364/405 |
| 5,521,815 | 5/1996 | Rose, Jr. | 364/409 |
| 5,546,303 | 8/1996 | Helbling | 364/401 |
| 5,555,497 | 9/1996 | Helbling | 364/401 |
| 5,694,322 | * 12/1997 | Westerlage et al. | 364/464.27 |
| 5,724,523 | * 3/1998 | Logfield | 705/35 |
| 5,774,872 | * 6/1998 | Golden et al. | 705/19 |

OTHER PUBLICATIONS

J. McTague, "Auditing the IRS," Barrons, Dec. 23, 1996, pp. 1–9.

* cited by examiner

*Primary Examiner*—Eric W. Stamber
*Assistant Examiner*—M. Irshadullah
(74) *Attorney, Agent, or Firm*—Venable; Robert J. Frank; Michael A. Sartori

(57)     **ABSTRACT**

An electronic intermediary electronically connects with a tax data provider and collects electronically tax data from the tax data provider. The electronic intermediary processes the tax data collected electronically, and prepares an electronic tax return using the processed tax data. The electronic intermediary connects electronically with a taxing authority, files the electronic tax return with the taxing authority, and arranges electronically for the payment or receipt of any tax liability or refund, respectively.

**20 Claims, 2 Drawing Sheets**



**U.S. Patent**        Mar. 13, 2001        Sheet 1 of 2        US 6,202,052 B1



Fig. 1



Fig. 2

US 6,202,052 B1

1

# FULLY-AUTOMATED SYSTEM FOR TAX REPORTING, PAYMENT AND REFUND

## CROSS-REFERENCE TO RELATED APPLICATION

Applicant claims the benefit of U.S. Provisional Patent Application No. 60/045,945, filed May 8, 1997.

## BACKGROUND OF THE INVENTION

The invention relates generally to collecting, processing, compiling, and distributing information and data. More specifically, the invention relates to a method, an apparatus, and an article of manufacture for automated tax reporting, payment, and refund.

In recent years, an increasing amount of data and other information necessary to compute the federal, state, local, and foreign income tax liability of individual taxpayers and other taxpayers, including certain trusts, estates, corporations and partnerships, is available electronically and capable of being transmitted over telephone communication equipment or other electronic means to the taxpayer or the taxpayer's agent or representative. For example, payroll, bank statement, residential mortgage payment, and brokerage and mutual fund account information is prepared almost entirely on computers, and is capable of being transmitted electronically in standardized or other readable format. In addition, for data that is necessary to compute a taxpayer's liability but that may not at present be regularly transmitted to the taxpayer, such as the amount of donations made to charitable organizations, the information is generally entered into, and processed by, computers and could easily be transmitted to the taxpayer or the taxpayer's agent electronically using telephone communication equipment, by modem, or through the Internet. Thus, substantially all of the information necessary to compute most individuals' and many other taxpayers' income tax liability is readily available and capable of being transmitted electronically.

In addition, tax return preparation has become increasingly automated. Several computer programs are available for individual taxpayers to compute their federal income tax liability and generate completed tax returns (such as TurboTax, which is a registered trademark of Intuit, Inc.). Further, tax return professionals, who prepare over forty-nine percent of individual tax returns, routinely process the tax returns of millions of individuals and other taxpayers on computers with automated software. See Jim McTague, "Auditing the IRS," Barron's 29 (Dec. 23, 1996); Internal Revenue Service, 1995 Data Book 3 (July 1996).

Moreover, few legal interpretational issues or methodology variations exist with respect to the income tax liability of individuals and other taxpayers whose taxable income, gain, loss, and deduction consist substantially of wages, interest, dividends, capital gains and losses, residential mortgage interest, state and local taxes, and other similar typical items. For taxpayers whose income tax liability consists substantially of these items, as is the case with many or most U.S. individual taxpayers, computation of income tax liability is generally a routine matter of collecting the relevant data, processing it, reflecting the data and ultimate calculations on the proper form or forms, and transmitting or otherwise sending the forms to the relevant taxing authorities.

Finally, taxing authorities have increasingly automated the tax collecting and return filing process. The U.S. Internal Revenue Service ("IRS") permits in certain situations the electronic filing of tax returns and the payment and refund

2

of income taxes through electronic money transfers. For example, in 1997, thirteen million returns were filed electronically, and 4.2 million Form 1040EZ returns were filed by touch-tone phone. However, even with the ability to electronically file, less than 18% of all tax returns were filed electronically by Apr. 11, 1997. See Internal Revenue Service, "IRS Concludes Successful Tax Season" (Press Release) (Apr. 17, 1997). As a further example, U.S. Pat. No. 5,193,057 to Longfield shows a process for expediting tax refund payments through the use of a loan by an authorized financial institution. Accordingly, few technological, legal, or practical obstacles exist for the fully automated preparation and filing of federal and state tax returns for many individuals and other taxpayers, and further for the payment or refund of taxes.

However, despite these technological advances, the potential for fully-automated tax reporting has not yet been realized for several reasons. First, at present, it is still necessary for individuals and other taxpayers to collect and save hard copies of, or otherwise record, all of the data and other information needed to compute their tax liability. This information includes: IRS Forms W-2 from their employers; IRS Forms 1099 from their banks; each mutual fund in which interests are held, each broker in respect of dividends, interest and gross brokerage proceeds, and other persons from whom payments are received; IRS Forms 1098 in respect of residential mortgage interest paid; and canceled checks or other acknowledgments from charitable organizations.

Second, to prepare a tax return individually, even if a taxpayer purchases tax preparation software, installs it in a computer, learns to use the tax preparation software (and the relevant substantive tax law necessary to navigate through the software), the taxpayer must manually enter the tax liability information into the computer. Alternatively, even if the taxpayer hires an individual accountant, or other tax return preparer, the taxpayer must deliver all of the hard copies of data and other tax liability information to the accountant, who, in turn, must manually enter this data information into a computer. For example, the process claimed in U.S. Pat. No. 5,193,057 to Longfield must occur in the offices of an authorized tax return preparer who must manually input the taxpayer's tax information into a data processing machine.

Third and finally, taxpayers, at present, must print out or receive back completed income tax returns, and manually write checks for ultimate tax liability and mail or have mailed the entire package to the relevant taxing authorities. In certain circumstances, as mentioned above, tax returns may be filed electronically, and payments may be made electronically or refunds may be received electronically. However, this ability to file electronically is used sparsely. See Internal Revenue Service, "IRS Concludes Successful Tax Season," (Press Release) (Apr. 17, 1997). Presumably, such sparse usage of the current electronic filing system is due to the laborious manual steps still required and that the modicum of automation offered by the current electronic filing system is not worth the effort to use it.

As a consequence of this manually intensive process, April 15 is a date of considerable concern to the U.S. individual taxpayer, not only because of the tax liability due on that day, but also because of the substantial time expenditures necessary to file annual federal, state, local, and foreign tax returns, even when the returns are prepared by a tax professional. For example, in fiscal 1995, U.S. taxpayers spent 5.3 billion hours fulfilling their tax responsibilities. See Jim McTague, "Auditing the IRS," Barron's 29 (Dec.

US 6,202,052 B1

3

23, 1996). For this reason, the federal income tax system has been the target of legislative proposals for substantial "simplification" that would reduce the reporting requirements of many taxpayers. However, in order to achieve this tax reporting simplification, the legislative proposals would generally make substantial alterations to the entire federal income tax system, with significant adverse consequences.

### SUMMARY OF THE INVENTION

It is an object of the present invention to eliminate many of the inconveniences associated with the filing of federal, state, local, and foreign income tax returns and the payment of any associated tax liability or receipt of tax refund in accordance with to the tax laws.

Another object of the present invention is to reduce error in and the cost associated with the filing of tax returns.

A further object of the present invention is to eliminate the need for hard copies of all or virtually all intermediate tax reporting forms, and thereby to realize savings in paper, time, and cost.

The above objects and advantages of the present invention are achieved by a method, an apparatus, and an article of manufacture for fully-automated tax reporting, payment, and refund. The method comprises: connecting electronically to tax data providers; collecting electronically tax data from the tax data providers; processing electronically the tax data collected electronically from the tax data providers to obtain processed tax data; preparing electronically an electronic tax return using the processed tax data; connecting electronically to taxing authorities; filing electronically the electronic tax return with the taxing authorities; connecting electronically to a financial institution; and paying or receiving electronically tax liability or refund, respectively, between the financial institution and the taxing authorities.

Further, the apparatus of the present invention comprises a general purpose computer programmed with software to operate the general purpose computer in accordance with the present invention. In particular, the apparatus comprises: means for connecting electronically to tax data providers; means for collecting electronically tax data from the tax data providers; means for processing electronically the tax data collected electronically from the tax data providers to obtain processed tax data; means for preparing electronically an electronic tax return using the processed tax data; means for connecting electronically to taxing authorities; means for filing electronically the electronic tax return with the taxing authorities; means for connecting electronically to a financial institution; and means for paying or receiving electronically tax liability or refund, respectively, between the financial institution and the taxing authorities.

Still further, the article of manufacture of the present invention comprises a computer-readable medium embodying a computer program. For the present invention, the computer-readable medium embodying the computer program comprises code segments to control a general purpose computer to perform the method of the present invention. Non-limiting examples of a "computer-readable medium" include a magnetic hard disk, a floppy disk, an optical disk, a magnetic tape, a memory chip, and a carrier wave used to carry electronic data, such as those used in transmitting and receiving electronic mail or in accessing an electronic data network, such as the Internet. Further, non-limiting examples of "code segments" include software, instructions, computer programs, or any means for controlling a general purpose computer.

In particular, the computer-readable medium embodying a computer program comprises code segments for: connect-

4

ing electronically to tax data providers; collecting electronically tax data from the tax data providers; processing electronically the tax data collected electronically from the tax data providers to obtain processed tax data; preparing electronically electronic tax returns using the processed tax data; connecting electronically to taxing authorities; filing electronically the electronic tax return with the taxing authorities; connecting electronically to a financial institution; and paying or receiving electronically tax liability or refund, respectively, between the financial institution and the taxing authorities.

Moreover, the above objects and advantages of the present invention are illustrative, and not exhaustive, of those which can be achieved by the present invention. Thus, these and other objects and advantages of the present invention will be apparent from the description herein or can be learned from practicing the invention, both as embodied herein and as modified in view of any variations which may be apparent to those skilled in the art.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates the procedure of the invention.

FIG. 2 illustrates the relationships of the invention.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring now to the accompanying drawings, wherein similar reference characters refer to similar reference parts throughout the drawings, FIGS. 1 and 2 depict the procedure used in the preferred embodiment for a method, an apparatus, and an article of manufacture for fully-automated tax reporting, payment, and refund.

In step 11, the taxpayer 20 provides the electronic intermediary 21 with information on tax data providers. As used hereinafter, the term "taxpayer" refers to an individual or other entity, such as a trust, estate, corporation, or partnership, who has tax liability or must file a tax return. The term "electronic intermediary" refers to a data processing system comprising a general purpose computer and a computer program, as described above, for performing the invention. The term "tax data provider" refers to each party that has tax information relevant to the taxpayer's tax liability or tax reporting obligations. Non-limiting examples of tax data providers include the taxpayer's employers 22, partnerships, banks 23, savings and loans institutions, mortgage institutions, credit card bureaus, thrift institutions, security brokerage firms 24, mutual fund holding institutions, charities 25, and federal, state, local, and foreign taxing authorities 27.

The information provided by the taxpayer to the electronic intermediary may include identification, such as the taxpayer's social security number, so that electronic data networks, such as the Internet, or electronic data bases may be searched by the electronic intermediary for the taxpayer's tax data. Alternatively, the taxpayer could specifically identify the tax data providers and could include information on how to contact the tax data providers electronically, if the electronic intermediary cannot automatically search for and locate the tax data providers. Additionally, the taxpayer can provide the electronic intermediary with authorization to contact and receive information from the tax data providers. Moreover, the taxpayer can provide the electronic intermediary with information concerning basic questions designed to identify special tax cases. For example, the taxpayer could be asked whether the taxpayer has donated money or other items to charities. If the taxpayer has donated, the electronic

US 6,202,052 B1

**5**

intermediary then notes that these charities need to be electronically contacted for collection of tax data.

The taxpayer can provide the electronic intermediary with the information on the tax data providers in a number of ways. For example, the electronic intermediary could prompt the taxpayer for the information, and the taxpayer could provide the information using an input means. Non-limiting examples of the input means include: a keyboard, a mouse, a microphone, and a telephone touch-tone pad. In FIG. 2, the communication between the taxpayer 20 and the electronic intermediary 21 is indicated by link 31. In the preferred embodiment, this link is an electronic link. Non-limiting examples of such an electronic link include: input means for a computer, a modem, telephone communication equipment, and an electronic data network, such as the Internet.

In the preferred embodiment of the invention, the taxpayer has control over the electronic intermediary. For example, the electronic intermediary could be a pre-packaged computer program embodied on a computer-readable medium available in a retail market. In this case, the taxpayer purchases the electronic intermediary from the retail market and installs the electronic intermediary on the taxpayer's general purpose computer. The taxpayer then provides the information on the tax data providers as well as other information to the electronic intermediary installed on the taxpayer's general purpose computer.

In an alternative embodiment of the present invention, the electronic intermediary is controlled by a tax return preparer institution, such as a professional tax preparation company, an accounting firm, or an individual accountant. In this embodiment, the tax return preparer is authorized by the taxpayer to collect, compute, prepare, and file the taxpayer's tax return, and to debit or credit the taxpayer's bank account for any tax liability or refund, respectively. The granting of the authorization by the taxpayer to the tax return preparer to perform these functions for the taxpayer can be implemented in a number of ways. Non-limiting examples of such a granting include: in person; through the mail; by facsimile; or electronically using a general purpose computer and a modem connected to a general purpose computer with a modem at the financial institution, and connected either through telephone communication equipment or an electronic data network, such as the Internet. Because the tax return preparer controls the electronic intermediary in this alternative embodiment, the tax return preparer ensures that the electronic intermediary receives the appropriate information required, such as the electronic location of the tax data providers, and information to determine whether the taxpayer has a special tax case.

In step 12, the electronic intermediary electronically collects tax data from the tax data providers using electronic links. The electronic intermediary connects electronically to each tax data provider that has tax data pertaining to the taxpayer using the electronic links. Referring to FIG. 2, the electronic intermediary 21 electronically connects to the taxpayer's employers 22 through electronic links 32, to the taxpayer's banks 23 through electronic links 33, to the taxpayer's brokerage firms 24 through electronic links 34, to the taxpayer's charities 25 through electronic links 35, to taxing authorities 27 through electronic links 37, and to the taxpayer's other tax data providers 26 through electronic links 36. FIG. 2 is illustrative, and the electronic intermediary 21 can connect electronically with and collect tax data electronically from other tax data providers, as discussed above in step 11.

In FIG. 2, the electronic links 32–37 can be provided in a number of ways. Non-limiting examples of electronic links

**6**

used to connect electronically the electronic intermediary and the tax data providers include: a general purpose computer electronically connected to telephone communication equipment using, for example, a modem or to an electronic data network, such as the Internet; or a computer-readable medium for transferring and receiving the tax data.

Non-limiting examples of the tax data electronically collected from the tax data providers include the following: a payroll statement, a bank statement, a savings and loan statement, a mortgage statement, a credit card bureau statement, a thrift institution statement, a brokerage account statement, a mutual fund statement, or a charity statement.

Alternatively, the electronic intermediary can connect electronically with the IRS, and receive the tax data from the IRS. In this alternative embodiment, the tax data providers have already provided the tax data to the IRS, and the electronic intermediary obtains the tax data from the IRS, and not the tax data providers. Further, the electronic intermediary can connect electronically with other taxing authorities possessing the taxpayer's tax data. In this case, the electronic intermediary receives the tax data from the taxing authorities instead of the tax data providers.

Hence, with the electronic collection of tax data as in step 12, the invention eliminates the current requirement that a taxpayer manually collect the tax data, eliminates the current requirement that a taxpayer manually enter such tax data onto a tax return or into a computer, and eliminates the need for all, or virtually all, intermediate hard copies of tax data, thereby saving paper, time, and cost.

In step 13, the electronic intermediary processes the tax data obtained electronically from the tax data providers in step 12. In the present invention, step 13 can be implemented using a computer program similar to the computer programs currently available in the market place, such as TurboTax, which is a registered trademark of Intuit, Inc. Although step 13 can be implemented with current technology, the current technology requires that the tax data and other information relevant to the taxpayer be inputted manually. With the present invention, this information is obtained as described above in steps 11 and 12.

Further, in step 13, the electronic intermediary processes the tax data by performing the appropriate tax computations. Non-limiting examples of appropriate tax computations include: addition, subtraction, multiplication, and division to determine the taxpayer's gross income, relevant deductions, net taxable income, and tax liability. As an illustration, the electronic intermediary compiles the home mortgage interest paid by the taxpayer and reported as tax data by the financial institutions to the electronic intermediary and determines the taxpayer's relevant deduction for the home mortgage interest paid to the financial institutions.

In step 14, the electronic intermediary prepares electronic tax returns using the processed tax data from step 13. Similar to step 13, step 14 can be implemented using current technology. In practicing the invention, the electronic tax returns are prepared with respect to the particular taxing authorities. For example, if the taxing authority is the IRS, the electronic tax return will correspond to the appropriate federal tax return, such as the Form 1040 or the Form 1040EZ.

In step 15, the electronic intermediary electronically files the electronic tax returns prepared in step 14 with the taxing authorities. Referring to FIG. 2, the electronic intermediary 21 electronically connects with the taxing authorities 27 using electronic link 37, and transmits the electronic tax forms to the taxing authorities 27 over the electronic links

US 6,202,052 B1

7

37. In practicing the invention, the taxing authority can be the IRS, or a state, local or foreign taxing authority.

In step 16, the electronic intermediary determines whether the taxpayer owes any taxes to each taxing authority. If the taxpayer does owe to a particular taxing authority, the process proceeds to step 17, and if the taxpayer does not owe and will receive a refund, the process proceeds to step 18. If the taxpayer neither owes nor is entitled to a refund, the process proceeds directly to step 19, which is not shown in FIG. 1.

In step 17, after determining in step 16 that the taxpayer owes taxes to a particular taxing authority, the electronic intermediary authorizes a financial institution to debit the taxpayer's account with the financial institution for the taxes owed and to transmit the funds to the taxing authority. Referring to FIG. 2, the electronic intermediary 21 electronically connects to a financial institution using an electronic link, such as one of the taxpayer's banks 23 using one of the electronic links 33. The electronic intermediary authorizes the taxpayer's bank, for example, to debit, or cause to be debited, the taxes owed from the taxpayer's bank account in the taxpayer's bank 23. Further, the electronic intermediary 21 authorizes the taxpayer's bank 23 through the electronic link 33 to transmit funds from the taxpayer's bank 23 to the taxing authority 27 over electronic link 38. Additionally, the electronic intermediary 21 can communicate this information to the taxing authority 27 using electronic link 37.

As an alternative to using the taxpayer's bank as a financial institution, the electronic intermediary can authorize any financial institution, which is able to connect electronically to the taxing authority, to debit the taxpayer's account with the financial institution and to transmit funds to the taxing authority for the amount owed by the taxpayer. Hence, in step 17, the electronic intermediary electronically authorizes the taxpayer's financial institution to pay the taxing authority the taxes owed from funds in the taxpayer's account.

In step 18, after determining in step 16 that the taxpayer does not owe taxes to a particular taxing authority and is entitled to a refund from the taxing authority, the electronic intermediary authorizes the taxing authority to credit the refund electronically to the taxpayer's account with a financial institution. Referring to FIG. 2, the electronic intermediary authorizes the taxing authority 27 over electronic link 37 to credit the taxpayer's financial institution using an electronic link, such as one of the taxpayer's banks 23 using electronic link 38. If the taxing authority is the IRS, this step can be accomplished using the Treasury Department's Automated Clearinghouse ("ACH") system. Similar technology can be used for implementing this step with respect to other taxing authorities. As an alternative to using the taxpayer's bank as the financial institution, the electronic intermediary can authorize the taxing authority to credit the taxpayer's refund to any financial institution which is able to connect electronically to the taxing authority. Hence, in step 18, the electronic intermediary electronically authorizes the taxing authority to credit the taxpayer's refund electronically to the taxpayer's financial institution.

In step 19, after the electronic intermediary authorizes the payment of the taxes owed in step 17 or the collection of the taxpayer's refund in step 18, the electronic intermediary electronically prepares a final report. The final report can be embodied in a number of ways, including electronically or on paper. Non-limiting examples of what the final report can include are the following: the tax data electronically

8

received from the tax data providers in step 12, the processed tax data from step 13, the electronic tax returns prepared in step 14, the data associated with the electronic filing of the taxpayer's tax returns in step 15, and the information associated with the payment of the taxpayer's tax liability in step 17 or the receipt of the taxpayer's refund in step 18.

In an alternative embodiment of the present invention, instead of the electronic intermediary preparing the tax returns in step 14, filing the tax returns in step 15, and either authorizing the payment of the taxes owed in step 17 or authorizing the receipt of the tax refund in step 18, the taxpayer can choose to do these steps manually. In this alternative embodiment, the electronic intermediary performs steps 11–14 and 19.

What is claimed is:

1. A method for automatic tax reporting by an electronic intermediary comprising:

   connecting electronically said electronic intermediary to a tax data provider;

   collecting electronically tax data from said tax data provider;

   processing electronically said tax data collected electronically from said tax data provider to obtain processed tax data;

   preparing electronically an electronic tax return using said processed tax data;

   connecting electronically said electronic intermediary to a taxing authority; and

   filing electronically said electronic tax return with said taxing authority.

2. The method for automatic tax reporting by an electronic intermediary as in claim 1, wherein said tax data provider is an employer, a partnership, a bank, a savings and loan institution, a mortgage institution, a credit card bureau, a thrift institution, a securities brokerage firm, a mutual fund holding institution, or a charity.

3. The method for automatic tax reporting by an electronic intermediary as in claim 1, wherein said tax data provider is said taxing authority.

4. The method for automatic tax reporting by an electronic intermediary as in claim 1, wherein said tax data provider is a second taxing authority.

5. The method for automatic tax reporting by an electronic intermediary as in claim 1, wherein said tax data provider is the United States Internal Revenue Service.

6. The method for automatic tax reporting by an electronic intermediary as in claim 1, wherein said tax data provider being electronically connected to said electronic intermediary using an electronic link.

7. The method for automatic tax reporting by an electronic intermediary as in claim 6, wherein said electronic link comprises telephone communication equipment.

8. The method for automatic tax reporting by an electronic intermediary as in claim 6, wherein said electronic link comprises an electronic data network.

9. The method for automatic tax reporting by an electronic intermediary as in claim 1, wherein said tax data provider being electronically connected to said electronic intermediary using a computer-readable medium.

10. The method for automatic tax reporting by an electronic intermediary as in claim 1, wherein said tax data is a payroll statement, a bank statement, a savings and loan statement, a mortgage statement, a credit card bureau statement, a thrift institution statement, a brokerage account statement, a mutual fund statement, or a charity statement.

US 6,202,052 B1

9

**11.** The method for automatic tax reporting by an electronic intermediary as in claim **1**, further comprising the steps of:

determining whether taxes are owed or to be refunded;

if taxes are owed, paying electronically said taxes owed; and

if taxes are to be refunded, receiving electronically a tax refund.

**12.** The method for automatic tax reporting by an electronic intermediary as in claim **11**, wherein the step of paying electronically said taxes owed comprises:

connecting electronically said electronic intermediary to a financial institution; and

authorizing said financial institution to pay said taxes owed.

**13.** The method for automatic tax reporting by an electronic intermediary as in claim **11**, wherein the step of receiving electronically said tax refund comprises:

connecting electronically said electronic intermediary to a financial institution; and

authorizing said taxing authority to credit said tax refund to said financial institution.

**14.** The method for automatic tax reporting by an electronic intermediary as in claim **1**, further comprising the step of preparing electronically a final report.

**15.** An apparatus for automatic tax reporting by an electronic intermediary comprising:

means for connecting electronically said electronic intermediary to a tax data provider;

means for collecting electronically tax data from said tax data provider;

means for processing electronically said tax data collected electronically from said tax data provider to obtain processed tax data;

means for preparing electronically an electronic tax return using said processed tax data;

means for connecting electronically said electronic intermediary to a taxing authority; and

means for filing electronically said electronic tax return with said taxing authority.

**16.** An apparatus for automatic tax reporting by an electronic intermediary as in claim **15**, wherein said means for

10

connecting electronically said electronic intermediary to said tax data provider comprises a modem.

**17.** An apparatus for automatic tax reporting by an electronic intermediary as in claim **15**, wherein said means for connecting electronically said electronic intermediary to said tax data provider comprises a computer-readable medium.

**18.** An apparatus for automatic tax reporting by an electronic intermediary as in claim **15**, wherein said means for connecting electronically said electronic intermediary to said tax data provider comprises an electronic data network.

**19.** A computer-readable medium embodying a computer program for automatic tax reporting by an electronic intermediary, said computer program comprising code segments for:

connecting electronically said electronic intermediary to a tax data provider;

collecting electronically tax data from said tax data provider;

processing electronically said tax data collected electronically from said tax data provider to obtain processed tax data;

preparing electronically an electronic tax return using said processed tax data;

connecting electronically said electronic intermediary with a taxing authority; and

filing electronically said electronic tax return to said taxing authority.

**20.** A method for automatic tax reporting by an electronic intermediary comprising:

connecting electronically said electronic intermediary to a tax data provider;

collecting electronically tax data from said tax data provider;

processing electronically said tax data collected electronically from said tax data provider to obtain processed tax data; and

preparing electronically an electronic tax return using said processed tax data.

\* \* \* \* \*

# EXHIBIT B



US006697787B1

(12) **United States Patent**
Miller

(10) Patent No.: **US 6,697,787 B1**
(45) Date of Patent: **Feb. 24, 2004**

(54) **SYSTEM FOR COLLECTING TAX DATA**

(75) Inventor: **David S. Miller**, New York, NY (US)

(73) Assignee: **Simplification, LLC**, New York, NY (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/776,707**

(22) Filed: **Feb. 6, 2001**

**Related U.S. Application Data**

(63) Continuation of application No. 09/073,027, filed on May 7, 1998, now Pat. No. 6,202,052.
(60) Provisional application No. 60/045,945, filed on May 8, 1997.

(51) Int. Cl.⁷ ................................................. G06F 17/60
(52) U.S. Cl. .......................... 705/31; 705/1; 705/35
(58) Field of Search ............................... 705/1, 19, 31, 705/35, 417; 700/419

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,554,418 A | | 11/1985 | Toy |
| 4,713,761 A | | 12/1987 | Sharpe et al. |
| 4,727,243 A | | 2/1988 | Savar |
| 4,890,228 A | * | 12/1989 | Longfield ..................... 705/35 |
| 4,961,158 A | | 10/1990 | Sussman |
| 4,970,655 A | * | 11/1990 | Winn et al. ................. 700/235 |
| 5,117,355 A | | 5/1992 | McCarthy |
| 5,138,549 A | * | 8/1992 | Bern ........................... 705/31 |
| 5,193,057 A | * | 3/1993 | Longfield ..................... 705/31 |
| 5,202,826 A | | 4/1993 | McCarthy |
| 5,287,268 A | | 2/1994 | McCarthy |
| 5,521,815 A | | 5/1996 | Rose, Jr. |

| | | | |
|---|---|---|---|
| 5,546,303 A | | 8/1996 | Helbling |
| 5,555,497 A | | 9/1996 | Helbling |
| 5,694,322 A | * | 12/1997 | Westerlage et al. ......... 705/417 |
| 5,706,442 A | | 1/1998 | Anderson et al. |
| 5,724,523 A | * | 3/1998 | Longfield ..................... 705/35 |
| 5,774,872 A | * | 6/1998 | Golden et al. ............... 705/19 |
| 5,802,511 A | | 9/1998 | Kouchi et al. |
| 6,023,694 A | | 2/2000 | Kouchi et al. |
| 6,026,392 A | | 2/2000 | Kouchi et al. |
| 6,131,115 A | | 10/2000 | Anderson et al. |
| 6,202,052 B1 | * | 3/2001 | Miller ......................... 705/31 |

OTHER PUBLICATIONS

Filing Govt. Statements Electronically, Harper, Robert M., Jr.; Hoffman, Michael J. R., Journal of Accounting & EDP, v2, n2, pp. 52–56, Summer 1986.*
Computers and the Tax Professional. Thronberry, Mary Beth, Malley, Jhon, C.; Wallace, William D., National Public Accountant, v32, n5, pp. 52–54, May 1987.*
Make Apr. 15 less taxing—Turbo Tax finds deductions even accountants miss., Middleton, Timothy, Computer Life, Mar. 1, 1995, v2, n3k, pp. 159–162, 3 pages.*
CA–Infopoint Combined Interest Reporting, Computer Associates International Inc., DR 01/90.*
J. McTague, "Auditing the IRS," Barrons, Dec. 23, 1996, pp. 1–9.

(List continued on next page.)

Primary Examiner—Tariq R. Hafiz
Assistant Examiner—M. Irshadullah
(74) Attorney, Agent, or Firm—Venable; Michael A. Sartori

(57) **ABSTRACT**

An electronic intermediary electronically connects with a tax data provider and collects electronically tax data from the tax data provider. The electronic intermediary processes the tax data collected electronically, and prepares an electronic tax return using the processed tax data.

**18 Claims, 2 Drawing Sheets**



US 6,697,787 B1
Page 2

OTHER PUBLICATIONS

Pam Thompson, "Quicken Deluxe", Oct. 23, 1997, pp. 1–4, www.macoobserver.com/reviews/quicken98.shtml.
Turbo Tax "What are the limitations of Quicken Taxlink?", May 14, 2001, pp. 1–2, www.intuit.com/support/turbotax/faqs/ty99/win/1169.html.
Service & Support, "Using TaxLink With ProSeries Products–Technical Tip", May 14, 2001, pp. 1–2, www.proseries.com/service_/support/1999/faqs/docs/10116.shtml.
Quicken, "How do I import QIF files into Quicken that I downloaded from my Financial Institution", May 14, 2001, pp. 1–2, www.intuit.com/support/quicken/faqs/win3/5176.html.
Quicken, "Exporting Quicken data", May 14, 2001, pp. 1–2, www.intuit.com/support/quicken/faqs/docs/w_export.html.
Quicken, "Exporting and Importing Quicken Data", 2000, pp. 1–2, www.intuit.com/support/quicken/faqs/docs/w_export–import.html.
"Using Community PC Banking and Quicken", May 14, 2001, pp. 1–2, www.communitybankssb.net/quicken.htm.
"PocketMoney to QIF Convertor–Home", v0.1–Jul. 28, 2000, pp. 1–2, http://pm2qif.sourceforge.net/
Crane (Crane Federal Credit Union's), "Common Cents", Apr. 2001, pp. 1–2, www.cranecu.org.
Information Concepts, Inc., "Fixed Price Software Development", May 17, 2001, p. 1, www.infoconcepts.com/v2/home.html.
"QIF Converter For Online Transactions", May 17, 2001, p. 1, www.etfcu.org/files/Readme.txt.
Chapter 6, "Downloading and Using QIF Files", pp. 53–56.
Voice, "General Voice Meeting from Aug. 6, 1997", p. 1, www.os2voice.org/logs/V080697.LOG.html.
Intuit, "Intuit Introduces Online Investment Tracking In Quicken 98", Mountain View, Calif. Sep. 15, 1997, pp. 1–2, www.intuit.com/corporate/press_release/091597c.html.
Microsoft, H&R Block Switches from Solaris/Oracle to Microsoft.Net Enterprise Servers, Improves Scalability and Performance, Mar. 2001, pp. 1–4, www.microsoft.com/.
H&R Block, "Archived Press Release", Apr. 26, 2001, pp. 1–6, www.hrblock.com/press_/relations/archives_pr.jsp.
H&R Block, "H&R Block Brings Its Nationwide Network Of Tax Professionals Online To Offer Complete Anytime, Anywhere, Any Way Tax Support", Kansas City, Mo., Apr. 26, 2001, pp. 1–3, www.hrblock.com/press_relations/content/pr_2001_04.html.
Microsoft Business, "An Open Standard for Tax Data Interchange Using TaxML", Jan. 22, 2001, p. 1, www.microsoft.com/BUSINESS/government/resources/taxml.asp.
Pricewaterhousecoopers, "Develop a Professional Business Plan", Sep. 28, 2000, pp. 1–2, www.microsoft.com/BUSINESS/ecommerce/build/pwc_develop.asp.
Microsoft Presspass, "Microsoft Adds Premium Content and Tools to Investor, Delivering Integrated, Comprehensive Service for Individual Investors", Redmond, Wash., Jun. 3, 1997, pp. 1–3, www.microsoft.com/PressPass/press/1997/Jun97/invst4pr.asp.
Cynthia Norman, Muir Software, Inc., "The Open Financial Exchange", pp. 1–6, www.ofx.net.
Intnit, "Intuit Partners With American Century Investments To Offer Online Investment Tracking Through Quicken", Mountain View, Calif., Jun. 22, 1998, pp. 1–2, www.intuit.com/corporate/press_release/062398.html.

Michael L. Schneider, "Banking on a New Internet Standard", Feb. 24, 1998, pp. 1–2, www.zdnet.com/products/content/pcmg/1704/277635.html.
"OFX Specification Version 1.5.1", Nov. 23, 1998, pp. 1–7, www.webiz.com/151html.
Intuit, Intuit, Top Technology Companies Team To Launch Intuit Osp Program, Mountain View, Calif., Nov. 16, 1999, pp. 1–6, www.ituit.com/corporate.press_releases/111699.html.
Open Financial Exchange, "Tax Forms", Apr. 19, 2001, p. 1, www.ofx.net/ofx/fi_taxforms.asp.
Intuit, "Award–Winning Turbotax For Business Offers Small Businesses Comprehensive Business–Specific Advice To File Their Taxes," San Diego, Jan. 13, 1998, pp. 1–5, www.intuit.com/corporate/press_releases/011398b.html.
Intuit, "Quicken TurboTax Debut For Tax Year 1999 Marks The Largest Retail Launch In Software Application History", San Diego, Dec. 7, 1999, pp. 1–4, www.intuit.com/corporate/press_release/120799a.html.
Simson L. Garfinkel, "Web Banking Comes of Age", Sep. 23, 1999, pp. 1–3, www.info–sec.com/commerce/99/commerce_100299a_j.shtml.
Intuit, "Quicken 98 QIF Converter Instructions", May 14, 2001, pp. 1–2, fi.intuit.com/quicken98/qifalert.cfm.
"Yahoo! Search Results for +.QIF", May 14, 2001, pp. 1–3, google.yahoo.com/bin/query?p=%2b.QIF&hc=0&hs=0.
CDC Federal Credit Union, "Instructions for Exporting Account History to Quicken Using Web Connect", May 14, 2001, pp. 1–2, www.cdcfedcu.com/info/IBShistoryexport.html.
Open Financial Exchange, "Information Concepts Offers Implementation and Migration Toolkit", Herdon, VA., Nov. 8, 1999, pp. 1–2, www.ofx.net/ofx/pressget.asp?id=41.
Open Financial Exchange, "Bits, Publishers of Open Financial Exchange and Gold Team Announce Timetable for the Publication of Converged Specification", Washington, Apr. 7, 1998, pp. 1–5, www.ofx.net/pressget.asp?id=17.
Open Financial Exchange, "Microsoft Money and Intelidata First to Certify End–To–End OFX Solution", Herdon, Mar. 5, 1998, pp. 1–3, www.ofx.net/ofx/pressget.asp?id=21.
Open Financial Exchange, "Banks, Brokerage and Technology Companies Collaborate to Guide Open Financial Exchange", Jun. 10, 1997, pp. 1–5, www.ofx.net/ofx/pressget.asp/id=3.
Robert Barker, "Quicken vs. Money: And the Winner Is . . .", Aug. 18, 2001, pp. 1–3, www.businessweek.com/bwdaily/dnflash/aug2000818_650.htm.
Danbury Area Computer Society, Inc., vol. 9, Issue 2, Feb. 1998, pp. 1–16, www.dacs.org.
Theresa W. Carey, "The best personal tax packages", May 14, 2001, pp. 1–3, coverage.cnet.com/Content/Reviews/Compare/Tax/index.html.
Cnet, "Electronic links of paperless taxes", May 14, 2001, pp. 1–2, coverage.cnet.com/Content/Reviews/Compare/Tax/ss1.html.
"Instructions for Downloading & Printing Statements", May 14, 2001, pp. 1–3, gateway.fundxpress.com/fibvw/instructions_downloads.htm.
"Feature Guide", May 14, 2001, pp. 1–2, manuals.sybase.com/onlinebooks/group–fs/fsg0110e/sfsfg/@Generic_BookText . . . / 32.
GnuCash User Manual, "Quicken QIF File Import", May 14, 2001, pp. 1–2, www.gnucash.org/docs/C/xacc–qif.html.

**US 6,697,787 B1**
Page 3

Open Financial Exchange, "Solution Provider Profiles", May 14, 2001, pp. 1–34, www.ofx.net/ofx/fi_prof.asp.

The Business Journal, "New tax-prep programs appeal to Quicken users", Jan. 31, 1997, pp. 1–2, portland.bcentral.com/portland/stories/1997/02/03/focus4.html.

Open Financial Exchange, "Intuit Canada and Microsoft Canada Create Open Financial Exchange", Jan. 20, 1997, pp. 1–4, www.ofx.net/ofx/pressget.asp?id=6.

Intuit, "Intuit's Turbotax Provides Expert Tax Advice And Filing Tips for Sweeping New Tax Laws", San Diego, CA, Dec. 1, 1997, pp. 1–4, www.intuit.com/company/press_releases/1997/12–01/html.

Cucug, "The Status Register", Oct. 1997, pp. 1–31, www.cucug.org/sr/sr9710.html.

Intuit, "Intuit and Microsoft Advance Financial Info Exchange on the Internet", Mountain View, CA, Dec. 8, 1999, pp. 1–3, www.intuit.com/company/press_releases/1999/12–08b.html.

Terri Stone, "The Tax Man Cometh", Dec. 23, 1997, pp. 2–3, www.computeruser.com/magazine/national/1525/news1525.html.

MacFixIt, "Nov. 1999–a Archive Late–Breakers", Nov. 1999, pp. 1–9, www.macfixit.com/archives/november.99.a.shtml.

Bill Gates, "Remarks by Bill Gates", Bellevue, WA, Mar. 26, 1997, pp. 1–17, www.microsoft.com/BillGates/Speeches/industry&tech/inarble.asp.

Open Financial Exchange, "Intelidata Certifies First End–to–End Open Financial Exchange Solution to Support Quicken®", Herndon, VA, Jun. 24, 1998, pp. 1–3, www.ofx.net/ofx/pressget.asp?id=22.

Talk City, "Wingspan Bank Presents Bill Wallace, Executive Vice President and Chief Information Officer Wingspan-Bank.com", Nov. 16, 1999, pp. 1–2, www.talkcity.com/transcripts/WingspanBank/11–16–1999.1–1.htmpl.

Talk City, "Wingspan Bank Presents Bill Wallace, Executive Vice President and Chief Information Officer Wingspan-Bank.com", Nov. 16, 1999, pp. 1–2, www.talkcity.com/transcripts/WingspanBank/11–16–1999.1–2.htmpl.

Tom Negrino, "Quicken Deluxe 6", MacWorld Reviews, Feb. 1996, pp. 1–3, www.macworld.com/1996/02/reviews/1851.html.

"Microsoft Online–Banking Strategy Gains Wide Industry Support", May 8, 1996, pp. 1–2, www.microsoft.com/Press-Pass/press/1996/may96/hmbankpr.asp.

"Intuit Will Create Comprehensive Framework For Financial Data Exchange Using The Internet", Sep. 16, 1996, pp. 1–4, www.intuit.com/corporate/press_releases/091696.html.

"OpenExchange", Sep. 16, 1996, pp. 1–11, www.intuit.com/corporate/press_releases/091696_white_paper.html.

"Microsoft Delivers Open Internet Banking Solutions Today", Sep. 30, 1996, pp. 1–4, www.microsoft.com/Press-Pass/press/1996/sept96/INETBKPR.asp.

"Microsoft Announces Availability of Active Statement Technology For Microsoft Money 97", Nov. 18, 1996, pp. 1–3, www.microsoft.com/PressPass/press/1996/Nov96/money97.asp.

"Intuit, Microsoft and Checkfree Create Open Financial Exchange", Jan. 16, 1997, pp. 1–6, www.intuit.com/corporate/press_releases/011697.html.

"Intuit Makes Tax Preparation Software Available Free On The Internet", Jan. 27, 1997, pp. 1–2, www.intuit.com/corporate/press_releases/012797.html.

"Confusing Tax Lingo Delays Americans From Filing", Feb. 3, 1997, pp. 1–2, www.intuit.com/corporate/press_releases/020397.html.

"Open Financial Exchange Winning Broad Support From Financial Services And Technology Companies", Feb. 19, 1997, pp. 1–3, www.intuit.com/corporate/press_releases/021997.html.

"Open Financial Exchange—About OFX", 1 page, www.ofx.net/ofx/ab_main.asp.

Screenshots from the electronic publication, TaxCut 1994 Filing Edition, distributed via floppy.

Electronic publication entitled "TaxCut 1995 Filing Edition", distributed via 4 3/5 floppy disks, copyright 1995–96.

Screenshots from the electronic publication, Tax Cut 1995 Filing Edition, distributed via 4 3/5 floppy disks, copyright 1995–96.

Cover of box from distribution of electronic publication, Tax Cut 1995 filing Edition, copyright 1996.

Kiplinger TaxCut User Guide for the 1995 Tax Season, copyright 1995.

Printout of selected portions of the Help file from the electronic publication, TaxCut 1995 Filing Edition, distributed via 4 3.5 floppy disks, copyrighted 1995–96.

Electronic publication entitled "TaxCut 1996 Filing Edition", distributed via 4/3/5 floppy disks, copyright 1996–97.

Screenshots from the electronic publication, Tax Cut 1996 Filing Edition, distributed via 4 3.5 floppy disks, copyright 1996–97.

Cover of box from distribution of electronic publication, Tax Cut 1996 Filing Edition, copyright 1997.

Intuit Press Release of Jan. 30, 1996, entitled *"Intuit Announces 15 More Financial Institutions To Deliver Online Banking"*.

Intuit Press Release of Dec. 17, 1996, entitled *"More Small Businesses Find Success As They Go Online"*.

Microsoft Press Release of Nov. 18, 1996, entitled *"Microsoft Announces Availability of Active Statement Technology For Microsoft Money 97"*.

"Taxing Matters: Updating Technology at the Internal Revenue Service", Wassin, J.; vol. 7, Issue 2, *EDI Forum* (1994) pp. 59–63 (ISSN: 1048–3047).

"State Tax Reporting Via the Electronic Highway", Lyon, J.; vol. 6, Issue 3, *EDI Forum*, (1993) pp. 30–35 (ISSN: 1048–3047).

"This Just In Getting Back to Business: Tax Prep Software Doesn't Add Up To 1040: Expect More For the Money from 1065, 1120, and 1120S Business Tax Software This Season.", Cohn, M.; *Accounting Technology*, (Jan. 1996) pp. 29–39.

Kiplinger TaxCut Quick Start Guide; Filing Edition–Tax Year 1996.

* cited by examiner



Fig. 1



Fig. 2

US 6,697,787 B1

1

## SYSTEM FOR COLLECTING TAX DATA

This application claims the priority of U.S. Provisional Patent Application Ser. No. 60/045,945, filed May 8, 1997, and a continuation of U.S. patent application Ser. No. 09/073,027, filed May 7, 1998, now U.S. Pat No. 6,202,052.

## BACKGROUND OF THE INVENTION

The invention relates generally to collecting, processing, compiling, and distributing information and data. More specifically, the invention relates to a method, an apparatus, and an article of manufacture for automated tax reporting, payment, and refund.

In recent years, an increasing amount of data and other information necessary to compute the federal, state, local, and foreign income tax liability of individual taxpayers and other taxpayers, including certain trusts, estates, corporations and partnerships, is available electronically and capable of being transmitted over telephone communication equipment or other electronic means to the taxpayer or the taxpayer's agent or representative. For example, payroll, bank statement, residential mortgage payment, and brokerage and mutual fund account information is prepared almost entirely on computers, and is capable of being transmitted electronically in standardized or other readable format. In addition, for data that is necessary to compute a taxpayer's liability hut that may not at present be regularly transmitted to the taxpayer, such as the amount of donations made to charitable organizations, the information is generally entered into, and processed by, computers and could easily be transmitted to the taxpayer or the taxpayer's agent electronically using telephone communication equipment, by modem, or through the Internet. Thus, substantially all of the information necessary to compute most individuals' and many other taxpayers' income tax liability is readily available and capable of being transmitted electronically.

In addition, tax return preparation has become increasingly automated. Several computer programs are available for individual taxpayers to compute their federal income tax liability and generate completed tax returns (such as TurboTax, which is a registered trademark of Intuit, Inc.). Further, tax return professionals, who prepare over forty-nine percent of individual tax returns, routinely process the tax returns of millions of individuals and other taxpayers on computers with automated software. See Jim McTague, "Auditing the IRS," Barron's 29 (Dec. 23, 1996); Internal Revenue Service, 1995 Data Book 3 (July 1996).

Moreover, few legal interpretational issues or methodology variations exist with respect to the income tax liability of individuals and other taxpayers whose taxable income, gain, loss, and deduction consist substantially of wages, interest, dividends, capital gains and losses, residential mortgage interest, state and local taxes, and other similar typical items. For taxpayers whose income tax liability consists substantially of these items, as is the case with many or most U.S. individual taxpayers, computation of income tax liability is generally a routine matter of collecting the relevant data, processing it, reflecting the data and ultimate calculations on the proper form or forms, and transmitting or otherwise sending the forms to the relevant taxing authorities.

Finally, taxing authorities have increasingly automated the tax collecting and return filing process. The U.S. Internal Revenue Service ("IRS") permits in certain situations the electronic filing of tax returns and the payment and refund of income taxes through electronic money transfers. For

2

example, in 1997, thirteen million returns were filed electronically, and 4.2 million Form 1040EZ returns were filed by touch-tone phone. However, even with the ability to electronically file, less than 18% of all tax returns were filed electronically by Apr. 11, 1997. See Internal Revenue Service, "IRS Concludes Successful Tax Season" (Press Release) (Apr. 17, 1997). As a further example, U.S. Pat. No. 5,193,057 to Longfield shows a process for expediting tax refund payments through the use of a loan by an authorized financial institution. Accordingly, few technological, legal, or practical obstacles exist for the fully automated preparation and filing of federal and state tax returns for many individuals and other taxpayers, and further for the payment or refund of taxes.

However, despite these technological advances, the potential for fully-automated tax reporting has not yet been realized for several reasons. First, at present, it is still necessary for individuals and other taxpayers to collect and save hard copies of, or otherwise record, all of the data and other information needed to compute their tax liability. This information includes: IRS Forms W-2 from their employers; IRS Forms 1099 from their banks; each mutual fund in which interests are held, each broker in respect of dividends, interest and gross brokerage proceeds, and other persons from whom payments are received; IRS Forms 1098 in respect of residential mortgage interest paid; and canceled checks or other acknowledgments from charitable organizations.

Second, to prepare a tax return individually, even if a taxpayer purchases tax preparation software, installs it in a computer, learns to use the tax preparation software (and the relevant substantive tax law necessary to navigate through the software), the taxpayer must manually enter the tax liability information into the computer. Alternatively, even if the taxpayer hires an individual accountant, or other tax-return preparer, the taxpayer must deliver all of the hard copies of data and other tax liability information to the accountant, who, in turn, must manually enter this data information into a computer. For example, the process claimed in U.S. Pat. No. 5,193,057 to Longfield must occur in the offices of an authorized tax return preparer who must manually input the taxpayer's tax information into a data processing machine.

Third and finally, taxpayers, at present, must print out or receive back completed income tax returns, and manually write checks for ultimate tax liability and mail or have mailed the entire package to the relevant taxing authorities. In certain circumstances, as mentioned above, tax returns may be filed electronically, and payments may be made electronically or refunds may be received electronically. However, this ability to file electronically is used sparsely. See Internal Revenue Service, "IRS Concludes Successful Tax Season," (Press Release) (Apr. 17, 1997). Presumably, such sparse usage of the current electronic filing system is due to the laborious manual steps still required and that the modicum of automation offered by the current electronic filing system is not worth the effort to use it.

As a consequence of this manually intensive process, April 15 is a date of considerable concern to the U.S. individual taxpayer, not only because of the tax liability due on that day, but also because of the substantial time expenditures necessary to file annual federal, state, local, and foreign tax returns, even when the returns are prepared by a tax professional. For example, in fiscal 1995, U.S. taxpayers spent 5.3 billion hours fulfilling their tax responsibilities. See Jim McTague, "Auditing the IRS," Barron's 29 (Dec. 23, 1996). For this reason, the federal income tax system has

US 6,697,787 B1

3

been the target of legislative proposals for substantial "simplification" that would reduce the reporting requirements of many taxpayers. However, in order to achieve this tax reporting simplification, the legislative proposals would generally make substantial alterations to the entire federal income tax system, with significant adverse consequences.

## SUMMARY OF THE INVENTION

It is an object of the present invention to eliminate many of the inconveniences associated with the filing of federal, state, local, and foreign income tax returns and the payment of any associated tax liability or receipt of tax refund in accordance with to the tax laws.

Another object of the present invention is to reduce error in and the cost associated with the filing of tax returns.

A further object of the present invention is to eliminate the need for hard copies of all or virtually all intermediate tax reporting forms, and thereby to realize savings in paper, time, and cost.

The above objects and advantages of the present invention are achieved by a method, an apparatus, and an article of manufacture for fully-automated tax reporting, payment, and refund. The method comprises: connecting electronically to tax data providers; collecting electronically tax data from the tax data providers; processing electronically the tax data collected electronically from the tax data providers to obtain processed tax data; preparing electronically an electronic tax return using the processed tax data; connecting electronically to taxing authorities; filing electronically the electronic tax return with the taxing authorities; connecting electronically to a financial institution; and paying or receiving electronically tax liability or refund, respectively, between the financial institution and the taxing authorities.

Further, the apparatus of the present invention comprises a general purpose computer programmed with software to operate the general purpose computer in accordance with the present invention. In particular, the apparatus comprises: means for connecting electronically to tax data providers; means for collecting electronically tax data from the tax data providers; means for processing electronically the tax data collected electronically from the tax data providers to obtain processed tax data; means for preparing electronically an electronic tax return using the processed tax data; means for connecting electronically to taxing authorities; means for filing electronically the electronic tax return with the taxing authorities; means for connecting electronically to a financial institution; and means for paying or receiving electronically tax liability or refund, respectively, between the financial institution and the taxing authorities.

Still further, the article of manufacture of the present invention comprises a computer-readable medium embodying a computer program. For the present invention, the computer-readable medium embodying the computer program comprises code segments to control a general purpose computer to perform the method of the present invention. Non-limiting examples of a "computer-readable medium" include a magnetic hard disk, a floppy disk, an optical disk, a magnetic tape, a memory chip, and a carrier wave used to carry electronic data, such as those used in transmitting and receiving electronic mail or in accessing an electronic data network, such as the Internet. Further, non-limiting examples of "code segments" include software, instructions, computer programs, or any means for controlling a general purpose computer.

In particular, the computer-readable medium embodying a computer program comprises code segments for: connect-

4

ing electronically to tax data providers; collecting electronically tax data from the tax data providers; processing electronically the tax data collected electronically from the tax data providers to obtain processed tax data; preparing electronically electronic tax returns using the processed tax data; connecting electronically to taxing authorities; filing electronically the electronic tax return with the taxing authorities; connecting electronically to a financial institution; and paying or receiving electronically tax liability or refund, respectively, between the financial institution and the taxing authorities.

Moreover, the above objects and advantages of the present invention are illustrative, and not exhaustive, of those which can be achieved by the present invention. Thus, these and other objects and advantages of the present invention will be apparent from the description herein or can be learned from practicing the invention, both as embodied herein and as modified in view of any variations which may be apparent to those skilled in the art.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates the procedure of the invention.

FIG. 2 illustrates the relationships of the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring now to the accompanying drawings, wherein similar reference characters refer to similar reference parts throughout the drawings, FIGS. 1 and 2 depict the procedure used in the preferred embodiment for a method, an apparatus, and an article of manufacture for fully-automated tax reporting, payment, and refund.

In step 11, the taxpayer 20 provides the electronic intermediary 21 with information on tax data providers. As used hereinafter, the term "taxpayer" refers to an individual or other entity, such as a trust, estate, corporation, or partnership, who has tax liability or must file a tax return. The term "electronic intermediary" refers to a data processing system comprising a general purpose computer and a computer program, as described above, for performing the invention. The term "tax data provider" refers to each party that has tax information relevant to the taxpayer's liability or tax reporting obligations. Non-limiting examples of tax data providers include the taxpayer's employers 22, partnerships, banks 23, savings and loans institutions, mortgage institutions, credit card bureaus, thrift institutions, security brokerage firms 24, mutual fund holding institutions, charities 25, and federal, state, local, and foreign taxing authorities 27.

The information provided by the taxpayer to the electronic intermediary may include identification, such as the taxpayer's social security number, so that electronic data networks, such as the Internet, or electronic data bases may be searched by the electronic intermediary for the taxpayer's tax data. Alternatively, the taxpayer could specifically identify the tax data providers and could include information on how to contact the tax data providers electronically, if the electronic intermediary cannot automatically search for and locate the tax data providers. Additionally, the taxpayer can provide the electronic intermediary with authorization to contact and receive information from the tax data providers. Moreover, the taxpayer can provide the electronic intermediary with information concerning basic questions designed to identify special tax cases. For example, the taxpayer could be asked whether the taxpayer has donated money or other items to charities. If the taxpayer has donated, the electronic

US 6,697,787 B1

5

6

intermediary then notes that these charities need to be electronically contacted for collection of tax data.

The taxpayer can provide the electronic intermediary with the information on the tax data providers in a number of ways. For example, the electronic intermediary could prompt the taxpayer for the information, and the taxpayer could provide the information using an input means. Non-limiting examples of the input means include: a keyboard, a mouse, a microphone, and a telephone touch-tone pad. In FIG. 2, the communication between the taxpayer 20 and the electronic intermediary 21 is indicated by link 31. In the preferred embodiment, this link is an electronic link. Non-limiting examples of such an electronic link include: input means for a computer, a modem, telephone communication equipment, and an electronic data network, such as the Internet.

In the preferred embodiment of the invention, the taxpayer has control over the electronic intermediary. For example, the electronic intermediary could be a pre-packaged computer program embodied on a computer-readable medium available in a retail market. In this case, the taxpayer purchases the electronic intermediary from the retail market and installs the electronic intermediary on the taxpayer's general purpose computer. The taxpayer then provides the information on the tax data providers as well as other information to the electronic intermediary installed on the taxpayer's general purpose computer.

In an alternative embodiment of the present invention, the electronic intermediary is controlled by a tax return preparer institution, such as a professional tax preparation company, an accounting firm, or an individual accountant. In this embodiment, the tax return preparer is authorized by the taxpayer to collect, compute, prepare, and file the taxpayer's tax return, and to debit or credit the taxpayer's bank account for any tax liability or refund, respectively. The granting of the authorization by the taxpayer to the tax return preparer to perform these functions for the taxpayer can be implemented in a number of ways. Non-limiting examples of such a granting include: in person; through the mail; by facsimile; or electronically using a general purpose computer and a modem connected to a general purpose computer with a modem at the financial institution, and connected either through telephone communication equipment or an electronic data network, such as the Internet. Because the tax return preparer controls the electronic intermediary in this alternative embodiment, the tax return preparer ensures that the electronic intermediary receives the appropriate information required, such as the electronic location of the tax data providers, and information to determine whether the taxpayer has a special tax case.

In step 12, the electronic intermediary electronically collects tax data from the tax data providers using electronic links. The electronic intermediary connects electronically to each tax data provider that has tax data pertaining to the taxpayer using the electronic links. Referring to FIG. 2, the electronic intermediary 21 electronically connects to the taxpayer's employers 22 through electronic links 32, to the taxpayer's banks 23 through electronic links 33, to the taxpayer's brokerage firms 24 through electronic links 34, to the taxpayer's charities 25 through electronic links 35, to taxing authorities 27 through electronic links 37, and to the taxpayer's other tax data providers 26 through electronic links 36. FIG. 2 is illustrative, and the electronic intermediary 21 can connect electronically with and collect tax data electronically from other tax data providers, as discussed above in step 11.

In FIG. 2, the electronic links 32–37 can be provided in a number of ways. Non-limiting examples of electronic links

used to connect electronically the electronic intermediary and the tax data providers include: a general purpose computer electronically connected to telephone communication equipment using, for example, a modem or to an electronic data network, such as the Internet; or a computer-readable medium for transferring and receiving the tax data.

Non-limiting examples of the tax data electronically collected from the tax data providers include the following: a payroll statement, a bank statement, a savings and loan statement, a mortgage statement, a credit card bureau statement, a thrift institution statement, a brokerage account statement, a mutual fund statement, or a charity statement.

Alternatively, the electronic intermediary can connect electronically with the IRS, and receive the tax data from the IRS. In this alternative embodiment, the tax data providers have already provided the tax data to the IRS, and the electronic intermediary obtains the tax data from the IRS, and not the tax data providers. Further, the electronic intermediary can connect electronically with other taxing authorities possessing the taxpayer's tax data. In this case, the electronic intermediary receives the tax data from the taxing authorities instead of the tax data providers.

Hence, with the electronic collection of tax data as in step 12, the invention eliminates the current requirement that a taxpayer manually collect the tax data, eliminates the current requirement that a taxpayer manually enter such tax data onto a tax return or into a computer, and eliminates the need for all, or virtually all, intermediate hard copies of tax data, thereby saving paper, time, and cost.

In step 13, the electronic intermediary processes the tax data obtained electronically from the tax data providers in step 12. In the present invention, step 13 can be implemented using a computer program similar to the computer programs currently available in the market place, such as TurboTax, which is a registered trademark of Intuit, Inc. Although step 13 can be implemented with current technology, the current technology requires that the tax data and other information relevant to the taxpayer be inputted manually. With the present invention, this information is obtained as described above in steps 11 and 12.

Further, in step 13, the electronic intermediary processes the tax data by performing the appropriate tax computations. Non-limiting examples of appropriate tax computations include: addition, subtraction, multiplication, and division to determine the taxpayer's gross income, relevant deductions, net taxable income, and tax liability. As an illustration, the electronic intermediary compiles the home mortgage interest paid by the taxpayer and reported as tax data by the financial institutions to the electronic intermediary and determines the taxpayer's relevant deduction for the home mortgage interest paid to the financial institutions.

In step 14, the electronic intermediary prepares electronic tax returns using the processed tax data from step 13. Similar to step 13, step 14 can be implemented using current technology. In practicing the invention, the electronic tax returns are prepared with respect to the particular taxing authorities. For example, if the taxing authority is the IRS, the electronic tax return will correspond to the appropriate federal tax return, such as the Form 1040 or the Form 1040EZ.

In step 15, the electronic intermediary electronically files the electronic tax returns prepared in step 14 with the taxing authorities. Referring to FIG. 2, the electronic intermediary 21 electronically connects with the taxing authorities 27 using electronic link 37, and transmits the electronic tax forms to the taxing authorities 27 over the electronic links

US 6,697,787 B1

7

37. In practicing the invention, the taxing authority can be the IRS, or a state, local or foreign taxing authority.

In step 16, the electronic intermediary determines whether the taxpayer owes any taxes to each taxing authority. If the taxpayer does owe to a particular taxing authority, the process proceeds to step 17, and if the taxpayer does not owe and will receive a refund, the process proceeds to step 18. If the taxpayer neither owes nor is entitled to a refund, the process proceeds directly to step 19, which is not shown in FIG. 1.

In step 17, after determining in step 16 that the taxpayer owes taxes to a particular taxing authority, the electronic intermediary authorizes a financial institution to debit the taxpayer's account with the financial institution for the taxes owed and to transmit the funds to the taxing authority. Referring to FIG. 2, the electronic intermediary 21 electronically connects to a financial institution using an electronic link, such as one of the taxpayer's banks 23 using one of the electronic links 33. The electronic intermediary authorizes the taxpayer's bank, for example, to debit, or cause to be debited, the taxes owed from the taxpayer's bank account in the taxpayer's bank 23. Further, the electronic intermediary 21 authorizes the taxpayer's bank 23 through the electronic link 33 to transmit funds from the taxpayer's bank 23 to the taxing authority 27 over electronic link 38. Additionally, the electronic intermediary 21 can communicate this information to the taxing authority 27 using electronic link 37.

As an alternative to using the taxpayer's bank as a financial institution, the electronic intermediary can authorize any financial institution, which is able to connect electronically to the taxing authority, to debit the taxpayer's account with the financial institution and to transmit funds to the taxing authority for the amount owed by the taxpayer. Hence, in step 17, the electronic intermediary electronically authorizes the taxpayer's financial institution to pay the taxing authority the taxes owed from funds in the taxpayer's account.

In step 18, after determining in step 16 that the taxpayer does not owe taxes to a particular taxing authority and is entitled to a refund from the taxing authority, the electronic intermediary authorizes the taxing authority to credit the refund electronically to the taxpayer's account with a financial institution. Referring to FIG. 2, the electronic intermediary authorizes the taxing authority 27 over electronic link 37 to credit the taxpayer's financial institution using an electronic link, such as one of the taxpayer's banks 23 using electronic link 38. If the taxing authority is the IRS, this step can be accomplished using the Treasury Department's Automated Clearinghouse ("ACH") system. Similar technology can be used for implementing this step with respect to other taxing authorities. As an alternative to using the taxpayer's bank as the financial institution, the electronic intermediary can authorize the taxing authority to credit the taxpayer's refund to any financial institution which is able to connect electronically to the taxing authority. Hence, in step 18, the electronic intermediary electronically authorizes the taxing authority to credit the taxpayer's refund electronically to the taxpayer's financial institution.

In step 19, after the electronic intermediary authorizes the payment of the taxes owed in step 17 or the collection of the taxpayer's refund in step 18, the electronic intermediary electronically prepares a final report. The final report can be embodied in a number of ways, including electronically or on paper. Non-limiting examples of what the final report can include are the following: the tax data electronically

8

received from the tax data providers in step 12, the processed tax data from step 13, the electronic tax returns prepared in step 14, the data associated with the electronic filing of the taxpayer's tax returns in step 15, and the information associated with the payment of the taxpayer's tax liability in step 17 or the receipt of the taxpayer's refund in step 18.

In an alternative embodiment of the present invention, instead of the electronic intermediary preparing the tax returns in step 14, filing the tax returns in step 15, and either authorizing the payment of the taxes owed in step 17 or authorizing the receipt of the tax refund in step 18, the taxpayer can choose to do these steps manually. In this alternative embodiment, the electronic intermediary performs steps 11–14 and 19.

What is claimed is:

1. An apparatus for collecting tax data comprising:

means for connecting electronically an electronic intermediary to a tax data provider;

means for collecting electronically tax data from said tax data provider;

means for processing electronically said tax data collected from said tax data provider to obtain processed tax data; and

means for preparing electronically an electronic tax return using said processed tax data.

2. An apparatus as in claim 1, wherein said means for connecting electronically an electronic intermediary to a tax data provider uses an electronic link, and wherein means for collecting electronically tax data from said tax data provider uses an electronic link.

3. An apparatus as in claim 2, wherein said electronic link is an electronic data network.

4. An apparatus as in claim 3, wherein said electronic data network is the Internet.

5. An apparatus as in claim 1, wherein said tax data provider is an employer, a partnership, a bank, a savings and loan institution, a mortgage institution, a credit card bureau, a thrift institution, a securities brokerage firm, a mutual fund holding institution, or a charity.

6. An apparatus as in claim 1, wherein said tax data is reported on an Internal Revenue Service ("IRS"), state, local, or foreign tax form.

7. An apparatus as in claim 6, wherein said form is an IRS Form W-2.

8. An apparatus as in claim 6, wherein said form is an IRS Form 1099.

9. An apparatus as in claim 6, wherein said form is an IRS Form 1098.

10. A computer-readable medium embodying a computer program for collecting tax data, said computer program comprising code segments for:

connecting electronically an electronic intermediary to a tax data provider;

collecting electronically tax data from said tax data provider;

processing electronically said tax data collected from said tax data provider to obtain processed tax data; and

preparing electronically an electronic tax return using said processed tax data.

11. A computer-readable medium as in claim 10, wherein said tax data is reported on an Internal Revenue Service ("IRS"), state, local, or foreign tax form.

12. A computer-readable medium as in claim 11, wherein said form is an IRS Form W-2.

US 6,697,787 B1

9

10

13. A computer-readable medium as in claim 11, wherein said form is an IRS Form 1099.

14. A computer-readable medium as in claim 11, wherein said form is an IRS Form 1098.

15. A method for automatic tax data collecting by an electronic intermediary comprising:

connecting electronically said electronic intermediary to a tax data provider;

collecting electronically tax data from said tax data provider, wherein said tax data is reported on an Internal Revenue Service ("IRS"), state, local, or foreign tax form;

processing electronically said tax data collected electronically from said tax data provider to obtain processed tax data; and

preparing electronically an electronic tax return using said processed tax data.

16. A method as in claim 15, wherein said form is an IRS Form W-2.

17. A method as in claim 15, wherein said form is an IRS Form 1099.

18. A method as in claim 15, wherein said form is an IRS Form 1098.

* * * * *

EXHIBIT C

RECEIVED

AUG 0 2 2007

The opinion in support of the decision being entered today was *not* written
for publication and is *not* binding precedent of the Board.

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

*Ex parte* SIMPLIFICATION, LLC

Appeal 2007-0712
Reexamination Control 90/006,713[1]
Patent 6,202,052
Technology Center 3600

Decided: July 31, 2007

Before  JAMESON LEE, SALLY C. MEDLEY, and JAMES T. MOORE,
*Administrative Patent Judges.*

MEDLEY, *Administrative Patent Judge.*

## DECISION ON APPEAL

### A.  Statement of the Case

This appeal under 35 U.S.C. §§ 134 and 306 is from a final rejection
of claims 1-20 and 29-36.  We have jurisdiction under 35 U.S.C. § 6(b).

The prior art relied upon by the Examiner in rejecting the claims on

---

1   Application filed 11 July 2003.

STANDLEY LAW GROUP LLP
Received for Docketing
Date:

Appeal 2007-0712
Application 90/006,713

appeal is:

Scott Beamer, *A Marriage of Convenience. (MacInTax, MacMoney, and Dollars & Sense for tax preparation and planning)*, MacUser, v3, n3, p102(4) (March 1987).

*It's W-2 Time – But This Year There's a Better Way to Do your Taxes*, PR Newswire, (February 1987).

Laura Lou Meadows, *Faster refunds with electronic filing: computerizing your relationship with the IRS*, PC Magazine, v9, n4, p388(2) (February 1990).

*Electronic tax payment through TAXLINK discussed in IRS procedure, standard Federal Tax Reports,* Taxes on Parade, v80, n25, p4 (June 1993).

Claims 29-36 stand rejected under 35 U.S.C. § 112, first paragraph, as failing to comply with the written description requirement.

Claims 29-36 stand rejected under 35 U.S.C. § 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

Claims 1, 2, 6, 8-10, 14, 15, 17-20 and 29-36 stand rejected under 35 U.S.C. § 102(b) as being anticipated by Beamer as further supported by "It's W-2 Time."

Claims 3-5, 7 and 16 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Beamer and further in view of "It's W-2 Time."

Claims 11-13 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Beamer, "It's W-2 Time", Meadows and "Electronic Tax Payment Through TAXLINK Discussed in IRS Procedure."

Appeal 2007-0712
Application 90/006,713

### *The Invention*

The invention relates to a system and method for collecting, processing and reporting tax data. A tax payer provides information to an electronic intermediary. The information provided may include, for example, the tax payer's social security number, so that the electronic intermediary may electronically search databases for the tax payer's tax data (Specification col. 4:51-56). Alternatively, the tax payer may provide account access information to the electronic intermediary so that the electronic intermediary may electronically contact and collect from tax data providers the tax payer's tax data (Specification col. 4:56-62).

The electronic intermediary electronically processes the collected tax data to determine the tax payer's tax liability. The electronic intermediary prepares a tax return using the processed data, connects to a taxing authority and files a tax return with the taxing authority.

### *Procedural Posture and Related Proceedings*

On 8 April 2003, patentee (hereafter "Simplification"), the real party in interest of U.S. patent 6,202,052 ('052) filed a patent infringement action against Block Financial Corporation ("Block") in the United States District Court for the District of Delaware based on '052. On 11 July 2003, Block requested reexamination of '052. Reexamination was granted on 2 October 2003. The civil case was stayed pending the reexamination. Simplification appealed under 35 U.S.C. §§ 134 and 306 from a final rejection of claims 1-20 and 29-36. The appeal is the subject of this decision.

3

Appeal 2007-0712
Application 90/006,713

On 24 February 2004, Simplification filed a patent infringement action against Block in the United States District Court for the District of Delaware based on U.S. Patent 6,697,787 ('787), which is a child of the involved reexamination application. On 15 March 2004, Block requested reexamination of the '787 patent, which reexamination was granted on 3 June 2004. The civil action was stayed pending the reexamination. Simplification appealed from a final rejection in that case, which is also before us and is decided in a separate, concurrently mailed paper.

**B. Issue**

1) The first issue before us is whether the Examiner has sufficiently demonstrated that claims 29-36 are unpatentable under the written description requirement of 35 U.S.C. § 112, ¶ 1?

For the reasons that follow, we conclude that the Examiner has failed to sufficiently demonstrate that claims 29-36 are unpatentable under the written description requirement of 35 U.S.C. § 112, ¶ 1.

2) Has the Examiner sufficiently demonstrated that claims 29-36 are unpatentable under 35 U.S.C. § 112, ¶ 2?

For the reasons that follow, we conclude that the Examiner has failed to sufficiently demonstrate that claims 29-36 are unpatentable under 35 U.S.C. § 112, ¶ 2.

3) The last issue before us is whether the Examiner has sufficiently demonstrated that there is a basis for rejecting the claims based on the prior art relied on by the Examiner?

4

Appeal 2007-0712
Application 90/006,713

For the reasons that follow, we conclude that the Examiner has failed to sufficiently demonstrate that there is a basis for rejecting the claims based on the prior art relied on by the Examiner.

## C. Findings of Fact

The record supports the following findings of fact as well as any other findings of fact set forth in this opinion by at least a preponderance of the evidence.

1.    Claims 1-20 and 29-36 are the subject of this appeal.

2.    Claims 1-20 are original '787 patent claims.

3.    Independent claims 1, 15, 19 and 20 are as follows:

1.    A method for automatic tax reporting by an electronic intermediary comprising:

connecting electronically said electronic intermediary to a tax data provider;

collecting electronically tax data from said tax data provider;

processing electronically said tax data collected electronically from said tax data provider to obtain processed tax data;

preparing electronically an electronic tax return using said processed tax data;

connecting electronically said electronic intermediary to a taxing authority; and

filing electronically said electronic tax return with said taxing authority.

5

Appeal 2007-0712
Application 90/006,713

       15.     An apparatus for automatic tax reporting by an electronic intermediary comprising:

           means for connecting electronically said electronic intermediary to a tax data provider;

           means for collecting electronically tax data from said tax data provider;

           means for processing electronically said tax data collected electronically from said tax data provider to obtain processed tax data;

           means for preparing electronically an electronic tax return using said processed tax data;

           means for connecting electronically said electronic intermediary to a taxing authority; and

           means for filing electronically said electronic tax return with said taxing authority.

       19.     A computer-readable medium embodying a computer program for automatic tax reporting by an electronic intermediary, said computer program comprising code segments for:

           connecting electronically said electronic intermediary to a tax data provider;

           collecting electronically tax data from said tax data provider;

           processing electronically said tax data collected electronically from said tax data provider to obtain processed tax data; and

           preparing electronically an electronic tax return using said processed tax data;

6

Appeal 2007-0712
Application 90/006,713

connecting electronically said electronic intermediary with a taxing authority; and

filing electronically said electronic tax return to said taxing authority.

20. A method for automatic tax reporting by an electronic intermediary comprising:

connecting electronically said electronic intermediary to a tax data provider;

collecting electronically tax data from said tax data provider;

processing electronically said tax data collected electronically from said tax data provider to obtain processed tax data; and

preparing electronically an electronic tax return using said processed tax data.

4. Each of claims 29-36 were first presented during reexamination.

5. Each one of claims 29-36 are independent claims.

6. Independent claims 29-36 are variations of and similar to the original independent claims 1, 15, 19 and 20, but differ with the added language:

(1) "wherein said tax data collected electronically is not collected manually, and wherein said tax data collected electronically is not manually entered onto said electronic tax return" (claims 29-32), and

(2) the tax data is collected "automatically" (33- 36).

7

Appeal 2007-0712
Application 90/006,713

### *The 112, ¶ 1 and ¶ 2 rejections*

7.    The Examiner rejected claims 29-36 under 35 U.S.C. 112, ¶ 1, as the Specification allegedly does not provide the intended metes and bounds of:

>    1) the electronic collection of tax data wherein the tax data collected electronically is not collected manually or manually entered onto said electronic tax return (as recited in claims 29-32) (Final Rejection 5 and Answer 5-6);

>    2) the automatic and electronic collection of tax data (as recited in claims 33-36) (Final Rejection 12 and Answer 6).

8.  The Examiner also argues that since the Specification describes that the invention may be implemented using existing software, such as TurboTax®, that the demarcation between one off-the-shelf software program being integrated into another piece of software is not made clear by the Specification (Final Rejection 11 and Answer 5 and 40-41).

9.    Simplification's Specification states:

>    Hence, with the electronic collection of tax data as in step 12, the invention eliminates the current requirement that a taxpayer manually collect the tax data, eliminates the current requirement that a taxpayer manually enter such tax data onto a tax return or into a computer, and eliminates the need for all, or virtually all, intermediate hard copies of tax data, thereby saving paper, time, and cost.

>    In step 13, the electronic intermediary processes the tax data obtained electronically from the tax data providers in step 12. In the present invention, step 13 can be implemented using a computer program similar to the computer programs currently available in the

8

Appeal 2007-0712
Application 90/006,713

> market place, such as TurboTax, which is a registered trademark of
> Intuit, Inc. Although step 13 can be implemented with current
> technology, the current technology requires that the tax data and other
> information relevant to the taxpayer be inputted manually. With the
> present invention, this information is obtained as described above in
> steps 11 and 12. ('052 col. 6:23-41).

10.     The Specification also describes the following:

> Alternatively, the electronic intermediary can connect
> electronically with the IRS, and receive the tax data from the IRS. In
> this alternative embodiment, the tax data providers have already
> provided the tax data to the IRS and the electronic intermediary
> obtains the tax data from the IRS, and not the tax data providers.
> Further, the electronic intermediary can connect electronically with
> other taxing authorities possessing the taxpayer's tax data. In this
> case, the electronic intermediary receives the tax data from the taxing
> authorities instead of the tax data providers. ('052 col. 6:13-23).

11. The Examiner rejected claims 29-36 under 35 U.S.C. 112, ¶ 2 for
the identical reasons articulated in connection with the 112, ¶ 1 rejection
(Final Rejection 12-15 and Answer 6-9).

12. Simplification argues that the Examiner's rejections are improper
since any rejection made under 35 U.S.C. 112, ¶ 1 should be limited to only
the amended or added language (Br. 14-15).

13. The Examiner responded and argued that the amendments alter the
scope of the claims as a whole and that the rejection is proper (Answer 36).

14. In response to Simplification's arguments, the Examiner agrees
that the Specification does provide support for the electronic transmission of
data and software processing using the data, but argues that the Specification

9

Appeal 2007-0712
Application 90/006,713

fails to explain in detail how this is accomplished (Answer 36).

*The rejection of Claims 1, 2, 6, 8-10, 14, 15, 17-20 and 29-36 as being anticipated by Beamer and "It's W-2 Time"*

15. The Examiner relied on the "It's W-2 Time" article for the purpose of showing "various characteristics of MacInTax that are deemed to be inherent to the version of MacInTax described in Beamer."

16. Specifically, the Examiner relied on "It's W-2 Time" to demonstrate that the MacInTax described in Beamer performs all tax calculations on the computer (Final Rejection 15-16 and Answer 9-10).

17. The Examiner found that Beamer describes connecting electronically an electronic intermediary to a tax data provider and collecting electronically tax data from the tax data provider (e.g., Final Rejection 16-17 and Answer 10-12).

18. Specifically, the Examiner found with respect to independent claims 1, 10, 31, 32, 34, 35, 37-40 (directing attention to Beamer ¶¶ 3, 4, 6, 15, 16, 23, and 26) that:

> The tax preparation software, e.g., MacInTax, can electronically connect to and download relevant financial information from a bank via a home accounting program, e.g., Dollars & Sense. This downloaded information is used to assist in completing one's tax return. Completion of an IRS tax form is expressly disclosed by Beamer; therefore, by using data downloaded from a bank to complete the IRS tax form, said data qualifies as tax data since it provides information that is required to complete one's tax return (e.g., Final Rejection 16 and Answer 10).

10

Appeal 2007-0712
Application 90/006,713

19.  The following is from ¶ 3 of Beamer:

> One day in the not-too-distant future Jan and Jim
> Smithwick will have their employers transmit their salaries
> electronically directly into their personal bank accounts. They
> will be able to download their bank records into their personal
> financial software. That program can lien pass the information
> to a tax preparation program.

20.  Moneyline, the program that allows electronic access to a bank is
described as follows:

> Moneyline allows you to communicate directly with your bank's
> computer system. Many transactions can be directly fed by the bank's
> computer into Dollar & Sense accounts. This reduces the drudgery of
> retyping data, increases accuracy and gives convenient access to bank
> information at any time, not just when the statement arrives. (¶ 26).

21.  Beamer describes Dollars & Sense as a home accounting program
that keeps track of personal finances (¶ 1 and 6).

22.  Beamer also describes the following with respect to home
accounting software programs:

> Grooming your files at the end of the year is a must. If your
> accounts balance at the end of the year, you are in pretty good shape
> but transactions can still be in the wrong categories. At tax time it is
> necessary to review all transactions one by one, making sure that each
> is in the correct category and correctly marked as taxable or
> nontaxable. It is best to empty out the "Misc." and "Cash" accounts as
> much as possible.
>
> Hopefully, before tax time rolls around you will have been
> practicing with report templates all year. This is the most difficult part
> of using these programs, especially with MacMoney, because there are
> so many variables to deal with. You must make a year end report that
> will correctly summarize the tax data from your files. If you have been

11

Appeal 2007-0712
Application 90/006,713

using the suggested tax accounts from the program, this shouldn't be
too hard (Beamer ¶¶ 36 and 37).

23. Simplification argued that Beamer fails to describe that the tax

data provider, e.g., the bank, provides tax data as follows:

Contrary to the assertion in the Final Office Action, the bank
record and the salary deposit indicated by Beamer are **not** "tax data."
Beamer teaches that the bank record indicates salary of the taxpayer.
Beamer, ¶ 3. This salary entry in the bank record is the net pay of the
taxpayer. One of ordinary skill in the art of taxes would know that this
salary entry, by itself, **neither** includes **nor** suggests the taxpayer's
gross income, the tax withholdings taken from the taxpayer's gross
income by the taxpayer's employer, and other deductions, such as, for
example, retirement deductions, transportation deductions, and parking
deductions, all of which are used to determine the taxpayer's taxable
income. Further, one of ordinary skill in the art of taxes would know
that, given that the employer withheld money from the taxpayer's
income, the tax return including only the salary deposit indicated in the
bank record of Beamer would be **incorrect** because that tax return
would not include the taxpayer's taxable income. Only through
**manual input**, then, could the taxpayer's taxable income be obtained.
Hence, the downloaded bank record disclosed in Beamer, which
indicates the salary deposit of the taxpayer, is **not** "tax data" because,
by itself, the salary entry in the bank record cannot be used to prepare
the tax return of the taxpayer. (Br. 45) (emphasis by Simplification).

24. The Examiner responded and argued that:

Beamer discloses that the tax preparation software, e.g.,
MacInTax, can electronically connect to and download relevant
financial information from a bank via a home accounting program,
e.g., Dollars & Sense (¶¶ 3, 4, 6, 15, 16, 23, 26). This downloaded
information is used to assist in completing one's tax return.
Completion of an IRS tax form is expressly disclosed by Beamer;

12

Appeal 2007-0712
Application 90/006,713

therefore, by using data downloaded from a bank to complete the IRS
tax form, said data qualifies as tax data since it provides information
that is required to complete one's tax return. Beamer ultimately
utilizes the downloaded bank statement information to electronically
prepare a tax return, thereby addressing both the spirit and literal
interpretation of the claimed invention. Furthermore, Patent Owner's
independent claims recite "collecting electronically tax data from said
tax data provider." Since the collected tax data is not referred to as
"said tax data," it is not necessarily required that the collected tax data
be the type of tax data expressly recited as possessed by the tax data
provider. (Answer at 44-45).

25. The Simplification Specification gives examples of the type of

data that is considered "tax data" as follows:

This information [data needed to compute the tax payer's liability]
includes: IRS Forms W-2 from their employers; IRS Forms 1099 from
their banks; each mutual fund in which interests are held, each broker
in respect of dividends, interest and gross brokerage proceeds, and
other persons from whom payments are received; IRS Forms 1098 in
respect of residential mortgage interest paid; and canceled checks or
other acknowledgments from charitable organizations ('052, col. 2:21-
29).

*Obviousness rejection*

26. The Examiner rejected dependent claims 3-5, 7 and 16 based on

Beamer and further supported by "It's W-2 Time" as applied in the

anticipation rejection and also based on Official Notice taken by the

Examiner (Final Rejection 38-40 and Answer 32-33).

27. The Examiner rejected dependent claims 11-13 based on Beamer

and further supported by "It's W-2 Time" as applied in the anticipation

13

Appeal 2007-0712
Application 90/006,713

rejection and also based on Meadows and "Electronic Tax Payment Through
TAXLINK Discussed in IRS Procedure." (Final Rejection 40-42 and
Answer 33-35).

### D. Principles of Law

#### 35 U.S.C. § 112, ¶ 1

Adequate written description means that, in the Specification, the
applicant must "convey with reasonable clarity to those skilled in the art that,
as of the filing date sought, he or she was in possession of the [claimed]
invention." *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64, 19
USPQ2d 1111, 1117 (Fed. Cir. 1991). The written description requirement
is separate and distinct from the enablement requirement. *Id.*

#### 35 U.S.C. § 112, ¶ 2

A claim is indefinite if, when read in light of the Specification, it does
not reasonably apprize those skilled in the art of the scope of the invention.
*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342, 65
USPQ2d 1385, 1406 (Fed. Cir. 2003). Specifically, if the scope of the
invention sought to be patented cannot be determined from the language of
the claims, the Specification or the teachings of the prior art with a
reasonable degree of certainty, a rejection of the claims under 35 U.S.C.
§ 112, second paragraph is appropriate. *In re Wiggins*, 488 F.2d 538, 541,
179 USPQ 421, 423 (CCPA 1973).

14

Appeal 2007-0712
Application 90/006,713

## 35 U.S.C. § 102

"A person shall be entitled to a patent unless .... the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States" 35 USC § 102(b).

To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either expressly or inherently. *Verdegaal Bros. v. Union Oil Co.*, 814 F.2d 628, 631, 2 USPQ2d 1051, 1053 (Fed. Cir. 1987).

## 35 U.S.C. § 103

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 USC § 103(a).

In determining whether claimed subject matter would have been obvious we take into consideration (1) the scope and content of the prior art, (2) any differences between the claimed invention and the prior art, (3) the level of skill in the art, and (4) any relevant objective evidence of obviousness or non-obviousness. ***KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1731, 82 USPQ2d 1385, 1389 (2007)**, *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

15

Appeal 2007-0712
Application 90/006,713

### E. Analysis

#### *The 112, ¶¶ 1 and 2 rejections*

Simplification argues that the Examiner failed to follow the
requirements for reexamination proceedings and that the rejections of claims
29-36 under 35 U.S.C. § 112, ¶¶ 1 and 2 were improper (FF 12). The
Examiner argued that the amendatory language changed the scope of the
claims 29-36 and therefore the rejection is proper (FF 13). We need not
decide who is correct, since even considering the Examiner's rejections we
cannot sustain the rejections made.

We first address the arguments made in the context of the written
description requirement. The Examiner initially bears the burden to
demonstrate that the Specification fails to provide written description support
for the claimed invention. Inherent in that demonstration is that the
Examiner clearly articulates a reason for making the rejection. *In re
Piasecki*, 745 F.2d 1468, 1472 (Fed. Cir. 1984). In order to demonstrate that
a claim term lacks written description support, the burden is initially on the
Examiner to demonstrate that the inventor did not have possession of the
claimed invention.

The Examiner argued that there is not a clear picture of the intended
metes and bounds of the electronic collection of tax data wherein the tax data
collected electronically is not collected manually or manually entered onto
said electronic tax return as recited in claims 29-32 (FF 7(1)). The Examiner
acknowledges that portion of the Specification that describes this feature, yet
fails to explain why that description fails to convey to one of ordinary skill in

16

Appeal 2007-0712
Application 90/006,713

the art that the inventor had possession of the claimed feature. For example,
the Specification states that "the invention eliminates the current requirement
that a taxpayer manually collect the tax data, eliminates the current
requirement that a taxpayer manually enter such tax data onto a tax return or
into a computer..." (FF 9). That description is very similar to the claim
language that the Examiner argues does not have written description support.
Yet, the Examiner has failed to clearly articulate why the passage does not
support the claim language.

The Examiner also argued that the Specification does not render a
clear picture of the metes and bounds of the automatic and electronic
collection of tax data. Again, the Examiner has failed to articulate in any
meaningful way why the description discussed immediately above or that the
Specification as a whole fails to convey to one of ordinary skill in the art that
the inventor had possession of the claimed feature. For example, the
Specification describes that once the tax payer provides account or
identification data to the intermediary, the intermediary then may
*electronically* search databases for the tax payer's tax data (Specification col.
4:51-56), or the electronic intermediary may *electronically* contact and
collect from the tax data providers the tax payer's tax data (Specification col.
4:56-62). The Examiner has failed to clearly articulate why such descriptions
fail to convey to one of ordinary skill in the art that the inventor had
possession of automatic and electronic collection of tax data.

The Examiner also found that since the Specification describes that the
invention may be implemented using existing software, such as TurboTax®,

17

Appeal 2007-0712
Application 90/006,713

that the demarcation between one off-the-shelf software program being
integrated into another piece of software is not made clear by the
Specification (FF 8). The Examiner's position is not persuasive. The
Specification states that "step 13 can be implemented using a computer
program *similar to* the computer programs currently available in the market
place" such as TurboTax® (FF 9). The Specification makes clear that the
software may be similar to what is available in the market place, but need not
be exactly the same software.

In response to Simplification's arguments, the Examiner apparently
agrees that the Specification *does* provide written description support for the
electronic transmission of data and software processing using the data, but
argues that the Specification fails to explain in detail how this is
accomplished (FF 15).

Whether one of ordinary skill in the art can make or use a described
invention, e.g., enablement, is a separate and distinct requirement of 35
U.S.C. § 112, ¶ 1. The test for enablement is based on undue
experimentation, where several underlying factual findings need be made. *In
re Wands*, 858 F.2d 731, 8 USPQ2d 1400. The Examiner has failed to make
any such findings. We need not and will not speculate as to how the
Examiner's rejections may possibly fit into an enablement scenario. The
Examiner has the initial burden to succinctly articulate a rationale for
rejecting the claims.

The Examiner's rejection of claims 29-36 based on the second
paragraph of 35 U.S.C. § 112 is verbatim the same as the written description

18

Appeal 2007-0712
Application 90/006,713

rejection. In the context of 35 U.S.C. § 112, second paragraph, the Examiner
has failed to explain why the scope of the invention sought to be patented
cannot be determined from the language of the claims, the Specification or
the teachings of the prior art with a reasonable degree of certainty, as
required. *In re Wiggins*, 488 F.2d 538, 541, 179 USPQ 421, 423 (CCPA
1973).

As already discussed above, at the heart of the Examiner's rejections is
that the Specification does not provide enough information such that one of
ordinary skill in the art would be able to make or use the invention.
However, whether a Specification conveys enough information to enable one
of ordinary skill in the art to make or use an invention is a different and
separate requirement from the written description requirement or the
definiteness requirement. In that respect, and as already explained, the
Examiner has failed to make the requisite findings to support the assertions
made, e.g., that one of ordinary skill in the art would not know how to make
or use the invention without undue experimentation.

### *The prior art rejections*

The Examiner finally rejected all of the independent claims as being
anticipated under 35 U.S.C. § 102(b) by Beamer and further supported by the
disclosure of "It's W-2 Time." The Examiner relied on Beamer to teach
collecting electronically tax data from said tax data provider.

An issue raised by Simplification is whether Beamer describes that the
information collected from the tax data provider, e.g., bank, is "tax data." For
the reasons that follow, the Examiner has failed to sufficiently establish that

19

Appeal 2007-0712
Application 90/006,713

Beamer describes that the information collected from the tax data provider,
e.g., bank, is "tax data," and therefore the rejection of all of the claims 1-20
and 29-36 is reversed.

In reviewing both the Examiner's and Simplification's arguments, it
appears that both agree that "tax data" is data that is used to determine a tax
payer's liability (FFs 18 and 23), which is consistent with the Specification
description of tax data (FF 25). The specification describes examples of "tax
data" as IRS Forms W-2 from their employers and IRS Forms 1099 from
their banks (FF 25). Simplification disagrees that Beamer describes that the
information obtained from the bank, e.g., tax data provider, is data that is
used to determine a taxpayer's liability.

Simplification argues that the information obtained from the tax data
provider, e.g., the bank, is described as "salary data" and that "salary data"
does not indicate the net pay of the taxpayer, which is necessary to determine
the taxpayer's taxable income (FF 23). Specifically, Simplification argues
that the Beamer bank record indicates the salary of the taxpayer.
Simplification further argues that the bank record salary entry is the net pay
of the taxpayer, and that the salary entry data would not include a taxpayer's
taxable income, or tax liability (FF 23).

We understand Simplification to argue that the information contained
on a bank statement as described in Beamer would show a record of the
amount of money directly deposited into a taxpayer's account, which
Simplification refers to as "salary data." We further understand
Simplification to argue that a monthly bank record showing the amount of

20

Appeal 2007-0712
Application 90/006,713

money directly deposited would not be "tax data" since one could not determine the taxable income from the data showing the amount deposited. Instead, Simplification maintains that Beamer's direct deposit information is not useful information for determining a tax payer's liability.

In support of the argument, Simplification directs attention to paragraph 3 of Beamer. That passage is as follows:

> One day in the not-too-distant future Jan and Jim Smithwick will have their employers transmit their salaries electronically directly into their personal bank accounts. They will be able to download their bank records into their personal financial software. That program can lien pass the information to a tax preparation program.

This passage tends to support Simplification's argument that the only type of data that is specifically described is "salary" information, or the amount of money directly deposited into the taxpayer's bank account from an employer. From the above passage, one would understand that what an employer is electronically directly transmitting to the Smithwick's bank accounts is the amount of money owed to them from their employer. Such direct deposits are typically made on a weekly, bi-weekly or monthly basis. That amount would be after all tax deductions, retirement deductions, social security deductions, and any other deductions are made. There is no indication from the above passage that the amount deposited directly into the Smithwick's account is the type of data that is typically used to determine one's tax liability. For example, a monthly bank report showing direct deposits from an employer is a snap shot of what occurred in a given month

21

Appeal 2007-0712
Application 90/006,713

and would not be a complete accurate summary of a taxpayer's total net income for a year, information that would be found on a W-2 form, e.g., the type of data that the Specification describes as being "tax data." Even if the direct deposit salary amount on a bank statement is assumed to be passed to a tax preparation program that does not turn it into "tax data" without any demonstration that the tax preparation software indeed uses that data to determine one's tax liability.

The Examiner's response to Simplifications' argument is not sufficient to refute the Applicants' arguments. The Examiner is silent with respect to Simplification's specific argument that Beamer describes a monthly bank statement that would only include a direct deposit amount from an employer, and that such information would not be enough or helpful to determine a taxpayer's tax liability. Instead, the Examiner merely repeats what was stated in the rejection, e.g., that Beamer ultimately utilizes the downloaded bank statement information to electronically prepare a tax return. However, the Examiner has failed to direct attention to where in Beamer that the conclusion finds support, or explain how Beamer necessarily or inherently describes the feature. Such a conclusory response is not sufficient to overcome the argument made by Simplification and what Beamer describes in paragraph 3.

The Examiner argues that:

Completion of an IRS tax form is expressly disclosed by Beamer; therefore, by using data downloaded from a bank to complete the IRS tax form, said data qualifies as tax data since it

22

Appeal 2007-0712
Application 90/006,713

> provides information that is required to complete one's tax
> return (FF 24).

The Examiner has failed to show that Beamer contemplates "using
data downloaded from a bank to complete the IRS tax form" as argued. The
Examiner places much emphasis on the following passage in Beamer to
support the assertion that Beamer describes "tax data" e.g., data that can be
used to complete a tax form.

> Moneyline allows you to communicate directly with your
> bank's computer system. Many transactions can be directly fed
> by the bank's computer into Dollar & Sense accounts. This
> reduces the drudgery of retyping data, increases accuracy and
> gives convenient access to bank information at any time, not just
> when the statement arrives. (Beamer ¶26).

The references to "bank records" and "statement" from the above
passage are not specific as to the type of data that is contained on the bank
record or statement. The only reference to the type of data that may be
contained on the record or statement is that of the money that is deposited
into the Smithwick's bank account from their employer as previously
discussed. The Examiner has also failed to demonstrate that the data
collected from the bank must necessarily or inherently be tax data as argued
(FF 24).

Beamer focuses on tax preparation. However, Beamer also focuses in
detail on home accounting software too. There is approximately a full page
of the three page article describing the general advantages of using a home
accounting software program. Within that description is the above paragraph

23

Appeal 2007-0712
Application 90/006,713

that discusses the link between Moneyline and a home accounting software
program. The downloaded bank information is to the home accounting or
personal financial software, not directly to the MacInTax or tax software. As
described in Beamer, home accounting software such as the Dollars & Sense
software tracks data that is otherwise not relevant to a tax payer's tax
liability. For example, direct deposit data, e.g., the amount of money that is
deposited from an employer into an employee's bank account may be useful
in the context of home accounting software, for the purpose of budgeting and
paying one's bills, but is not the type of data that a tax payer uses to
determine tax liability as already discussed. The home accounting software of
Beamer tracks data that would appear to have nothing to do with a tax
payer's tax liability. For example, Beamer describes manipulating the home
accounting software files in preparation for determining tax liability. Beamer
states that "[a]t tax time it is necessary to review all transactions one by one,
making sure that each is in the correct category and correctly marked as
*taxable or nontaxable*" (FF 22). That statement supports the notion that data
collected through the home accounting software such as Dollars & Sense is
not limited to tax data. Here, the Examiner has failed to sufficiently
demonstrate that the data obtained from the bank is anything more than
information that a taxpayer would use for household budgeting purposes,
which data the Examiner has failed to demonstrate would in fact be used to
determine a tax payer's tax liability.

24

Appeal 2007-0712
Application 90/006,713

For all of these reasons, the Examiner's determination that the data collected from the bank must necessarily or inherently be data that is used to process a tax payer's liability is not supported by record evidence.

As applied by the Examiner (FF 26 and 27) none of the other references make up for the deficiencies of Beamer.

For all of these reasons, we will not sustain the Examiner's rejection of the claims based on the prior art of record.

**F. Decision**

Upon consideration of the record, and for the reasons given, the Examiner's rejections are reversed.

The Examiner's rejection of claims 29-36 under 35 U.S.C. § 112, first paragraph, as failing to comply with the written description requirement is reversed.

The Examiner's rejection of claims 29-36 under 35 U.S.C. § 112, second paragraph, as being indefinite is reversed.

The Examiner's rejection of claims 1, 2, 6, 8-10, 14, 15, 17-20 and 29-36 under 35 U.S.C. § 102(b) as being anticipated by Beamer as further supported by "It's W-2 Time" is reversed.

The Examiner's rejection of claims 3-5, 7 and 16 under 35 U.S.C. § 103(a) as being unpatentable over Beamer and further in view of "It's W-2 Time" is reversed.

The Examiner's rejection of claims 11-13 under 35 U.S.C. § 103(a) as being unpatentable over Beamer, "It's W-2 Time," Meadows and "Electronic Tax Payment Through TAXLINK Discussed in IRS Procedure" is reversed.

25

Appeal 2007-0712
Application 90/006,713

## <u>REVERSED</u>

VENABLE LLP
P.O. BOX 34385
WASHINGTON DC 20043-9998

JAMES L. KWAK
STANDLEY & GILCHRIST, LLP
495 METRO PLACE SOUTH SUITE 210
DUBLIN, OH  43017-5319

lp

26

# EXHIBIT D

The opinion in support of the decision being entered today was *not* written
for publication and is *not* binding precedent of the Board.

## UNITED STATES PATENT AND TRADEMARK OFFICE

### BEFORE THE BOARD OF PATENT APPEALS
### AND INTERFERENCES

RECEIVED

AUG 0 2 2007

STANDLEY LAW GROUP LLP

*Ex parte* SIMPLIFICATION, LLC

Appeal 2007-0518
Reexamination Control 90/006,969[1]
Patent 6,697,787
Technology Center 3600

Decided:  July 31, 2007

Before  JAMESON LEE, SALLY C. MEDLEY, and JAMES T. MOORE,
*Administrative Patent Judges.*

MEDLEY, *Administrative Patent Judge.*

## DECISION ON APPEAL

### A.  Statement of the Case

This appeal under 35 U.S.C. §§ 134 and 306 is from a final rejection
of claims 1-18 and 31-40.  We have jurisdiction under 35 U.S.C. § 6(b).

The prior art relied upon by the Examiner in rejecting the claims on

---

1   Application for patent filed 15 March 2004.

STANDLEY LAW GROUP LLP
Received for Docketing

Date:_____

Appeal 2007-0518
Application 90/006,969

appeal is:

Scott Beamer, *A Marriage of Convenience. (MacInTax, MacMoney, and Dollars & Sense for tax preparation and planning)*, MacUser, v3, n3, p 102(4) (March 1987).

*It's W-2 Time – But This Year There's a Better Way to Do your Taxes*, PR Newswire, (February 1987).

Claims 31-40 stand rejected under 35 U.S.C. § 112, first paragraph, as failing to comply with the written description requirement.

Claims 31-40 stand rejected under 35 U.S.C.§ 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

Claims 1-3, 5, 10, 31, 32, 34, 35, and 37-40 stand rejected under 35 U.S.C. § 102(b) as being anticipated by Beamer as further supported by "It's W-2 Time."

Claims 4, 6-9, 11-18, 33, and 36 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Beamer and further in view of "It's W-2 Time."

<u>The Invention</u>

The invention relates to a system and method for collecting and processing tax data. A tax payer provides information to an electronic intermediary. The information provided may include, for example, the tax payer's social security number, so that the electronic intermediary may electronically search databases for the tax payer's tax data (Specification col. 4:51-56). Alternatively, the tax payer may provide account access

2

Appeal 2007-0518
Application 90/006,969

information to the electronic intermediary so that the electronic intermediary
may electronically contact and collect from tax data providers the tax payer's
tax data (Specification col. 5:50-65).

The electronic intermediary electronically processes the collected tax
data to determine the tax payer's tax liability. The electronic intermediary
prepares a tax return using the processed data.

### Procedural Posture and related Proceedings

On 24 February 2004, patentee (hereafter "Simplification"), the real
party in interest of U.S. patent 6,697,787 ('787) filed a patent infringement
action against Block Financial Corporation ("Block") in the United States
District Court for the District of Delaware based on U.S. patent 6,697,787
('787). On 15 March 2004, Block requested reexamination of '787.
Reexamination was granted on 3 June 2004. The civil case was stayed
pending the reexamination. Simplification appealed under 35 U.S.C. §§ 134
and 306 from a final rejection of claims 1-18 and 31-40. The appeal is the
subject of this decision.

On 8 April 2003, Simplification filed a patent infringement action
against Block in the United States District Court for the District of Delaware
based on U.S. Patent 6,202,052 ('052), which is the parent of the involved
reexamination application. On 11 July 2003, Block requested reexamination
of the '052 patent, which reexamination was granted on 2 October 2003. The
civil action was stayed pending the reexamination. Simplification appealed
from a final rejection in that case, which is also before us and is decided in a
separate, concurrently mailed paper.

3

Appeal 2007-0518
Application 90/006,969

### B. Issue

1) The first issue before us is whether the Examiner has sufficiently demonstrated that claims 31-40 are unpatentable under the written description requirement of 35 U.S.C. § 112, ¶ 1?

For the reasons that follow, we conclude that the Examiner has failed to sufficiently demonstrate that claims 31-40 are unpatentable under the written description requirement of 35 U.S.C. § 112, ¶ 1.

2) Has the Examiner sufficiently demonstrated that claims 31-40 are unpatentable under 35 U.S.C. § 112, ¶ 2?

For the reasons that follow, we conclude that the Examiner has failed to sufficiently demonstrate that claims 31-40 are unpatentable under 35 U.S.C. § 112, ¶ 2.

3) The last issue before us is whether the Examiner has sufficiently demonstrated that there is a basis for rejecting the claims based on the prior art relied on by the Examiner?

For the reasons that follow, we conclude that the Examiner has failed to sufficiently demonstrate that there is a basis for rejecting the claims based on the prior art relied on by the Examiner.

### C. Findings of fact

The record supports the following findings of fact as well as any other findings of fact set forth in this opinion by at least a preponderance of the evidence.

1. Claims 1-18 and 31-40 are the subject of this appeal.
2. Claims 1-18 are original '787 patent claims.

4

Appeal 2007-0518
Application 90/006,969

3.  Independent claims 1, 10 and 15 are as follows:

1.  An apparatus for collecting tax data comprising:

means for connecting electronically an electronic intermediary to a tax data provider;

means for collecting electronically tax data from said tax data provider;

means for processing electronically said tax data collected from said tax data provider to obtain processed tax data; and

means for preparing electronically an electronic tax return using said processed tax data.

10.  A computer-readable medium embodying a computer program for collecting tax data, said computer program comprising code segments for:

connecting electronically an electronic intermediary to a tax data provider;

collecting electronically tax data from said tax data provider;

processing electronically said tax data collected from said tax data provider to obtain processed tax data; and

preparing electronically an electronic tax return using said processed tax data.

15.  A method for automatic tax data collecting by an electronic intermediary comprising:

connecting electronically said electronic intermediary to a tax data provider;

5

Appeal 2007-0518
Application 90/006,969

collecting electronically tax data from said tax data provider,
wherein said tax data is reported on an Internal Revenue Service
("IRS"), state, local, or foreign tax form;

processing electronically said tax data collected electronically
from said tax data provider to obtain processed tax data; and

preparing electronically an electronic tax return using said
processed tax data.

4.    Each of claims 31-40 were first presented during reexamination.

5.    Each one of claims 31-40 are independent claims.

6.    Independent claims 31-40 are variations of and similar to the
original independent claims 1, 10 and 15, but differ with the added language:

(1) "wherein said tax data collected electronically is not
collected manually, and wherein said tax data collected electronically is not
manually entered onto said electronic tax return" (claims 31-33, 39, and 40);

(2) the tax data is collected "automatically" (34, 35, and 36)

(3) "automatic" tax data collecting (recited in the preamble)
(claim 37, 38, 39, and 40).

*The 112, ¶ 1 and ¶ 2 rejections*

7.    The Examiner rejected claims 31-40 under 35 U.S.C. 112, ¶ 1,
as the Specification allegedly does not provide the intended metes and
bounds of:

1) the electronic collection of tax data wherein the tax data
collected electronically is not collected manually or manually entered
onto said electronic tax return (as recited in claims 31-33, 39 and 40)

6

Appeal 2007-0518
Application 90/006,969

(Final Rejection 8 and Answer 5);

2) the automatic and electronic collection of tax data (as recited in claims 34-38)

3) the tax data collected is reported on an internal revenue service, state, local or foreign tax form as recited in claims 33 and 36.

8. With respect to the last item, the Examiner poses several hypothetical questions regarding the limitation such as 1) do the claims require that the tax data expressly be reported and, if so, to whom? 2) if the scope of the claims necessitates an active reporting of the tax data on one of the recited forms, what is the extent of the data reported? 3) does the invention report the actual image data or an OCR version of the contents of an entire IRS tax form? (Final Rejection 6-9 and Answer 3-6).

9. The Examiner also argues that since the Specification describes that the invention may be implemented using existing software, such as TurboTax®, that the demarcation between one off-the-shelf software program being integrated into another piece of software is not made clear by the Specification (Final Rejection 7-8 and Answer 8 and 27).

10. Simplification's Specification states:

Hence, with the electronic collection of tax data as in step 12, the invention eliminates the current requirement that a taxpayer manually collect the tax data, eliminates the current requirement that a taxpayer manually enter such tax data onto a tax return or into a computer, and eliminates the need for all, or virtually all, intermediate hard copies of tax data, thereby saving paper, time, and cost.

7

Appeal 2007-0518
Application 90/006,969

In step 13, the electronic intermediary processes the tax data obtained electronically from the tax data providers in step 12. In the present invention, step 13 can be implemented using a computer program similar to the computer programs currently available in the market place, such as TurboTax, which is a registered trademark of Intuit, Inc. Although step 13 can be implemented with current technology, the current technology requires that the tax data and other information relevant to the taxpayer be inputted manually. With the present invention, this information is obtained as described above in steps 11 and 12. ('787 col. 6:23-41).

11.    The Specification also describes the following:

Alternatively, the electronic intermediary can connect electronically with the IRS, and receive the tax data from the IRS. In this alternative embodiment, the tax data providers have already provided the tax data to the IRS and the electronic intermediary obtains the tax data from the IRS, and not the tax data providers. Further, the electronic intermediary can connect electronically with other taxing authorities possessing the taxpayer's tax data. In this case, the electronic intermediary receives the tax data from the taxing authorities instead of the tax data providers. ('787 col. 6:13-23).

12. The Examiner rejected claims 31-40 under 35 U.S.C. 112, ¶ 2 for the identical reasons articulated in connection with the 112, ¶ 1 rejection (Final Rejection 10-13 and Answer 7-10).

13. Simplification argues that the Examiner's rejections are improper since any rejection made under 35 U.S.C. 112, ¶ 1 should be limited to only the amended or added language (Br. 17-18).

14. The Examiner responded and argued that the amendments alter the scope of the claims as a whole and that the rejection is proper (Answer 22).

15. In response to Simplification's arguments, the Examiner agrees

Appeal 2007-0518
Application 90/006,969

that the Specification does provide support for the electronic transmission of data and software processing using the data, but argues that the Specification fails to explain in detail how this is accomplished (Answer 22-23).

*The rejection of Claims 1-3, 5, 10, 31, 32, 34, 35, 37-40 as being anticipated by Beamer and "It's W-2 Time"*

16. The Examiner relied on the "It's W-2 Time" article for the purpose of showing "various characteristics of MacInTax that are deemed to be inherent to the version of MacInTax described in Beamer."

17. Specifically, the Examiner relied on "It's W-2 Time" to demonstrate that the MacInTax described in Beamer performs all tax calculations on the computer (Final Rejection 14-16 and Answer 12-13).

18. The Examiner found that Beamer describes connecting electronically an electronic intermediary to a tax data provider and collecting electronically tax data from the tax data provider (Final Rejection 15-17 and Answer 12-17).

19. Specifically, the Examiner found with respect to independent claims 1, 10, 31, 32, 34, 35, 37-40 (directing attention to Beamer ¶¶ 3, 4, 6, 15, 16, 23, and 26) that:

> The tax preparation software, e.g., MacInTax, can electronically
> connect to and download relevant financial information from a
> bank via a home accounting program, e.g., Dollars & Sense.
> This downloaded information is used to assist in completing
> one's tax return. Completion of an IRS tax form is expressly
> disclosed by Beamer; therefore, by using data downloaded from
> a bank to complete the IRS tax form, said data qualifies as tax
> data since it provides information that is required to complete

9

Appeal 2007-0518
Application 90/006,969

one's tax return (Final Rejection 15, 17, 19-20 and Answer 12,
14-15, 16-17).

20.  The following is from ¶ 3 of Beamer:

One day in the not-too-distant future Jan and Jim
Smithwick will have their employers transmit their salaries
electronically directly into their personal bank accounts.  They
will be able to download their bank records into their personal
financial software.  That program can lien pass the information
to a tax preparation program.

21.  Moneyline, the program that allows electronic access to a bank is
described as follows:

Moneyline allows you to communicate directly with your bank's
computer system.  Many transactions can be directly fed by the bank's
computer into Dollar & Sense accounts.  This reduces the drudgery of
retyping data, increases accuracy and gives convenient access to bank
information at any time, not just when the statement arrives.  (¶ 26).

22.  Beamer describes Dollars & Sense as a home accounting program
that keeps track of personal finances (¶ 1 and 6).

23.  Beamer also describes the following with respect to home
accounting software programs:

Grooming your files at the end of the year is a must.  If your
accounts balance at the end of the year, you are in pretty good shape
but transactions can still be in the wrong categories.  At tax time it is
necessary to review all transactions one by one, making sure that each
is in the correct category and correctly marked as taxable or
nontaxable.  It is best to empty out the "Misc." and "Cash" accounts as
much as possible.

10

Appeal 2007-0518
Application 90/006,969

> Hopefully, before tax time rolls around you will have been
> practicing with report templates all year. This is the most difficult part
> of using these programs, especially with MacMoney, because there are
> so many variables to deal with. You must make a year end report that
> will correctly summarize the tax data from your files. If you have been
> using the suggested tax accounts from the program, this shouldn't be
> too hard (Beamer ¶¶ 36 and 37).

24. Simplification argued that Beamer fails to describe that the tax
data provider, e.g., the bank, provides tax data as follows:

> Contrary to the assertion in the Final Office Action, the bank
> record and the salary deposit indicated by Beamer are **not** "tax data."
> Beamer teaches that the bank record indicates the salary of the
> taxpayer. Beamer, ¶ 3. This salary entry in the bank record is the net
> pay of the taxpayer. One of ordinary skill in the art of taxes would
> know that this salary entry, by itself, **neither** includes **nor** suggests the
> taxpayer's gross income, the tax withholdings taken from the
> taxpayer's gross income by the taxpayer's employer, and other
> deductions, such as, for example, retirement deductions, transportation
> deductions, and parking deductions, all of which are used to determine
> the taxpayer's taxable income. Further, one of ordinary skill in the art
> of taxes would know that, given that the employer withheld money
> from the taxpayer's income, the tax return including only the salary
> deposit indicated in the bank record of Beamer would be **incorrect**
> because that tax return would not include the taxpayer's taxable
> income. Only through **manual input**, then, could the taxpayer's
> taxable income be obtained. Hence, the downloaded bank record
> disclosed in Beamer, which indicates the salary deposit of the
> taxpayer, is **not** "tax data" because, by itself, the salary entry in the
> bank record cannot be used to prepare the tax return of the taxpayer.
> (Br. 34) (emphasis by Simplification).

11

Appeal 2007-0518
Application 90/006,969

    25.  The Examiner responded and argued that:

> Beamer discloses that the tax preparation software, e.g.,
> MacInTax, can electronically connect to and download relevant
> financial information from a bank via a home accounting program,
> e.g., Dollars & Sense (¶¶ 3, 4, 6, 15, 16, 23, 26).  This downloaded
> information is used to assist in completing one's tax return.
> Completion of an IRS tax return is expressly disclosed by Beamer;
> therefore, by using data downloaded from a bank to complete the IRS
> tax form, said data qualifies as tax data since it provides information
> that is required to complete one's tax return.  Beamer ultimately
> utilizes the downloaded bank statement information to electronically
> prepare a tax return, thereby addressing both the spirit and literal
> interpretation of the claimed invention.  Furthermore, Patent Owner's
> independent claims recite "collecting electronically tax data from said
> tax data provider."  Since the collected tax data is not referred to as
> "said tax data," it is not necessarily required that the collected tax data
> be the type of tax data expressly recited as possessed by the tax data
> provider.  (Answer at 28-29).

    26.  The Simplification Specification gives examples of the type of
data that is considered "tax data" as follows:

> This information [data needed to compute the tax payer's liability]
> includes: IRS Forms W-2 from their employers; IRS Forms 1099 from
> their banks; each mutual fund in which interests are held, each broker
> in respect of dividends, interest and gross brokerage proceeds, and
> other persons from whom payments are received; IRS Forms 1098 in
> respect of residential mortgage interest paid; and canceled checks or
> other acknowledgments from charitable organizations ('787, col. 2:19-
> 28).

*Obviousness rejection*

    27.  The Examiner rejected independent claims 15, 33 and 36, along
with several dependent claims based on Beamer and further supported by

12

Appeal 2007-0518
Application 90/006,969

"It's W-2 Time" as applied in the anticipation rejection.

28. The Examiner recognized that Beamer does not expressly describe collecting electronically tax data from a tax data provider, wherein the tax data is reported on an IRS state, local or foreign tax form (Final Rejection 22 and Answer 19).

29. Instead, the Examiner took official notice:

[t]hat it is old and well-known in the art of United States tax returns that the IRS Form 1099 summarizes information from a bank that a taxpayer needs to complete his/her tax return(s). For example, one version of the IRS Form 1099 includes data such as taxable interest earned on a bank account, i.e., information typically found on a bank statement. Beamer does not expressly teach that the downloaded tax data is expressly printed on an IRS Form W-2, 1098, or 1099; however, Beamer clearly lays the groundwork for electronically downloading tax-related data, such as a bank statement data (i.e., data that is typically listed on an IRS Form 1099), and then using this data for automatically and electronically performing the calculations necessary to file an electronic tax return (Final Rejection 22-25 and Answer 20-22).

**D.  Principles of Law**

<u>35 U.S.C. § 112, ¶ 1</u>

Adequate written description means that, in the Specification, the applicant must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the [claimed] invention." *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64, 19 USPQ2d 1111, 1117 (Fed. Cir. 1991). The written description requirement is separate and distinct from the enablement requirement. *Id.*

13

Appeal 2007-0518
Application 90/006,969

### 35 U.S.C. § 112, ¶ 2

A claim is indefinite if, when read in light of the Specification, it does not reasonably apprize those skilled in the art of the scope of the invention. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342, 65 USPQ2d 1385, 1406 (Fed. Cir. 2003). Specifically, if the scope of the invention sought to be patented cannot be determined from the language of the claims, the Specification or the teachings of the prior art with a reasonable degree of certainty, a rejection of the claims under 35 U.S.C. § 112, second paragraph is appropriate. *In re Wiggins*, 488 F.2d 538, 541, 179 USPQ 421, 423 (CCPA 1973).

### 35 U.S.C. § 102

"A person shall be entitled to a patent unless .... the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States" 35 USC § 102(b).

To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either expressly or inherently. *Verdegaal Bros. v. Union Oil Co.*, 814 F.2d 628, 631, 2 USPQ2d 1051, 1053 (Fed. Cir. 1987).

### 35 U.S.C. § 103

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art

14

Appeal 2007-0518
Application 90/006,969

are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 USC § 103(a).

In determining whether claimed subject matter would have been obvious we take into consideration (1) the scope and content of the prior art, (2) any differences between the claimed invention and the prior art, (3) the level of skill in the art, and (4) any relevant objective evidence of obviousness or non-obviousness. *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1731, 82 USPQ2d 1385, 1389 (2007), *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

### E. Analysis

#### *The 112, ¶¶ 1 and 2 rejections*

Simplification argues that the Examiner failed to follow the requirements for reexamination proceedings and that the rejections of claims 31-40 under 35 U.S.C. 112, ¶¶ 1 and 2 were improper (FF 13). The Examiner argued that the amendatory language changed the scope of the claims 31-40 and therefore the rejection is proper (FF 14). We need not decide who is correct, since even considering the Examiner's rejections we cannot sustain the rejections made.

We first address the arguments made in the context of the written description requirement. The Examiner initially bears the burden to demonstrate that the Specification fails to provide written description support for the claimed invention. Inherent in that demonstration is that the Examiner clearly articulates a reason for making the rejection. *In re*

15

Appeal 2007-0518
Application 90/006,969

*Piasecki*, 745 F.2d 1468, 1472, 223 USPQ, 785, 788, (Fed. Cir. 1984). In order to demonstrate that a claim term lacks written description support, the burden is initially on the Examiner to demonstrate that the inventor did not have possession of the claimed invention.

The Examiner argued that there is not a clear picture of the intended metes and bounds of the electronic collection of tax data wherein the tax data collected electronically is not collected manually or manually entered onto said electronic tax return as recited in claims 31-33, 39 and 40 (FF 7(1)). The Examiner acknowledges that portion of the Specification that describes this feature, yet fails to explain why that description fails to convey to one of ordinary skill in the art that the inventor had possession of the claimed feature. For example, the Specification states that "the invention eliminates the current requirement that a taxpayer manually collect the tax data, eliminates the current requirement that a taxpayer manually enter such tax data onto a tax return or into a computer..." (FF 10). That description is very similar to the claim language that the Examiner argues does not have written description support. Yet, the Examiner has failed to clearly articulate why the passage does not support the claim language.

The Examiner also argued that the Specification does not render a clear picture of the metes and bounds of the automatic and electronic collection of tax data. Again, the Examiner has failed to articulate in any meaningful way why the description discussed immediately above or that the Specification as a whole fails to convey to one of ordinary skill in the art that the inventor had possession of the claimed feature. For example, the

16

Appeal 2007-0518
Application 90/006,969

Specification describes that once the tax payer provides account or
identification data to the intermediary, the intermediary then may
*electronically* search databases for the tax payer's tax data (Specification col.
4:51-56), or the electronic intermediary may *electronically* contact and
collect from the tax data providers the tax payer's tax data (Specification col.
4:56-62). The Examiner has failed to clearly articulate why such descriptions
fail to convey to one of ordinary skill in the art that the inventor had
possession of automatic and electronic collection of tax data.

    The Examiner also found that since the Specification describes that the
invention may be implemented using existing software, such as TurboTax®,
that the demarcation between one off-the-shelf software program being
integrated into another piece of software is not made clear by the
Specification (FF 9). The Examiner's position is not persuasive. The
Specification states that "step 13 can be implemented using a computer
program *similar to* the computer programs currently available in the market
place" such as TurboTax® (FF 10). The Specification makes clear that the
software may be similar to what is available in the market place, but need not
be exactly the same software.

    Lastly, the Examiner determined that tax data "reported on an Internal
Revenue Service ("IRS"), state, local, or foreign tax form" as recited in
claims 33 and 36 is not supported by the Specification. The Examiner poses
several hypothetical questions regarding the limitation (FF 8). The questions
are confusing and detract from any reasoned articulated explanation of why
the Examiner finds that the inventor did not have possession of the claimed

17

Appeal 2007-0518
Application 90/006,969

feature. The Specification would appear to support the limitation and the
Examiner has failed to explain otherwise. For example, the Specification
describes that the electronic intermediary can connect electronically with the
IRS and receive tax data from the IRS. The tax data is data that various tax
data providers provide to the IRS (FF 11). The Examiner has failed to
clearly articulate why the Specification fails to convey that the inventor had
possession of the claimed feature.

In response to Simplification's arguments, the Examiner apparently
agrees that the Specification *does* provide written description support for the
electronic transmission of data and software processing using the data, but
argues that the Specification fails to explain in detail how this is
accomplished (FF 15).

Whether one of ordinary skill in the art can make or use a described
invention, e.g., enablement, is a separate and distinct requirement of
35 U.S.C. § 112, ¶ 1. The test for enablement is based on undue
experimentation, where several underlying factual findings need be made. *In
re Wands*, 858 F.2d 731, 8 USPQ2d 1400. The Examiner has failed to make
any such findings. We need not and will not speculate as to how the
Examiner's rejections may possibly fit into an enablement scenario. The
Examiner has the initial burden to succinctly articulate a rationale for
rejecting the claims.

The Examiner's rejection based on the second paragraph of 35 U.S.C.
§ 112 is verbatim the same as the written description rejection. In the context
of 35 U.S.C. § 112, second paragraph, the Examiner has failed to explain

18

Appeal 2007-0518
Application 90/006,969

why the scope of the invention sought to be patented cannot be determined
from the language of the claims, the Specification or the teachings of the
prior art with a reasonable degree of certainty, as required. *In re Wiggins*,
488 F.2d 538, 541, 179 USPQ 421, 423 (CCPA 1973).

As already discussed above, at the heart of the Examiner's rejections is
that the Specification does not provide enough information such that one of
ordinary skill in the art would be able to make or use the invention.
However, whether a Specification conveys enough information to enable one
of ordinary skill in the art to make or use an invention is a different and
separate requirement from the written description requirement or the
definiteness requirement. In that respect, and as already explained, the
Examiner has failed to make the requisite findings to support the assertions
made, e.g., that one of ordinary skill in the art would not know how to make
or use the invention without undue experimentation.

In addition to the above, and with respect to claims 33 and 36, we
cannot sustain the rejection for the following reasons. Claims 33 and 36 both
recite "collecting automatically and electronically tax data from said tax data
provider, wherein said tax data is reported on an Internal Revenue Service
("IRS"), state, local, or foreign tax form." The Examiner argues that the
claim language is indefinite since the claim could properly be interpreted as
requiring active reporting. Specifically, the Examiner asks whether the tax
data is reported, and if so, by whom (FF 8). We disagree with the Examiner
that the claim may be properly interpreted to require active reporting of tax
data to anyone. Simplification argued, and we agree, that the phrase

19

Appeal 2007-0518
Application 90/006,969

"wherein the tax data is reported on an Internal Revenue ("IRS"), state, local, or foreign tax form" is merely descriptive of the type of tax data that is collected (Answer 22). Reported tax data is just data appearing on a tax form. The claim does not require active reporting of the data as argued by the Examiner. Our interpretation is supported by the description in the Specification (FF 11). It also does not matter who had placed the data on an IRS, state, local, or foreign tax form such that such data can then be collected as "reported." The Examiner failed to rebut Simplification's argument in this regard, and therefore, the rejection of the claims 33 and 36, under 35 U.S.C. 112, ¶ 2 is also without merit.

### The prior art rejections

The Examiner finally rejected: (1) independent claims 1, 10, 31, 32, 34, 35 and 37-40 as being anticipated under 35 U.S.C. § 102(b) by Beamer and further supported by the disclosure of "It's W-2 Time" and (2) independent claims 15, 33 and 36 as being unpatentable under 35 U.S.C. § 103 over Beamer and further supported by the disclosure of "It's W-2 Time" and based on official notice taken by the Examiner. In both the anticipation and the obviousness rejections, the Examiner relied on Beamer to teach collecting electronically tax data from said tax data provider.[2]

---

[2] Although the Examiner took official notice as to the different types of tax data that one could obtain from a bank, the Examiner in rejecting claims 15, 33, and 36 relies on Beamer to teach collecting tax data from a tax data provider, e.g., a bank (FFs 28 and 29). Thus, the issue with respect to claims 15, 33 and 36 is whether Beamer describes collecting tax data from a tax data provider.

20

Appeal 2007-0518
Application 90/006,969

An issue raised by Simplification is whether Beamer describes that the information collected from the tax data provider, e.g., bank, is "tax data." For the reasons that follow, the Examiner has failed to sufficiently establish that Beamer describes that the information collected from the tax data provider, e.g., bank, is "tax data," and therefore the rejection of all of the claims 1-18 and 31-40 is reversed.

In reviewing both the Examiner's and Simplification's arguments, it appears that both agree that "tax data" is data that is used to determine a tax payer's liability (FFs 19 and 24), which is consistent with the Specification description of tax data (FF 26). The specification describes examples of "tax data" as IRS Forms W-2 from their employers and IRS Forms 1099 from their banks (FF 26). Simplification disagrees that Beamer describes that the information obtained from the bank, e.g., tax data provider, is data that is used to determine a taxpayer's liability.

Simplification argues that the information obtained from the tax data provider, e.g., the bank, is described as "salary data" and that "salary data" does not indicate the net pay of the taxpayer, which is necessary to determine the taxpayer's taxable income. Specifically, Simplification argues that the Beamer bank record indicates the salary of the taxpayer. Simplification further argues that the bank record salary entry is the net pay of the taxpayer, and that the salary entry data would not include a taxpayer's taxable income, or tax liability (FF 24).

We understand Simplification to argue that the information contained on a bank statement as described in Beamer would show a record of the

21

Appeal 2007-0518
Application 90/006,969

amount of money directly deposited into a taxpayer's account, which
Simplification refers to as "salary data." We further understand
Simplification to argue that a monthly bank record showing the amount of
money directly deposited would not be "tax data" since one could not
determine the taxable income from the data showing the amount deposited.
Instead, Simplification maintains that Beamer's direct deposit information is
not useful information for determining a tax payer's liability.

In support of the argument, Simplification directs attention to
paragraph 3 of Beamer. That passage is as follows:

> One day in the not-too-distant future Jan and Jim
> Smithwick will have their employers transmit their salaries
> electronically directly into their personal bank accounts. They
> will be able to download their bank records into their personal
> financial software. That program can lien pass the information
> to a tax preparation program.

This passage tends to support Simplification's argument that the only
type of data that is specifically described is "salary" information, or the
amount of money directly deposited into the taxpayer's bank account from an
employer. From the above passage, one would understand that what an
employer is electronically directly transmitting to the Smithwick's bank
accounts is the amount of money owed to them from their employer. Such
direct deposits are typically made on a weekly, bi-weekly or monthly basis.
That amount would be after all tax deductions, retirement deductions, social
security deductions, and any other deductions are made. There is no
indication from the above passage that the amount deposited directly into the

22

Appeal 2007-0518
Application 90/006,969

Smithwick's account is the type of data that is typically used to determine one's tax liability. For example, a monthly bank report showing direct deposits from an employer is a snap shot of what occurred in a given month and would not be a complete accurate summary of a taxpayer's total net income for a year, information that would be found on a W-2 form, e.g., the type of data that the Specification describes as being "tax data." Even if the direct deposit salary amount on a bank statement is assumed to be passed to a tax preparation program that does not turn it into "tax data" without any demonstration that the tax preparation software indeed uses that data to determine one's tax liability.

The Examiner's response to Simplifications' argument is not sufficient to refute the Appellants' arguments. The Examiner is silent with respect to Simplification's specific argument that Beamer describes a monthly bank statement that would only include a direct deposit amount from an employer, and that such information would not be enough or helpful to determine a taxpayer's tax liability. Instead, the Examiner merely repeats what was stated in the rejection, e.g., that Beamer ultimately utilizes the downloaded bank statement information to electronically prepare a tax return. However, the Examiner has failed to direct attention to where in Beamer that conclusion finds support, or explain how Beamer necessarily or inherently describes the feature. Such a conclusory response is not sufficient to overcome the argument made by Simplification and what Beamer describes in paragraph 3.

23

Appeal 2007-0518
Application 90/006,969

> The Examiner argues that:

> Completion of an IRS tax form is expressly disclosed by
> Beamer; therefore, by using data downloaded from a bank to
> complete the IRS tax form, said data qualifies as tax data since it
> provides information that is required to complete one's tax
> return (FF 25).

The Examiner has failed to show that Beamer contemplates "using
data downloaded from a bank to complete the IRS tax form" as argued. The
Examiner places much emphasis on the following passage in Beamer to
support the assertion that Beamer describes "tax data" e.g., data that can be
used to complete a tax form.

> Moneyline allows you to communicate directly with your
> bank's computer system. Many transactions can be directly fed
> by the bank's computer into Dollar & Sense accounts. This
> reduces the drudgery of retyping data, increases accuracy and
> gives convenient access to bank information at any time, not just
> when the statement arrives. (Beamer ¶26).

The references to "bank records" and "statement" from the above
passage are not specific as to the type of data that is contained on the bank
record or statement. The only reference to the type of data that may be
contained on the record or statement is that of the money that is deposited
into the Smithwick's bank account from their employer as previously
discussed. The Examiner has also failed to demonstrate that the data
collected from the bank must necessarily or inherently be tax data as argued
(FF 25).

24

Appeal 2007-0518
Application 90/006,969

Beamer focuses on tax preparation. However, Beamer also focuses in detail on home accounting software too. There is approximately a full page of the three page article describing the general advantages of using a home accounting software program. Within that description is the above paragraph that discusses the link between Moneyline and a home accounting software program. The downloaded bank information is to the home accounting or personal financial software, not directly to the MacInTax or tax software. As described in Beamer, home accounting software such as the Dollars & Sense software tracks data that is otherwise not relevant to a tax payer's tax liability. For example, direct deposit data, e.g., the amount of money that is deposited from an employer into an employee's bank account may be useful in the context of home accounting software, for the purpose of budgeting and paying one's bills, but is not the type of data that a tax payer uses to determine tax liability as already discussed. The home accounting software of Beamer tracks data that would appear to have nothing to do with a tax payer's tax liability. For example, Beamer describes manipulating the home accounting software files in preparation for determining tax liability. Beamer states that "[a]t tax time it is necessary to review all transactions one by one, making sure that each is in the correct category and correctly marked as *taxable or nontaxable*" (FF 23). That statement supports the notion that data collected through the home accounting software such as Dollars & Sense is not limited to tax data. Here, the Examiner has failed to sufficiently demonstrate that the data obtained from the bank is anything more than information that a taxpayer would use for household budgeting purposes,

25

Appeal 2007-0518
Application 90/006,969

which data the Examiner has failed to demonstrate would in fact be used to determine a tax payer's tax liability.

For all of these reasons, the Examiner's conclusory assertion that the data collected from the bank must necessarily or inherently be data that is used to process a tax payer's liability is not supported by record evidence.

As applied by the Examiner (FF 16, 17 and 27-29), neither "It's W-2 Time" nor the official notice taken make up for the deficiencies of Beamer.

For all of these reasons, we will not sustain the Examiner's rejection of the claims based on the prior art of record.

## F. Decision

Upon consideration of the record, and for the reasons given, the Examiner's rejections are reversed.

The Examiner's rejection of claims 31-40 under 35 U.S.C. § 112, first paragraph, as failing to comply with the written description requirement is reversed.

The Examiner's rejection of claims 31-40 under 35 U.S.C. 112, second paragraph, as being indefinite is reversed.

The Examiner's rejection of claims 1-3, 5, 10, 31, 32, 34, 35, and 37-40 under 35 U.S.C. § 102(b) as being anticipated by Beamer as further supported by "It's W-2 Time" is reversed.

Appeal 2007-0518
Application 90/006,969

The Examiner's rejection of claims 4, 6-9, 11-18, 33, and 36 under 35
U.S.C. § 103(a) as being unpatentable over Beamer and further in view of the
article "It's W-2 Time" is reversed.

REVERSED

VENABLE LLP
P.O. BOX 34385
WASHINGTON, DC  20043-9998

JAMES L. KWAK
STANDLEY & GILCHRIST, LLP
495 METRO PLACE SOUTH SUITE 210
DUBLIN, OH  43017-5319

lp

27

# EXHIBIT E

# SIMPLIFICATION v. BLOCK

**Table of the Parties' Proposed Constructions for the Disputed Terms:**

| Claim Term | Block's Proposed Construction | Simplification's Proposed Construction |
|---|---|---|
| Automatic tax reporting | preparing a tax return on a computer automatically without manual intervention from the user | Determining and/or reporting tax liability, or satisfying tax reporting obligations, via process in which one or more functions, once initiated, are completed electronically without manual intervention. |
| Electronically | performed on a computer automatically without manual intervention from the user | By way of devices, circuits, or systems utilizing electron devices. |
| Connecting electronically | the act of establishing communication between computerized devices automatically without manual intervention from the user. | Physically or logically coupling by way of devices, circuits, or systems utilizing electron devices. |
| Collecting electronically | the act of gathering data automatically without manual intervention from the user | Gathering by the way of devices, circuits, or systems utilizing electron devices. |
| Processing electronically | the act of performing the appropriate computations (e.g., addition, subtraction, multiplication, and division) automatically without manual intervention from the user. | The systematic performance of operations, such as data manipulation, merging, sorting, and computing accomplished by way of devices, circuits, or systems utilizing electron devices. |
| Preparing electronically | the act of completing automatically without manual intervention from the user | This claim limitation does not require separate construction. It is a complication of several other construed claim terms. |
| Filing electronically | the act of entering a legal document into the public record by means of a computer automatically without manual intervention from | Submitting or transmitting to a taxing authority by way of devices, circuits, or systems utilizing electron devices. |

- 1 -

| | the user. | |
|---|---|---|
| Electronic tax return | a completed computerized tax return ready for submission to a governmental tax agency. | A tax return in an electronic format. |
| Means for connecting electronically | This term should be construed under 35 U.S.C. § 112(6).<br><br>Function: establishing communication between computerized devices automatically without manual intervention from the user<br><br>Corresponding Structure: Specification does not disclose structure sufficient to perform the recited function. However, to the extent the Court believes structure is sufficiently described, Defendant submits that the only structure disclosed is a general purpose computer programmed with undisclosed software connected by electronic links 32-37 to tax data providers. | Plaintiff agrees that this claim limitation should be construed under 35 U.S.C. § 112, ¶ 6.<br><br>Function: establishing a physical or logical coupling<br><br>Corresponding Structure: general-purpose computer programmed with code segments (see, e.g., Col. 3, ll. 62-65) to operate the general-purpose computer, causing it to establish a physical or logical coupling via an electronic link (e.g., FIG. 2, electronic links 32-36). Such code segments are present on a computer-readable medium. See, e.g., Col. 3, ll. 35-61. |
| Means for collecting electronically | This term should be construed under 35 U.S.C. § 112(6).<br><br>Function: gathering data automatically without manual intervention from the user<br><br>Corresponding Structure: Specification does not disclose structure sufficient to perform the recited function. However, to the extent the Court believes structure is sufficiently described, Defendant submits that the only structure disclosed is a general purpose | Plaintiff agrees that this claim limitation should be construed under 35 U.S.C. § 112, ¶ 6.<br><br>Function: gathering tax data<br><br>Corresponding Structure: general-purpose computer programmed with code segments (see, e.g., Col. 3, ll. 62-65) to operate the general-purpose computer, causing it to gather tax data via an electronic ling (e.g., FIG. 2, electronic |

| | | |
|---|---|---|
| | computer programmed with undisclosed software connected by electronic links 32-37 to tax data providers. | links 32-36). Such code segments are present on a computer-readable medium. *See, e.g.,* Col. 3, ll. 35-61. |
| Means for processing electronically | This term should be construed under 35 U.S.C. § 112(6).<br><br>Function: performing the appropriate computations (*e.g.,* addition, subtraction, multiplication, and division) automatically without manual intervention from the user.<br><br>Corresponding Structure: Specification does not disclose structure sufficient to perform the recited function. However, to the extent the Court believes structure is sufficiently described, Defendant submits that the only structure disclosed is a general purpose computer programmed with undisclosed software. | Plaintiff agrees that this claim limitation should be construed under 35 U.S.C. § 112, ¶ 6.<br><br>Function: performing systematically operations such as data manipulation, merging, sorting, computing<br><br>Corresponding Structure: general-purpose computer programmed with code segments (*see, e.g.,* Col. 3, ll. 62-65) to operate the general-purpose computer, causing it to perform said systematic operations. Such code segments are present on a computer readable medium. *See, e.g.,* Col. 3, ll. 35-61. |
| Means for preparing electronically | This term should be construed under 35 U.S.C. § 112(6).<br><br>Function: completing automatically without manual intervention from the user<br><br>Corresponding Structure: Specification does not disclose structure sufficient to perform the recited function. However, to the extent the Court believes structure is sufficiently described, Defendant submits that the only structure disclosed is a general purpose | Plaintiff agrees that this claim limitation should be construed under 35 U.S.C. § 112, ¶ 6.<br><br>Function: preparing an electronic tax return<br><br>Corresponding Structure: general-purpose computer programmed with code segments (*see, e.g.,* Col. 3, ll. 62-65) to operate the general-purpose computer and to prepare an electronic tax return. Such code segments are present on a computer readable medium. *See, e.g.,* Col. 3, ll. |

| | computer programmed with undisclosed software. | 35-61. |
|---|---|---|
| Means for filing electronically | This term should be construed under 35 U.S.C. § 112(6).<br><br>Function: entering a legal document into the public record by means of a computer automatically without manual intervention from the user.<br><br>Corresponding Structure: Specification does not disclose structure sufficient to perform the recited function. However, to the extent the Court believes structure is sufficiently described, Defendant submits that the only structure disclosed is a general purpose computer programmed with undisclosed software connected to a taxing authority by electronic link 37. | Plaintiff agrees that this claim limitation should be construed under 35 U.S.C. § 112, ¶ 6.<br><br>Function: submitting or transmitting to a taxing authority<br><br>Corresponding Structure: general-purpose computer programmed with code segments (see, e.g., Col. 3, ll. 62-65) to operate the general-purpose computer, causing it to submit said electronic tax return to the taxing authority via an electronic link (e.g., FIG. 2, electronic link 37). Such code segments are present on a computer readable medium. See, e.g., Col. 3, ll. 35-61. |

# EXHIBIT F

MAILED

JUN 1 3 2007

U.S. PATENT AND TRADEMARK OFFICE
BOARD OF PATENT APPEALS
AND INTERFERENCES

1  RECORD OF ORAL HEARING

2

3  UNITED STATES PATENT AND TRADEMARK OFFICE

4  _____

5  BEFORE THE BOARD OF PATENT APPEALS
6  AND INTERFERENCES

7  _____

8  Ex parte DAVID S. MILLER

9  _____

10  Appeal 2007-0518
11  Reexamination Control 90/006,969
12  Patent 6,697,787
13  Technology Center 3600

14  _____

15

16  Oral Hearing Held: May 2, 2007

17  _____

18

19  Before JAMESON LEE, SALLY C. MEDLEY and
20  JAMES T. MOORE,
21  Administrative Patent Judges.

22

23  ON BEHALF OF THE APPELLANT:
24      MICHAEL A. SARTORI, ESQUIRE
25      RYAN M. FLANDRO, ESQUIRE
26      Venable, LLP
27      575 7th Street, N.W.
28      Washington, D.C. 20004-1601
29
30
31
32

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1       The above-entitled matter came on for hearing on Wednesday,

2    May 2, 2007, commencing at 1:00 p.m., at The U.S. Patent and Trademark Office,

3    600 Dulany Street, Alexandria, Virginia before Dominico Quattrociocchi,

4    Reporter.

5       MR. SARTORI:  This is actually my first time in the Board for the

6    new building here.  May I begin?

7       JUDGE MEDLEY:  Yes.

8       MR. SARTORI:  May it please the Board, I'm Michael Sartori,

9    counsel for patent order Simplification, LLC.  We've made our introductions

10    around who we have with us today.  And prior to proceeding, just to confirm our

11    understanding, we have 20 minutes to discuss both of the reexaminations; is that

12    correct?

13       JUDGE MEDLEY:  Right.  Of course, we ask a lot of questions, but

14    we'll be sensitive to that.

15       MR. SARTORI:  Okay, no problem.  We think 20 minutes is fine.

16    That's no problem.

17       And initially, we'd like to also kind of -- it's interesting the timing of

18    the oral hearing.  You know, here the beginning of May.  We just had April 17th,

19    the day to file our tax returns.  And if you file your tax returns on your own, you

20    would have found the invention for the '052 and the '787 patent very beneficial to

21    you.

22       To put the invention in the context of the real world, and without using

23    the formal claim language as an example, if you prepare your own tax return, you

24    would use tax preparation software on your personal computer.  And say, for

25    instance, you had an account at a mutual fund, maybe Fidelity, and you had many

26    accounts there.  And Fidelity would send you a Form 1099, which would include

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   the information, your tax information, for 2006, your interest, dividends, capital

2   gains, whatnot.  And you would take that, your 1099, sit in front of your computer

3   with your tax preparation software, and you'd type in the information that was on

4   your 1099.  You would enter that into the tax preparation software.

5              With the invention in the two patents, what you would do instead is,

6   with the tax preparation software, you identify to the tax preparation software that

7   you had an account with Fidelity, and then you would provide the software with

8   maybe your account number or some sort of personal identification.  And then you

9   would say go, proceed, and the tax preparation software would automatically then

10  go over the Internet, go to Fidelity, and it would automatically obtain the

11  information that was in the Form 1099, such as your interest and dividends and

12  whatnot, and bring those back down automatically and download them into the tax

13  preparation software.

14             JUDGE MEDLEY:  I was just going say, does Simplification actually

15  have a product on the market?

16             MR. SARTORI:  Simplification does not have a product on the

17  market.  So this is hypothetically speaking how it would work in the real world.

18             And then the software would automatically process the information.

19  For example, adding together all the interests, all the dividends.  And then it would

20  populate your tax returns in the appropriate places in the 1040s, and the various

21  schedules that need that information would populate automatically.  And that's the

22  big difference between what's been done prior and the invention of these two

23  patents.

24             JUDGE MEDLEY:  Your specification, is it very specific, though, as

25  to how that's done, like the software, the coding?  None of that's in there.  It's

26  more of just a broad general description, right?

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1    MR. SARTORI:  That is correct.  And pursuant to the written

2  description requirement for software inventions, you just need to describe the

3  functionality.  You don't need to provide the source code or flow charts.  Just

4  describe the functionality per the Phonar and Rihase (phonetic) Microsystems

5  cases.  That's the standard that was used in drafting the application.

6    JUDGE MEDLEY:  So I give all of my tax forms to H&R Block.

7    MR. SARTORI:  Yes.

8    JUDGE MEDLEY:  I tell them go do this.  I don't want to have

9  anything to do with it.

10    MR. SARTORI:  Right.

11    JUDGE MEDLEY:  So I'm not involved very much at all.  But I

12  guess it's not really computerized, because the tax accountant goes and does his

13  thing.  Why wouldn't it have been obvious to make all of this electronic?

14    MR. SARTORI:  To begin with?

15    JUDGE MEDLEY:  To make the same thing electronic.  To gather

16  this information electronically and have the H&R Block person do everything

17  electronically.  I mean, certainly it was known for me to hand my stuff to H&R

18  Block and say, "Figure all this out."

19    MR. SARTORI:  Yes.  Well, but the pieces were not in place to

20  suggest that or to do that.  The closest thing that we've seen in the 10 years since

21  we've, you know, filed the application has been the Beamer article that the

22  examiner put forth.  And that one only discusses the manual aspects of entering the

23  system.  And there is some downloading of information, but it is very

24  distinguishable from what's in the patent.

25    JUDGE MEDLEY:  Are you aware of a product out there on the

26  market that actually does what you're describing here?

4

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1    MR. SARTORI: Yes, in fact, we are. There is -- the H&R Block Tax

2    Cut is the software that is on the market. Simplification sued H&R Block four

3    years ago or so, I think in 2003, and that suit has stayed pending the results of these

4    reexaminations.

5    JUDGE MEDLEY: The name of the software is H&R Block --

6    MR. SARTORI: It's H&R Block Tax Cut. Tax Cut is the name of the

7    software.

8    JUDGE MEDLEY: Okay.

9    JUDGE LEE: Mr. Sartori?

10    MR. SARTORI: Yes.

11    JUDGE LEE: When your accountant calls up your bank and says,

12    "Please, you know, I'm so-and-so's accountant. Here's his account number.

13    Please tell me the interest he's earned on this account," and if the bank says,

14    "Okay, instead of sending a paper copy," he says, "I'm going to fax it to you," or

15    "I'll scan it and transmit it electronically to you," why isn't that electronically

16    collecting tax data? Even though it involves someone in your accountant's office

17    to make the initial call and say, "Please give me this data," and the bank transmits

18    it electronically, why wouldn't that be electronic collection of the tax data?

19    MR. SARTORI: Because those are not done automatically. There is -

20    - the collection, the connecting, is not done automatically as required by the

21    claims.

22    JUDGE LEE: Yeah. But not all of your claims require automatic

23    collecting. I see quite a few that don't require automatic collection.

24    MR. SARTORI: That's true. There's Claims 1 and 10 of the '787

25    patent do not recite "automatic" in the preamble.

26    JUDGE LEE: Plus the means claims.

5

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1      MR. SARTORI:  The means claims.  All the claims in the '052 patent

2   recite "automatic" in the preamble, and they recite "automatically" as well in the

3   body.

4      JUDGE LEE:  Well, let's put your automatic claims aside.

5      MR. SARTORI:  Okay.

6      JUDGE LEE:  Let's focus on the ones that don't require automatic

7   collection.

8      MR. SARTORI:  Okay.  Those would be Claims 1 and 10, the two

9   independent claims, and their dependent claims in the '787 patent.

10     JUDGE LEE:  So what about the scenario I just proposed to you?

11  Why wouldn't that qualify as electronically collecting tax data?

12     MR. SARTORI:  Yes.  Those would not be done, because there is the

13  manual requirement to do that.  To collect them electronically requires the --

14  specification and electronic intermediary to do the collecting and connecting.  In

15  that situation, it's the human who's doing the calling up as soon as --

16     JUDGE LEE:  Yes.  But there's still the electronic aspect to it.

17     MR. SARTORI:  There is.  But we assert that that is not -- that that is

18  outside the scope of the claims.

19     JUDGE LEE:  I know your assertion.  But why?

20     MR. SARTORI:  Why?

21     JUDGE LEE:  What's the reasoning?  We had the broadest reasonable

22  interpretation that applies in our proceedings.  So if the electronic aspect's pretty

23  substantial, which I think it is in that case, the person just makes a call and

24  everything else is done electronically, why is that not -- why does that not meet

25  electronically collecting tax data?

26     MR. SARTORI:  Okay.  So let me just understand the facts of what

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   you're saying.  So the taxpayer calls up the bank on the phone?

2        JUDGE LEE:  The accountant calls the bank.

3        MR. SARTORI:  Accountant calls the bank.

4        JUDGE LEE:  "Here's my client's account number.  I need to know

5   the interest."

6        MR. SARTORI:  Okay.  And then the --

7        JUDGE LEE:  The bank teller says, "Oh, let me scan it and e-mail it to

8   you."

9        MR. SARTORI:  Okay.  Scans and e-mails to the --

10       JUDGE LEE:  Accountant.

11       MR. SARTORI:  Accountant.  Okay.  I think the one step that's

12  missing in that situation is the connecting electronically to a tax data provider.  The

13  human on the telephone calling up the bank is not connecting electronically to the

14  tax --

15       JUDGE LEE:  No.  But there is a piece of equipment in the

16  accountant's office that receives the tax data electronically.

17       MR. SARTORI:  You're correct.  There's two different -- there's two

18  steps that are recited in the claims.  One is connecting electronically, and then it's

19  collecting electronically.  There are two steps.  So in that situation, they're

20  connecting electronically.

21       JUDGE LEE:  Well, you can't receive electronically unless you first

22  connect electronically.  So whatever equipment that's receiving would have

23  connected electronically before it receives.

24       MR. SARTORI:  For e-mail, now, my knowledge of actually how the

25  whole e-mail system works is a bit vague, so I'm --

26       JUDGE LEE:  Well, it could be a fax machine.

7

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1    MR. SARTORI:  But then a fax machine is -- the fax machine is not

2    connected to the computer then.  So then you have a paper copy that comes off the

3    fax machine.  You have a paper copy, and then you're down there, you know,

4    entering the data in by hand again, so it's outside the scope of the claims.

5    It's outside the -- it doesn't anticipate or render obvious the claims.

6        JUDGE MOORE:  So you read these claims as excluding all manual

7    data entries.

8        MR. SARTORI:  No.  It doesn't for the fact that it's comprising, so

9    it's open-ended.  So you could perhaps enter other information automatically.

10       For example, let's say you gave some donations to Purple Heart last

11   year in 2006.  And Purple Heart, you know, isn't set up to do this electronic

12   transmission.  You would need to type in and enter in your donations to go on your

13   scheduled itemized deductions.  That would be within the software within the

14   scope of the claim, because it's comprising, but that would not actually meet the

15   elements of the claims.

16       JUDGE LEE:  Okay.  You're talking about two different limitations.

17   I'm only talking about electronically collecting.

18       MR. SARTORI:  Yes.

19       JUDGE LEE:  Maybe, you know, with a faxed copy, you wouldn't

20   have electronically entered it.  But I'm just focusing on electronically collecting.

21       MR. SARTORI:  Okay.

22       JUDGE LEE:  With the faxing, you do have electronic collection,

23   right?

24       MR. SARTORI:  I don't think so.  Because electronic collection --

25   this is interesting.  That's a good question.  Electronic collection, that's not

26   contemplated by the scope of the claims.  I think in -- the patent actually talks

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   about collection.  Let me just refer to that for a moment.  I'm sorry.

2            On -- let's see.  On the '052 -- well, the same as -- it's a continuation

3   of the other.  It talks about electronic links 32 to 37.  And that's what's connecting

4   the general purpose computer to the tax data provider.  And it says general purpose

5   computer electronically connected to telephone communication equipment using,

6   for example, a modem or electronic data network, such as the Internet or a

7   computer medium for transferring and receiving the tax data.

8            So I think the actual sending the fax over would not be collecting

9   electronically.  I think receiving an e-mail would probably be collecting

10  electronically.

11           JUDGE MOORE:  I don't know if I agree with that.  I think the fax

12  modem, it simply receives faxes.

13           MR. SARTORI:  It is.  Okay.  Collecting electronically.  But then it

14  would be the -- it would not be -- it's not into the tax preparation software at that

15  point.  You have the paper that comes out of your fax machine.  Then how is that

16  getting into your tax preparation software?  You're keying it in yourself.

17           JUDGE LEE:  Well, you're going to a different limitation now, and

18  just focusing on electronic collection.  The collection is done when that data is

19  received by the fax machine.

20           MR. SARTORI:  But the fax machine is not the tax preparation

21  software.

22           JUDGE LEE:  I agree.

23           MR. SARTORI:  Right.  So there's --

24           JUDGE LEE:  But as far as collecting goes, you have electronic

25  collection right there.

26           JUDGE MOORE:  Now, when you process it electronically, does that

9

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   just mean on the screen?  You're looking -- let's say it's a fax image that you never

2   print out.  Does looking at that and then typing in the information processing that

3   electronically, because it never gets into paper?  Or is --

4       MR. SARTORI:  No, it's not, because that requires manual entry.  In

5   fact, the specification calls out with respect to step 12, which is the step we're

6   talking about here of this manual collecting -- the specification says, "Hence, with

7   electronic collection of tax data" -- I'm on column 6, line 24 of step 12 -- "the

8   invention eliminates the current requirement that a taxpayer manually collect the

9   tax data and eliminates the current requirement that a taxpayer manually enters

10  such tax data onto a tax return."

11      So if it comes up on the screen, yeah, that's electronically, but you

12  still have to manually enter it.  So you're not within the scope of what's being

13  claimed.

14      JUDGE MEDLEY:  Why should we limit means for collecting

15  electronically to mean that no manual entry is done?  I mean, aren't you

16  necessarily importing limitations from the spec?  In your claim, we should be

17  giving it the broadest, most reasonable interpretation.

18      MR. SARTORI:  That's true, consistent with the specification of the --

19  if it's a means plus function claim we're discussing, then it's the structure and its

20  equivalent, as described in the terms and specifications.  Specification talks about a

21  computer with software and eliminating the need to manually enter the data.

22  Therefore, in terms of the 112-6 analysis, any manual entry of data would be

23  outside the scope of the claims.

24      JUDGE MEDLEY:  Well, the means that we're supposed to look at is

25  the structure, but it sounds like you're importing more functional limitation than

26  what's being claimed.  It's means for collecting electronically tax data.  But then

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   you're saying that you also have to have that it's not manually entered.

2       MR. SARTORI:  Yes.

3       JUDGE MEDLEY:  That doesn't have anything to do with the

4   structure on the means.  That would seem to be importing more functional

5   language.  It's just not there.

6       MR. SARTORI:  You could put it that way.  However, with the

7   example that Judge Moore gave where it's up on the screen, the fax comes up on

8   the screen, the tax preparation software isn't doing that electronically.  It's not

9   collecting electronically.  There is some intervention there that is assisting the

10  collection electronically, and we believe that's outside the scope of the claims.

11      JUDGE LEE:  What if we can't figure out what is your intermediary,

12  electronic intermediary?  Would that make your means claims indefinite?

13      MR. SARTORI:  No.  The electronic intermediary is, in fact, defined

14  in the specification on -- excuse me -- on column 4, lines 39 to 42.  On both

15  patents, it's the same site.  It says, "The term 'electronic intermediary' refers to a

16  data processing system comprising a general purpose computer and a computer

17  program as described above for performing the invention."

18      JUDGE LEE:  I understand.  I read that too.  But if you read on, you

19  have an alternative embodiment where the electronic intermediary is not the --

20  program,  but it's something that's controlled by your -- another institution.

21      MR. SARTORI:  Are you referring to column 5?  Column 5, line 27?

22      JUDGE LEE:  It starts with, "In an alternative embodiment" --

23      MR. SARTORI:  Yes.

24      JUDGE LEE:  -- "the electronic intermediary is controlled by a tax

25  return preparer institution."  Now, in this embodiment, the alternative embodiment,

26  you never tell us what is that electronic intermediary.

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1    MR. SARTORI: Yes. That's to be contrasted to the paragraph before

2    it, which starts on column 5, line 16. In that paragraph, the idea is if you want to,

3    say, Costco and you picked up the latest version of H&R Block's Tax Cut,

4    electronic intermediary now is that general purpose computer, but it's being

5    controlled by the actual taxpayer themselves.

6        The same sense, H&R Block has that same Tax Cut version used in

7    their brick and mortar stores around the corner by the Ruby Tuesdays. And so it's

8    the tax preparer that's actually using that same program that you could buy at

9    Costco, but using it at their brick and mortar establishment. And that's the

10   difference between those two embodiments discussed. It's the electronic

11   intermediary is both the computer, whether it's being controlled by the taxpayer or

12   by the tax accountant or the tax preparer. Taxpayer versus tax pre-payer.

13       JUDGE LEE: Aren't you reading a lot into that? Why isn't the plain

14   meaning that you haven't told us what the electronic intermediary is in this

15   alternative embodiment? It could be anything else. Why do we have to read

16   what's before in the previous paragraph into this paragraph?

17       MR. SARTORI: I think they're not -- I think it's clear the previous

18   paragraph says the taxpayer has control over the electronic intermediary. The next

19   paragraph, the electronic intermediary is controlled by the tax return preparer.

20       JUDGE LEE: I know. But it wouldn't be the same object. Because

21   in the paragraph before, you have a disk. That disk is in the possession of the

22   taxpayer.

23       MR. SARTORI: Yes.

24       JUDGE LEE: Well, it obviously is not in the possession of your tax

25   preparer. So the tax preparer cannot be in control of the structure that's described

26   in the previous embodiment. So what is the embodiment in the alternative -- what

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1    is the structure in the alternative embodiment?

2    MR. SARTORI:  It's a general purpose computer with software

3    according to the invention.  It's whether or not --

4    JUDGE LEE:  Where is it?  I mean, I don't see it.  You want us to say

5    that "Well, in my alternative embodiment, the electronic intermediary is a

6    computer and a program in my tax preparer's office."

7    MR. SARTORI:  Yes.

8    JUDGE LEE:  That's what you want us to say.

9    MR. SARTORI:  Yes.

10   JUDGE LEE:  Where is it in your spec?

11   MR. SARTORI:  Electronic intermediary, referring back to column 4,

12   is the same term used consistently throughout the specification and the claims.

13   JUDGE LEE:  I know.  But where is it telling me that in the

14   alternative embodiment, the electronic intermediary is a computer in my tax

15   preparer's office?

16   MR. SARTORI:  I think you have to read the specification together,

17   the definitional section on column 4 for electronic intermediary is used consistently

18   in column 5, in the paragraph on column 5, line 17, and on line 27.  The electronic

19   intermediary is a computer, your personal computer at your desk in your home.

20   And otherwise, it's the personal computer on the desk at the tax preparer's office,

21   at H&R Block's brick and mortar office.  And the program --

22   JUDGE LEE:  I don't know.  If you're trying to invoke paragraph 6

23   of Section 112, don't you need to be specific as to what structure you're referring

24   to, instead of letting us imply or assume that structure?

25   MR. SARTORI:  Yes.  The structure is the personal computer with

26   the software.

13

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1      JUDGE LEE:  Personal computer.  Why can't it be a --

2      MR. SARTORI:  Oh, I'm sorry.  I'm sorry.  Let me just -- I'm sorry.

3   Let me use the language in the specification.  We're getting a little too loose here.

4   "A data processing system comprising a general purpose computer and a computer

5   program."

6          The examiner has basically two sets of rejections, the 112 rejections

7   and the prior art rejections.  As to the prior art rejections, I'd like to discuss two

8   points around the prior art rejections, the first being that the examiner has

9   completely ignored Federal Circuit cases we've cited that are on point, both in the

10  prosecution and in the briefs.  The cases go to the recitation of "automatic" in all

11  the claims in the '052 and in most of the claims in the '787.  And "automatic" is

12  not defined anywhere in the specification, so it must be given its ordinary meaning

13  per the Phillips case.  In addition, it should be given weight for the Federal Circuit

14  cases.

15         The three cases I'd like to discuss are the Space Systems v. Lockheed

16  Martin case and the Mercantile Exchange v. E-Bay case, both of which are cited in

17  the briefs.  The third case I'd like to bring to the Board's attention is the College

18  Net v. Apply Yourself case, which we found after we filed the briefs, but is also a

19  Federal Circuit decision on point.

20         As to the first case, in the Space Systems v. Lockheed Martin case,

21  the invention was for a navigation control of a satellite.  And the claims at issue in

22  that case were cited automatically in the body of the claim.  And the Federal

23  Circuit construed the term "automatically" to have its ordinary meaning, and

24  looked to a dictionary definition for it, looked to the New Webster's -- the

25  Webster's II New University of Riverside dictionary for the definition of

26  "automatic," which is to -- acting or operating in a manner that is essentially

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   independent of external influence or control.  And the Federal Circuit took that

2   claim construction and gave the recitation of "automatically" weight, and used it,

3   actually, in its infringement analysis.

4            In the same sense here in the two cases before the Board, we have

5   provided numerous dictionary definitions in the briefs and to the examiner, and

6   those dictionary definitions are all in line and in sync with the definition provided

7   by the Federal Circuit in the Space Systems case.

8            JUDGE MEDLEY:  So "automatic," what does that

9   -- what is your position?  What does that mean?

10           MR. SARTORI:  It should mean acting or operating in a manner that

11  is essentially independent of external input or control.

12           JUDGE MEDLEY:  So not manual.

13           MR. SARTORI:  Not manual, yes.

14           JUDGE MEDLEY:  So if you have any kind of manual input from

15  start to end, then, it's no good.

16           MR. SARTORI:  It's no good in the sense of the comprising

17  language, and no good in the sense of the limitations we have in the claims must be

18  performed automatically.

19           JUDGE MEDLEY:  But somewhere along the line, some data has to

20  be put in somewhere manually.

21           MR. SARTORI:  You are correct.  In fact, in step 11 of the

22  application, we talked about you have to initiate the system.  You have to, you

23  know, tell the software that you have account fidelity.  Tell the software what your

24  account number is, or your pass code, or whatever.  That's done in step 11.  That

25  feature of the invention is not recited in the claims.  The claims are all limited to

26  what's performed automatically by the electronic intermediary or by the computer

15

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   with the software.  And the --

2           JUDGE LEE:  What about in column 5 where you say, "The tax return

3   preparer controls the electronic intermediary and ensures that the electronic

4   intermediary receives the appropriate information required"?  Well, how does he

5   ensure that that happens?

6           MR. SARTORI:  I'm sorry.  Could you give me the line site on

7   column 5 you're referring to?

8           JUDGE LEE:  Lines 45 to 46.

9           MR. SARTORI:  Okay.

10          JUDGE LEE:  "The tax return preparer ensures that the electronic

11  intermediary receives the appropriate information required."  How can you do that

12  without intervention?

13          MR. SARTORI:  This is all referring to step 11 in the application, in

14  the patent, which goes to how do you start the process?  How do you initiate the

15  software from going forward?  It can be analogized to an automatic dishwasher,

16  where you load the dishes up, and you close the door and you press start, and the

17  dishwasher, off it goes.  It's automatic.  You don't add the water.  You don't tell it

18  when to start the rinse cycle.

19          JUDGE LEE:  Well, that's what makes it hard.  See, some manual

20  intervention is okay, by your standard, but some are not.  Right?  Apparently, it's

21  okay for someone to turn it on.

22          MR. SARTORI:  Yes.

23          JUDGE LEE:  But somehow, it's not okay for someone to manually -

24  - well, perhaps it's okay for someone to even pour in the detergent.

25          MR. SARTORI:  Yes.

26          JUDGE LEE:  But it's not okay for someone to take a piece of

16

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   clothing out and rub it. That would be like washing, so that would be no good.

2          MR. SARTORI: That's right. That would be outside the scope.

3          JUDGE LEE: So it's hard for me to tell what manual intervention is

4   okay and what manual -- which type of manual intervention is not okay.

5          MR. SARTORI: Well, I think clearly, the kind that is okay is the kind

6   that initiates the process. Another good definition for "automatic" is from the

7   College Net case, which is another case that -- this Federal Circuit case. In that

8   case, the Federal Circuit affirmed the construction of the District Court, and they

9   said the word "automatic" means once initiated, the function is performed by a

10  machine without the need to perform the function manually.

11         So once initiated -- so whether or not you're pouring the detergent on

12  there or rubbing it in there, and then you toss it in the washer, that's all pre-

13  initiation. But once you start that dishwasher or that washing machine,

14  it's going to town.

15         JUDGE LEE: Okay. That, I can understand. But let's say something

16  goes wrong. The preparer initiates, makes the call. Something goes wrong. Our

17  computers go wrong all the time.

18         MR. SARTORI: Yes.

19         JUDGE LEE: You mean this language doesn't cover a case where

20  something goes wrong, and the preparer fixes the computer and reboots the

21  computer and redoes it again?

22         MR. SARTORI: In that case, if the computer did not complete all the

23  steps in the claim, then no, it would not be covered within the scope of the claim.

24         So the definitions for "automatic" also include the option to interrupt.

25  The Federal Circuit case -- the College Net case talks about the dishwasher, and it

26  also talks about an auto pilot example. In both of those, you could interrupt the

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1    automatic process. Perhaps that's what you're thinking about, essentially, where

2    you can -- if you forgot a plate in the dishwasher, you open the door, it turns off

3    automatically. You throw the plate in, close the door, it starts back up

4    automatically.

5             Or, for instance, in auto pilot, you engage the auto pilot -- that's

6    manual -- and the auto pilot is off on its merry way flying the plane. But if the

7    pilot sees some sort of adverse conditions out there that it needs to assume control,

8    the pilot can assume control of the plane. Disengage the auto pilot, assume control

9    for as long as needed, and then reengage the auto pilot, and the auto pilot is back

10   on board again.

11           And that's the meaning of "automatic," the definitional meaning, the

12   meaning that we mean, and the same meaning in the claim.

13           JUDGE LEE: See, you talk like we should be understanding this just

14   by reading the little text you have here. But don't you need more description in

15   order for us to catch that meaning? Aren't you asking us to read a lot from just a

16   few words? You want us to have that specific understanding, that "automatic" just

17   has to mean this but not that. It covers this but not that. I mean, where is it coming

18   from?

19           MR. SARTORI: It's coming from the ordinary meaning of

20   "automatic" inferred. For the Phillips case and for the Federal Circuit cases on

21   point, "automatic" has been contested previously, and they've given it the

22   dictionary definitions I've discussed here and in the briefs. And they're all in sync

23   and in line with the use we automatically have here in the patents.

24           JUDGE LEE: Why isn't the broadest reasonable interpretation simply

25   if the bulk of it is automatic, it's sufficient?

26           MR. SARTORI: Because it would be outside the definition. The bulk

18

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   of automatic doesn't mean, for example, the definition from the College Net case.

2   Once initiated, the function is performed by a machine without the need for the

3   function to be performed manually.

4            JUDGE LEE:  What if something goes wrong, the connection gets

5   dropped?

6            MR. SARTORI:  If the connection gets dropped, then it has to be

7   restarted again.

8            JUDGE LEE:  Right.  By the interceptor.  The preparer.

9            MR. SARTORI:  Right.  If the connection is dropped, then it's started

10  again.

11           JUDGE LEE:  So then it's no longer automatic.

12           MR. SARTORI:  Then it's not within the scope of the claim, then.

13  The machine didn't perform properly.  The entire steps in the claim were not

14  performed automatically.

15           JUDGE LEE:  So your invention would not work if

16  the connection drops?

17           MR. SARTORI:  Yes.  You'd have to reconnect it, yes.  That's

18  correct.

19           JUDGE LEE:  You'd have to reconnect it.  But you just said it's not

20  covered by the claim if there's intervention to reboot it.

21           MR. SARTORI:  See, I'm talking -- in terms of an infringement

22  analysis or a validity analysis are we talking right now?

23           JUDGE LEE:  We're talking about claim interpretation.

24           MR. SARTORI:  Okay, claim construction.  Claim construction.

25           JUDGE LEE:  I asked you what happens if the connection gets

26  dropped, and you need someone to reboot the computer or to do whatever he needs

19

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1    to do to ensure that the thing is received.  And you said well, in that case, then, it

2    isn't covered by the claim.

3                MR. SARTORI:  Right.  Because the rebooting would have -- you

4    have to start -- you'd get halfway through the process.  You may be connected

5    electronically, but you couldn't collect electronically.  So you would stop at the

6    collection point, because there was something at the Internet.  Who knows?

7                JUDGE LEE:  If it isn't covered by the claim, then your invention

8    guarantees that nothing goes wrong?

9                MR. SARTORI:  No.  No, of course not.  You have to restart the

10   computer.  You have to restart the process again.  Go back to your tax software,

11   start -- you know, press "go," try it again.  Reach out to your Fidelity over the

12   Internet, and try to connect it electronically.

13               JUDGE LEE:  But you just told me that's no longer your invention.  It

14   isn't covered by your claim if there is intervention.

15               MR. SARTORI:  You would have to start the process again.  If that

16   happened in terms of claim construction, that would not be how -- that's not how --

17   the invention would not be seen through every single step in the invention.  You

18   would get through 1 1/2 steps, maybe, and you'd have to start over again at step 1.

19               JUDGE MEDLEY:  Where does it describe that that's what -- that

20   that's what's going on in your specification?

21               MR. SARTORI:  Of starting and restarting?

22               JUDGE MEDLEY:  Does it talk about automatic and what it means?

23   I did a text search.  I only got one hit, and that was in your original Claim 15 in the

24   '797 patent.

25               MR. SARTORI:  Yes.  "Automatic" should be construed for its

26   ordinary meaning and relying on dictionary definitions according

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1    to the Phillips case.

2            JUDGE MEDLEY:  But do you have a description of once you get

3    started, it runs -- everything runs automatically?  You don't have any interruptions.

4    You don't do anything other than just --

5            MR. SARTORI:  The hypothetical Judge Lee was posing on the

6    interruption is not mentioned in the specification at all.  So it's assumed -- I'm

7    sorry?

8            JUDGE MEDLEY:  Because I remember reading somewhere in your

9    spec that you can prompt the user to input data.

10           MR. SARTORI:  Yes.

11           JUDGE MEDLEY:  So why is that not manual?  They have to click on

12   a mouse.  They have to input numbers, let's say my account number.  That's

13   manual, according to what you're saying is manual.

14           MR. SARTORI:  We completely agree with that.  That is manual.

15   And that is step 11 in the patent.  Step 11 talks about the manual part of it.  It's the

16   engaging part, it's the initiation, the starting of it.  You need to tell the software

17   what your account number is, what your pass code is.  And then once it receives

18   the information, it automatically goes through all the steps in the process.  It goes

19   out to the tax data provider, collects the tax data, processes the tax data, and

20   prepares the electronic tax return.

21           The second case we'd like to talk about is the Mercantile Exchange v.

22   E-Bay case.  And in this case, "automated" was recited in the preamble, and the

23   Federal Circuit was faced with the question as to whether or not "automatic"

24   should apply to every limitation in the body.  And the invention in the Merc

25   Exchange case involved an on-line auctioning system, basically E-Bay system, in

26   which a bidder could buy an auction item at a fixed price.

21

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1    And the Federal Circuit looked at the limitations in the claims in the

2    Merc Exchange case and found that two of the limitations actually were performed

3    manually.  One limitation required that the bidder manually enter into the computer

4    their bid.  Another limitation required that the seller manually enter into the

5    computer information on the auction item.

6    And the Federal Circuit decided that because those two limitations in

7    the claim were performed manually, "automatic" that's recited in the preamble

8    does not flow into the body for those two limitations.

9    Similar to the claim in the Merc Exchange case, the claims in the '052

10   and the '787 patents recite "automatic" in the preamble.  So we need to look at

11   each claim limitation to see if that's performed automatically and each of the

12   limitations in the claims at issue here are performed automatically.

13   JUDGE LEE:  I tell you, let me try to probe this a little more.

14   MR. SARTORI:  Okay.

15   JUDGE LEE:  What's really bothering me is this language in column

16   5 of the '052 patent where it says the tax preparer ensures that the electronic

17   intermediary receives the appropriate information required.  That seems very broad

18   to me.  The tax preparer essentially is going to fix everything.

19   Let's say you have a disaster or catastrophe.  It's still making the

20   connection.  Whatever the client is sending through is not coming through.  So

21   according to this, the way I read it, the tax preparer can exercise discretion and say,

22   "Oh, forget this."  You know, the electronic connection, forget it.  Pick up the

23   phone, call the client, gets all the information verbally, puts it on the phone, and

24   manually enter all that information into the computer.

25   That would be within "The tax preparer ensures that the electronic

26   intermediary receives the appropriate information required."  That's what that

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   means to me, because it's broad and it's vague.  Ensures.  So he's going to fix

2   whatever problem that comes up, even if that includes calling up the guy, getting

3   the information on the phone, and manually entering it, simply because the

4   connection isn't worth it.  If that doesn't mean that, what does it mean?  Where do

5   you draw the line?

6          MR. SARTORI:  The discussion here of the embodiment for the tax

7   preparer is in the context of step 11.  Step 11 talks about -- step 11 is providing the

8   electronic intermediary with information on the tax data providers.  And this is the

9   information that's being provided by the tax preparer.

10          So instead of the tax payer entering and saying, "Hey, I have an

11   account with Fidelity and here's my account number," the tax preparer receives

12   that information from the taxpayer, enters it into the software themselves.  That's

13   what's being discussed here.

14          If you're reading it out of context, it may sound that way.  But, you

15   know, turning back to column 4, this is all discussing step 11 and the following

16   paragraph on line 50 talks about step 12.  Step 12 is where the "automatic" kicks

17   in.

18          To discuss the Beamer article, which was cited by the examiner in all

19   the rejections of the two patents, the Beamer article -- the Beamer system requires

20   that the -- it requires two pieces of software, at least two pieces of software, a

21   personal finance software and a tax preparation software.

22          The personal finance software first downloads a bank record, and then

23   the Beamer system requires the taxpayer, the user of the system, to monthly

24   manipulate the data, the bank records and whatnot, to get ready for tax season.

25   And the Beamer system then requires the taxpayer, the user, at the end of the year

26   to put together their own template, their own form, for the data that will be used for

23

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1    the tax returns, and then to go through that template or form line by line to ensure

2    that every single thing is correct and no mistakes were made, because it was all

3    done manually.

4            And the third thing that the Beamer system requires is for that

5    template from the tax preparation software to be imported into -- I'm sorry -- from

6    the personal finance software to be imported into the tax preparation software.

7    And that's done by having the user point and click from the personal finance

8    software to the tax preparation software.

9            JUDGE MEDLEY:  Let me go back to what Judge Lee had said

10   earlier.

11           MR. SARTORI:  Sure.

12           JUDGE MEDLEY:  You have several claims that don't require this

13   automatic limitation.

14           MR. SARTORI:  Yes.

15           JUDGE MEDLEY:  But yet, when I look through your arguments, it

16   seems like you're equating electronic, automatic, and no manual input all to be the

17   same.  I could put equal signs in between.  But that's not -- but at least, like, for

18   example, Claim 1 of the --

19           MR. SARTORI:  The '787?

20           JUDGE MEDLEY:  Yeah.

21           MR. SARTORI:  Yes.

22           JUDGE MEDLEY:  It doesn't have any impact.  It doesn't have the

23   "without manual entry."  It doesn't have "automatic."  It's just means for

24   electronically collecting, or means for collecting electronically, means for

25   processing electronically.  So if the Beamer reference is doing these things

26   electronically, why does it matter that there is some manipulation going on, or

24

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   some manual input going on?

2        MR. SARTORI:  You are correct.  Independent Claims 1 and 10 of

3   the '787 patent do not recite "automatic" or "automatically."  In the briefs, we set

4   forth two reasons why those claims are not anticipated by the Beamer reference,

5   the first one being that it does not teach collecting electronically tax data from a tax

6   data provider, which we've discussed.

7        The second reason we set forth is that the Beamer reference does not

8   teach tax data.  Tax data is defined as tax information that is relevant to the tax

9   liability of the taxpayer.  The Beamer talks about the bank records coming in and

10  focuses on expressly the salary of the user that's in the bank record and the salaries

11  being used to compute the tax information.  Well, that's what Beamer says.  But

12  that's never going to happen.

13       The salary that you receive or that I receive, the government, the IRS,

14  doesn't care how much you take home.  The IRS cares about how much you're

15  paid, what's your gross pay, and they care about your withholdings.  How much

16  was withheld for your taxes, withheld for parking, withheld for transportation, for

17  your retirement, for your health spending account.  All that information is taken

18  out of your gross.  And what you receive in your bank statement is your net, is

19  your take-home.

20       But you can't go back from your net and figure out your gross or your

21  withholdings.  None of that information is there at all in the Beamer system.

22  And, so Beamer needs to actually add that information back into those records, that

23  information, manually typing that in.  You cannot obtain that in any stretch of the

24  imagination from your salary information.

25       JUDGE MEDLEY:  Why can't the Dollars and Cents Software be the

26  tax data provider?

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1    MR. SARTORI:  Because of the definition of a tax data provider.  A

2    tax data provider is defined in the '052 -- I'm sorry -- in both patents as -- excuse

3    me a moment -- in column 4, lines 42 to 50, as referring to each party that has tax

4    information relevant to the taxpayer's tax liability or tax reporting obligations.  The

5    personal finance software is not a party.

6            The examples given in the specification are for an employer, a

7    partnership, a bank, a savings and loan institution, a mortgage institution, credit

8    card bureau, thrift institution, security brokerage firm, mutual fund holding

9    institution, charity, and federal, state, local, and foreign taxing authorities.

10           JUDGE MEDLEY:  Why are we limited?  Was it --only can be those

11   things?

12           MR. SARTORI:  No.  Those are the parties.  The tax software is not a

13   party.

14           JUDGE MEDLEY:  No.  Well, I'm just saying why can't a tax data

15   provider be -- I'm the tax data provider.  I'm inputting all of this stuff into the

16   Dollars and Cents software.

17           MR. SARTORI:  Oh, the user?  The user is?

18           JUDGE MEDLEY:  Yes.

19           MR. SARTORI:  Oh.  The user is -- that would be the manual entry.

20   That's not collecting electronically.  That's --

21           JUDGE MEDLEY:  No.  I'm talking about if I enter all the data --

22           MR. SARTORI:  Into the personal finance?  Like Dollars

23   and Cents, right?

24           JUDGE MEDLEY:  Right, Dollars and Cents.

25           MR. SARTORI:  Right.

26           JUDGE MEDLEY:  And then I get my year-end.  Everything is ready

26

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   to go, and then I transfer it.  It says you can transfer it automatically to the Mac &

2   Tax.  Why doesn't that meet the limitations here?

3           MR. SARTORI:  For two reasons.  One, the Dollars and Cents

4   program is not a party per this definition.  The second reason is that I suppose the

5   automatic transfer that Beamer talks about in his article does not actually happen

6   automatic at all.  There is a manual point and clicking.

7           What's interesting is that we actually provided the --

8           JUDGE MEDLEY:  Why?  It says it's automatic.

9           MR. SARTORI:  It says it's automatic.  Actually -- I'm sorry.

10           JUDGE MEDLEY:  If you look at paragraph 10 of the Beamer

11   article, it says, "Next year, several companies expect to have new versions of their

12   products that will invisibly tag files.  In this way, data from the year-end report can

13   be transferred automatically to Mac & Tax."

14           MR. SARTORI:  That's right.  But if you read on further in the

15   article, actually what that means is it means that it's actually -- it's a point-and-

16   click operation that the user must go through by manually showing -- by manually

17   clicking on "Here's my entry in my Dollars and Cents program, and here's my

18   entry in Mac & Tax, and these two match up."

19           And then what Beamer does -- in fact, Beamer actually wrote a book

20   called "Mac & Tax Made Easy" in 1991, four years after the '87 article.  We

21   provided a copy of the book to the examiner and excerpts in here.  Actually, in this

22   book, Beamer talks about more explicitly what does that mean?  What does this

23   importing actually mean?  And it means that there's a lot of manual input.

24           In fact, in one section of the book, Beamer actually says, "Don't even

25   bother doing it."  He says, "Mac & Tax will import it, but you must cut and paste

26   each member to its appropriate line in Mac & Tax.  The amount of manual effort

27

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1  this entails largely negates the advantage of importing."

2        He further on says that "Mostly you'll find that the easiest approach is

3  to print out your year-end report from your Dollars and Cents in the personal

4  finance management software and type the relevant information into Mac & Tax."

5  So he's even suggesting this import function is so manually intensive, don't do it.

6  Simply print out your year-end report from your personal finance software.  Type

7  it back in.  This is manual.  This is outside the scope of the claims.  This is not

8  automatic.  Beamer does not anticipate --

9        JUDGE MEDLEY:  But you don't claim automatic everywhere.

10       MR. SARTORI:  We do not claim -- that's right.  We do not claim --

11  I'm sorry.  I'm sorry.

12       JUDGE MEDLEY:  So electronic -- see, that's why I'm kind of

13  having a problem.  Because I read your

14  brief --

15       MR. SARTORI:  I thought you were on the '052 for a second.  You're

16  on the '787.  I'm sorry.

17       JUDGE MEDLEY:  But you do.  You sort of mix the issues.  I read

18  what you say, and it seems like you're saying automatic is electronic, is not

19  entering manually information.  You're equating all three.

20       MR. SARTORI:  That's right.  In the context of the '052 patent,

21  which recites "automatic" in all the claims, "automatic" needs to be given its

22  ordinary meaning and weight.  In those ones, I think it's clear with regard to the

23  Beamer reference.

24       In the '787, we have two independent claims, 1 and 10, which do not

25  recite "automatic."  The rest of the independent claims recite "automatic."  And so

26  those ones, I think it's clear that the Beamer doesn't teach it.  We're focusing on

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   Claims 1 and 10.

2            And there are two reasons that I said previously that the Beamer

3   article does not teach it.  One is they're connecting electronically.  And yes, we are

4   saying electronically means that there's no manual input.  You have to -- we're

5   saying you need to read it in light of the specification.

6            The second reason we're saying is that Beamer does not teach tax

7   data in the sense that he receives -- the salaries are not tax data.  They don't tell

8   you anything about what should go on your tax return, how much tax do you owe.

9            JUDGE LEE:  Isn't the way you're interpreting it contrary to just

10  logic or common sense?  You know, simply saying this is made of wool doesn't

11  mean it doesn't have other components.

12           MR. SARTORI:  I'm sorry.  You lost me, sir.

13           JUDGE LEE:  Saying something is electronic doesn't necessarily

14  exclude any kind of manual contribution.

15           MR. SARTORI:  The claim recites connecting electronically to a tax

16  data provider, and then collecting electronically from a tax data provider.  And that

17  needs to be done electronically.  The --

18           JUDGE LEE:  Yeah.  But why does that exclude any kind of manual

19  input?  I mean, that's crux to the issue.

20           MR. SARTORI:  Yes, for Claims 1 and 10 of the '787 patent.

21           JUDGE LEE:  You just say that it does, but I don't get it.

22           MR. SARTORI:  In the context of the step which refers to -- that

23  recitation of collecting electronically refers to step 12 of the patent.  And there it

24  talks about, as I said before, the invention eliminates the current requirement that a

25  taxpayer manually collect the tax data, and that the taxpayer -- it eliminates the

26  current requirement that the taxpayer manually enter the tax data onto the tax

29

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   return or into the computer.  And by collecting electronically, you're eliminating

2   those requirements.  And to the extent that Beamer makes you do those things, or

3   the system requires you do those things, it doesn't anticipate the claim.

4          JUDGE LEE:  All right.  What about how does the tax preparer make

5   sure that information is collected to determine whether the taxpayer has a special

6   tax case?

7          MR. SARTORI:  I'm sorry.  Could you repeat that again?

8          JUDGE LEE:  The tax preparer ensures that information is collected to

9   determine whether the taxpayer has a special tax case.

10          MR. SARTORI:  Oh, on column 5.  Okay, I got you.  I'm sorry.

11          JUDGE LEE:  Can you explain that?

12          MR. SARTORI:  Sure.

13          JUDGE LEE:  That sounds like manual intervention.

14          MR. SARTORI:  That is manual intervention.  And that has to do with

15   step 11, which is the manual step required to initiate it, to initiate the automatic

16   process.  That's taken from column 5, line 45, what you've been focusing on, sir,

17   Your Honor.  And that has to do with step 11, which is the manual stuff.

18          JUDGE LEE:  I see.  So you're allocating all of these manual input to

19   the category of initiating the process.

20          MR. SARTORI:  Yes, yes.

21          JUDGE LEE:  If there's any manual input outside of initiation, then

22   it's not covered by the claim.

23          MR. SARTORI:  It's not covered by the claim and it does not

24   anticipate the claim.

25          The second point we'd like to discuss today regarding the prior art

26   rejections is the taxing authority recitation.  In the claims of the '052 patent, the

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1   claims recite "connecting electronically to a taxing authority." In rejecting the

2   claims, the examiner has misinterpreted the phrase "taxing authority." The '052

3   patent provides the definition for "taxing authority" on column 7, line 1 to 2. "The

4   taxing authority is the IRS, or a state, local, or foreign taxing authority. One of

5   ordinary skill would recognize that taxing authority refers to a government entity

6   that has the authority to levy or collect taxes."

7          The examiner, in rejecting the case, has said that the taxing authority

8   is your tax preparer, your tax accountant, or the IRS. The examiner -- it's saying

9   that the tax preparer is the taxing authority is inconsistent. We provided

10  substantial evidence in the prosecution and the briefs to say from certain

11  government agencies -- the IRS, the State of New York, the State of Florida -- the

12  taxing authority, giving definitions for it, and using it in its proper context.

13         We've also provided evidence from five EDGAR filings with the

14  SEC as to the definitional use of taxing authority. All this evidence has not been

15  addressed at all by the examiner. These definitions and use of it are all consistent

16  with taxing authority as used in the patent and the claims. Thus, the Beamer for

17  another reason does not anticipate the claims in the '052 patent.

18         JUDGE MOORE: So you think it's unreasonable to say that my CPA

19  who does my taxes is an authority on taxing, and therefore not a taxing authority.

20         MR. SARTORI: Maybe authority on taxes, yes. The inventor David

21  Miller is a tax lawyer. He's an authority on taxes, but he's not a taxing authority.

22  He does not have the power to levy and collect taxes from any one of us here.

23         The examiner also, in addition, rejected the claims under 112

24  rejections. We would like to rely on our briefs for response to those -- for those

25  rejections, we believe the examiner is incorrect. I'll ask the Board if there's any

26  questions on those at all.

31

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1    JUDGE MEDLEY:  I have a question on that.  Your '787 patent --

2    MR. SARTORI:  Yes --

3    JUDGE MEDLEY:  came later.

4    MR. SARTORI:  The '787 patent is a continuation of the '052, yes.

5    It's the same specification.

6    JUDGE MEDLEY:  But those claims are broader than the claims in

7    the earlier patent; is that correct?

8    MR. SARTORI:  They're of different scope.  Claim 20 of the original

9    '052 patent recites the steps of connecting electronically, collecting electronically,

10   preparing the tax return and filing it.  And the other independent claims -- oh, I'm

11   sorry.  Preparing it.  And the other electronic talks about filing.  I'm sorry.  Just a

12   second.

13   JUDGE MEDLEY:  It seemed to me that the later patent was just

14   focusing on tax collecting, whereas the claims in the earlier patent were collecting

15   and reporting.

16   MR. SARTORI:  Exactly.  The first patent includes two limitations of

17   interacting with the taxing authority:  connecting to the taxing authority and filing

18   the return with the taxing authority.  Those two steps are not recited in Claim 20 of

19   the '052 patent, which are the original claims.  And then in -- I'm sorry?

20   JUDGE MEDLEY:  I'm sorry.  Was there a TD filed in the '787

21   patent?

22   MR. SARTORI:  Yes, there was.  It was filed on July 22 -- July 29,

23   2002.  July 29, 2002, there was a terminal disclaimer filed in the '787 patent.

24   JUDGE LEE:  Had the rejections been 103, would you have evidence

25   of secondary consideration?

26   MR. SARTORI:  Yes, we have evidence of secondary consideration

Appeals 2007-0518
Reexamination 90/006,969
Patent 6,697,787

1  for three of the independent claims in the '787 patent.  The claims in the '052

2  patent are only rejected 1 or 2 as anticipated by the Beamer article.  And in the

3  second case, the '787 patent, we have -- we actually will argue long-felt need as a

4  secondary consideration to overcome the obviousness rejection by the examiner.

5          JUDGE MEDLEY:  For the dependent claims.

6          MR. SARTORI:  For the independent claims.  Well, independent

7  claims and dependent claims.  The examiner lumped them all together, and we

8  address only the independent claims.

9          JUDGE MEDLEY:  I thought she applied the art as anticipation with

10  respect to all the independent claims.

11          MR. SARTORI:  Not in the second patent.  Not in the second patent.

12  In the second patent, she rejected claims 4, 6 to 9, 11 to 18, 33 and 36 under 103.

13  And of that group of claims she rejected, claims 15, 33, and 36 are independent

14  claims that she rejected under 103.  And so we put forth the Webber article as an

15  example of secondary considerations of long-felt need.

16          JUDGE MEDLEY:  Any other questions?

17          JUDGE LEE:  No.

18          JUDGE MEDLEY:  Okay, thank you.

19          MR. SARTORI:  Thank you for your time.

20          (Whereupon, the proceedings at 1:45 p.m. were concluded.)