# EXHIBIT D

MAILED

JUN 1 3 2007

U.S. PATENT AND TRADEMARK OFFICE
BOARD OF PATENT APPEALS
AND INTERFERENCES

1    RECORD OF ORAL HEARING

2

3    UNITED STATES PATENT AND TRADEMARK OFFICE

4    _____

5    BEFORE THE BOARD OF PATENT APPEALS
6    AND INTERFERENCES
7    _____

8    Ex parte DAVID S. MILLER

9    _____

10    Appeal 2007-0712
11    Reexamination Control 90/006,713
12    Patent 6,202,052
13    Technology Center 3600
14    _____

15

16    Oral Hearing Held: May 2, 2007

17    _____

18

19    Before JAMESON LEE, SALLY C. MEDLEY and
20    JAMES T. MOORE,
21    Administrative Patent Judges.
22

23    ON BEHALF OF THE APPELLANT:
24        MICHAEL A. SARTORI, ESQUIRE
25        RYAN M. FLANDRO, ESQUIRE
26        Venable, LLP
27        575 7th Street, N.W.
28        Washington, D.C. 20004-1601
29
30
31
32

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1      The above-entitled matter came on for hearing on Wednesday,

2  May 2, 2007, commencing at 1:00 p.m., at The U.S. Patent and Trademark Office,

3  600 Dulany Street, Alexandria, Virginia before Dominico Quattrociocchi,

4  Reporter.

5      MR. SARTORI: This is actually my first time in the Board for the

6  new building here. May I begin?

7      JUDGE MEDLEY: Yes.

8      MR. SARTORI: May it please the Board, I'm Michael Sartori,

9  counsel for patent order Simplification, LLC. We've made our introductions

10  around who we have with us today. And prior to proceeding, just to confirm our

11  understanding, we have 20 minutes to discuss both of the reexaminations; is that

12  correct?

13      JUDGE MEDLEY: Right. Of course, we ask a lot of questions, but

14  we'll be sensitive to that.

15      MR. SARTORI: Okay, no problem. We think 20 minutes is fine.

16  That's no problem.

17      And initially, we'd like to also kind of -- it's interesting the timing of

18  the oral hearing. You know, here the beginning of May. We just had April 17th,

19  the day to file our tax returns. And if you file your tax returns on your own, you

20  would have found the invention for the '052 and the '787 patent very beneficial to

21  you.

22      To put the invention in the context of the real world, and without using

23  the formal claim language as an example, if you prepare your own tax return, you

24  would use tax preparation software on your personal computer. And say, for

25  instance, you had an account at a mutual fund, maybe Fidelity, and you had many

26  accounts there. And Fidelity would send you a Form 1099, which would include

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    the information, your tax information, for 2006, your interest, dividends, capital

2    gains, whatnot.  And you would take that, your 1099, sit in front of your computer

3    with your tax preparation software, and you'd type in the information that was on

4    your 1099.  You would enter that into the tax preparation software.

5              With the invention in the two patents, what you would do instead is,

6    with the tax preparation software, you identify to the tax preparation software that

7    you had an account with Fidelity, and then you would provide the software with

8    maybe your account number or some sort of personal identification.  And then you

9    would say go, proceed, and the tax preparation software would automatically then

10   go over the Internet, go to Fidelity, and it would automatically obtain the

11   information that was in the Form 1099, such as your interest and dividends and

12   whatnot, and bring those back down automatically and download them into the tax

13   preparation software.

14             JUDGE MEDLEY:  I was just going say, does Simplification actually

15   have a product on the market?

16             MR. SARTORI:  Simplification does not have a product on the

17   market.  So this is hypothetically speaking how it would work in the real world.

18             And then the software would automatically process the information.

19   For example, adding together all the interests, all the dividends.  And then it would

20   populate your tax returns in the appropriate places in the 1040s, and the various

21   schedules that need that information would populate automatically.  And that's the

22   big difference between what's been done prior and the invention of these two

23   patents.

24             JUDGE MEDLEY:  Your specification, is it very specific, though, as

25   to how that's done, like the software, the coding?  None of that's in there.  It's

26   more of just a broad general description, right?

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1       MR. SARTORI:  That is correct.  And pursuant to the written

2  description requirement for software inventions, you just need to describe the

3  functionality.  You don't need to provide the source code or flow charts.  Just

4  describe the functionality per the Phonar and Rihase (phonetic) Microsystems

5  cases.  That's the standard that was used in drafting the application.

6       JUDGE MEDLEY:  So I give all of my tax forms to H&R Block.

7       MR. SARTORI:  Yes.

8       JUDGE MEDLEY:  I tell them go do this.  I don't want to have

9  anything to do with it.

10      MR. SARTORI:  Right.

11      JUDGE MEDLEY:  So I'm not involved very much at all.  But I guess

12  it's not really computerized, because the tax accountant goes and does his thing.

13  Why wouldn't it have been obvious to make all of this electronic?

14      MR. SARTORI:  To begin with?

15      JUDGE MEDLEY:  To make the same thing electronic.  To gather

16  this information electronically and have the H&R Block person do everything

17  electronically.  I mean, certainly it was known for me to hand my stuff to H&R

18  Block and say, "Figure all this out."

19      MR. SARTORI:  Yes.  Well, but the pieces were not in place to

20  suggest that or to do that.  The closest thing that we've seen in the 10 years since

21  we've, you know, filed the application has been the Beamer article that the

22  examiner put forth.  And that one only discusses the manual aspects of entering the

23  system.  And there is some downloading of information, but it is very

24  distinguishable from what's in the patent.

25      JUDGE MEDLEY:  Are you aware of a product out there on the

26  market that actually does what you're describing here?

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    MR. SARTORI:  Yes, in fact, we are.  There is -- the H&R Block Tax

2  Cut is the software that is on the market.  Simplification sued H&R Block four

3  years ago or so, I think in 2003, and that suit has stayed pending the results of these

4  reexaminations.

5    JUDGE MEDLEY:  The name of the software is H&R Block --

6    MR. SARTORI:  It's H&R Block Tax Cut.  Tax Cut is the name of

7  the software.

8    JUDGE MEDLEY:  Okay.

9    JUDGE LEE:  Mr. Sartori?

10    MR. SARTORI:  Yes.

11    JUDGE LEE:  When your accountant calls up your bank and says,

12  "Please, you know, I'm so-and-so's accountant.  Here's his account number.

13  Please tell me the interest he's earned on this account," and if the bank says,

14  "Okay, instead of sending a paper copy," he says, "I'm going to fax it to you," or

15  "I'll scan it and transmit it electronically to you," why isn't that electronically

16  collecting tax data?  Even though it involves someone in your accountant's office

17  to make the initial call and say, "Please give me this data," and the bank transmits

18  it electronically, why wouldn't that be electronic collection of the tax data?

19    MR. SARTORI:  Because those are not done automatically.  There is

20  -- the collection, the connecting, is not done automatically as required by the

21  claims.

22    JUDGE LEE:  Yeah.  But not all of your claims require automatic

23  collecting.  I see quite a few that don't require automatic collection.

24    MR. SARTORI:  That's true.  There's Claims 1 and 10 of the '787

25  patent do not recite "automatic" in the preamble.

26    JUDGE LEE:  Plus the means claims.

5

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    MR. SARTORI:  The means claims.  All the claims in the '052 patent

2    recite "automatic" in the preamble, and they recite "automatically" as well in the

3    body.

4        JUDGE LEE:  Well, let's put your automatic claims aside.

5        MR. SARTORI:  Okay.

6        JUDGE LEE:  Let's focus on the ones that don't require automatic

7    collection.

8        MR. SARTORI:  Okay.  Those would be Claims 1 and 10, the two

9    independent claims, and their dependent claims in the '787 patent.

10       JUDGE LEE:  So what about the scenario I just proposed to you?

11   Why wouldn't that qualify as electronically collecting tax data?

12       MR. SARTORI:  Yes.  Those would not be done, because there is the

13   manual requirement to do that.  To collect them electronically requires the --

14   specification and electronic intermediary to do the collecting and connecting.  In

15   that situation, it's the human who's doing the calling up as soon as --

16       JUDGE LEE:  Yes.  But there's still the electronic aspect to it.

17       MR. SARTORI:  There is.  But we assert that that is not -- that that is

18   outside the scope of the claims.

19       JUDGE LEE:  I know your assertion.  But why?

20       MR. SARTORI:  Why?

21       JUDGE LEE:  What's the reasoning?  We had the broadest reasonable

22   interpretation that applies in our proceedings.  So if the electronic aspect's pretty

23   substantial, which I think it is in that case, the person just makes a call and

24   everything else is done electronically, why is that not -- why does that not meet

25   electronically collecting tax data?

26       MR. SARTORI:  Okay.  So let me just understand the facts of what

6

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1   you're saying.  So the taxpayer calls up the bank on the phone?

2           JUDGE LEE:  The accountant calls the bank.

3           MR. SARTORI:  Accountant calls the bank.

4           JUDGE LEE:  "Here's my client's account number.  I need to know

5   the interest."

6           MR. SARTORI:  Okay.  And then the --

7           JUDGE LEE:  The bank teller says, "Oh, let me scan it and e-mail it to

8   you."

9           MR. SARTORI:  Okay.  Scans and e-mails to the --

10          JUDGE LEE:  Accountant.

11          MR. SARTORI:  Accountant.  Okay.  I think the one step that's

12  missing in that situation is the connecting electronically to a tax data provider.  The

13  human on the telephone calling up the bank is not connecting electronically to the

14  tax --

15          JUDGE LEE:  No.  But there is a piece of equipment in the

16  accountant's office that receives the tax data electronically.

17          MR. SARTORI:  You're correct.  There's two different -- there's two

18  steps that are recited in the claims.  One is connecting electronically, and then it's

19  collecting electronically.  There are two steps.  So in that situation, they're

20  connecting electronically.

21          JUDGE LEE:  Well, you can't receive electronically unless you first

22  connect electronically.  So whatever equipment that's receiving would have

23  connected electronically before it receives.

24          MR. SARTORI:  For e-mail, now, my knowledge of actually how the

25  whole e-mail system works is a bit vague, so I'm --

26          JUDGE LEE:  Well, it could be a fax machine.

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1       MR. SARTORI:  But then a fax machine is -- the fax machine is not

2    connected to the computer then. So then you have a paper copy that comes off the

3    fax machine.  You have a paper copy, and then you're down there, you know,

4    entering the data in by hand again, so it's outside the scope of the claims.  It's

5    outside the -- it doesn't anticipate or render obvious the claims.

6       JUDGE MOORE:  So you read these claims as excluding all manual

7    data entries.

8       MR. SARTORI:  No.  It doesn't for the fact that it's comprising, so

9    it's open-ended.  So you could perhaps enter other information automatically.

10      For example, let's say you gave some donations to Purple Heart last

11   year in 2006.  And Purple Heart, you know, isn't set up to do this electronic

12   transmission.  You would need to type in and enter in your donations to go on your

13   scheduled itemized deductions.  That would be within the software within the

14   scope of the claim, because it's comprising, but that would not actually meet the

15   elements of the claims.

16      JUDGE LEE:  Okay.  You're talking about two different limitations.

17   I'm only talking about electronically collecting.

18      MR. SARTORI:  Yes.

19      JUDGE LEE:  Maybe, you know, with a faxed copy, you wouldn't

20   have electronically entered it.  But I'm just focusing on electronically collecting.

21      MR. SARTORI:  Okay.

22      JUDGE LEE:  With the faxing, you do have electronic collection,

23   right?

24      MR. SARTORI:  I don't think so.  Because electronic collection --

25   this is interesting.  That's a good question.  Electronic collection, that's not

26   contemplated by the scope of the claims.  I think in -- the patent actually talks

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1   about collection.  Let me just refer to that for a moment.  I'm sorry.

2              On -- let's see.  On the '052 -- well, the same as -- it's a continuation

3   of the other.  It talks about electronic links 32 to 37.  And that's what's connecting

4   the general purpose computer to the tax data provider.  And it says general purpose

5   computer electronically connected to telephone communication equipment using,

6   for example, a modem or electronic data network, such as the Internet or a

7   computer medium for transferring and receiving the tax data.

8              So I think the actual sending the fax over would not be collecting

9   electronically.  I think receiving an e-mail would probably be collecting

10  electronically.

11             JUDGE MOORE:  I don't know if I agree with that.  I think the fax

12  modem, it simply receives faxes.

13             MR. SARTORI:  It is.  Okay.  Collecting electronically.  But then it

14  would be the -- it would not be -- it's not into the tax preparation software at that

15  point.  You have the paper that comes out of your fax machine.  Then how is that

16  getting into your tax preparation software?  You're keying it in yourself.

17             JUDGE LEE:  Well, you're going to a different limitation now, and

18  just focusing on electronic collection.  The collection is done when that data is

19  received by the fax machine.

20             MR. SARTORI:  But the fax machine is not the tax preparation

21  software.

22             JUDGE LEE:  I agree.

23             MR. SARTORI:  Right.  So there's --

24             JUDGE LEE:  But as far as collecting goes, you have electronic

25  collection right there.

26             JUDGE MOORE:  Now, when you process it electronically, does that

9

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1  just mean on the screen?  You're looking -- let's say it's a fax image that you never

2  print out.  Does looking at that and then typing in the information processing that

3  electronically, because it never gets into paper?  Or is --

4        MR. SARTORI:  No, it's not, because that requires manual entry.  In

5  fact, the specification calls out with respect to step 12, which is the step we're

6  talking about here of this manual collecting -- the specification says, "Hence, with

7  electronic collection of tax data" -- I'm on column 6, line 24 of step 12 -- "the

8  invention eliminates the current requirement that a taxpayer manually collect the

9  tax data and eliminates the current requirement that a taxpayer manually enters

10  such tax data onto a tax return."

11        So if it comes up on the screen, yeah, that's electronically, but you

12  still have to manually enter it.  So you're not within the scope of what's being

13  claimed.

14        JUDGE MEDLEY:  Why should we limit means for collecting

15  electronically to mean that no manual entry is done?  I mean, aren't you

16  necessarily importing limitations from the spec?  In your claim, we should be

17  giving it the broadest, most reasonable interpretation.

18        MR. SARTORI:  That's true, consistent with the specification of the --

19  if it's a means plus function claim we're discussing, then it's the structure and its

20  equivalent, as described in the terms and specifications.  Specification talks about a

21  computer with software and eliminating the need to manually enter the data.

22  Therefore, in terms of the 112-6 analysis, any manual entry of data would be

23  outside the scope of the claims.

24        JUDGE MEDLEY:  Well, the means that we're supposed to look at is

25  the structure, but it sounds like you're importing more functional limitation than

26  what's being claimed.  It's means for collecting electronically tax data.  But then

10

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    you're saying that you also have to have that it's not manually entered.

2              MR. SARTORI:  Yes.

3              JUDGE MEDLEY:  That doesn't have anything to do with the

4    structure on the means.  That would seem to be importing more functional

5    language.  It's just not there.

6              MR. SARTORI:  You could put it that way.  However, with the

7    example that Judge Moore gave where it's up on the screen, the fax comes up on

8    the screen, the tax preparation software isn't doing that electronically.  It's not

9    collecting electronically.  There is some intervention there that is assisting the

10   collection electronically, and we believe that's outside the scope of the claims.

11             JUDGE LEE:  What if we can't figure out what is your intermediary,

12   electronic intermediary?  Would that make your means claims indefinite?

13             MR. SARTORI:  No.  The electronic intermediary is, in fact, defined

14   in the specification on -- excuse me -- on column 4, lines 39 to 42.  On both

15   patents, it's the same site.  It says, "The term 'electronic intermediary' refers to a

16   data processing system comprising a general purpose computer and a computer

17   program as described above for performing the invention."

18             JUDGE LEE:  I understand.  I read that too.  But if you read on, you

19   have an alternative embodiment where the electronic intermediary is not the --

20   program, but it's something that's controlled by your -- another institution.

21             MR. SARTORI:  Are you referring to column 5?  Column 5, line 27?

22             JUDGE LEE:  It starts with, "In an alternative embodiment" --

23             MR. SARTORI:  Yes.

24             JUDGE LEE:  -- "the electronic intermediary is controlled by a tax

25   return preparer institution."  Now, in this embodiment, the alternative embodiment,

26   you never tell us what is that electronic intermediary.

11

Appeal 2007-0772
Reexamination 90/006,713
Patent 6,202,052

1    MR. SARTORI: Yes. That's to be contrasted to the paragraph before

2    it, which starts on column 5, line 16. In that paragraph, the idea is if you want to,

3    say, Costco and you picked up the latest version of H&R Block's Tax Cut,

4    electronic intermediary now is that general purpose computer, but it's being

5    controlled by the actual taxpayer themselves.

6    The same sense, H&R Block has that same Tax Cut version used in

7    their brick and mortar stores around the corner by the Ruby Tuesdays. And so it's

8    the tax preparer that's actually using that same program that you could buy at

9    Costco, but using it at their brick and mortar establishment. And that's the

10   difference between those two embodiments discussed. It's the electronic

11   intermediary is both the computer, whether it's being controlled by the taxpayer or

12   by the tax accountant or the tax preparer. Taxpayer versus tax pre-payer.

13   JUDGE LEE: Aren't you reading a lot into that? Why isn't the plain

14   meaning that you haven't told us what the electronic intermediary is in this

15   alternative embodiment? It could be anything else. Why do we have to read

16   what's before in the previous paragraph into this paragraph?

17   MR. SARTORI: I think they're not -- I think it's clear the previous

18   paragraph says the taxpayer has control over the electronic intermediary. The next

19   paragraph, the electronic intermediary is controlled by the tax return preparer.

20   JUDGE LEE: I know. But it wouldn't be the same object. Because

21   in the paragraph before, you have a disk. That disk is in the possession of the

22   taxpayer.

23   MR. SARTORI: Yes.

24   JUDGE LEE: Well, it obviously is not in the possession of your tax

25   preparer. So the tax preparer cannot be in control of the structure that's described

26   in the previous embodiment. So what is the embodiment in the alternative -- what

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    is the structure in the alternative embodiment?

2           MR. SARTORI:  It's a general purpose computer with software

3    according to the invention.  It's whether or not --

4           JUDGE LEE:  Where is it?  I mean, I don't see it.  You want us to say

5    that "Well, in my alternative embodiment, the electronic intermediary is a

6    computer and a program in my tax preparer's office."

7           MR. SARTORI:  Yes.

8           JUDGE LEE:  That's what you want us to say.

9           MR. SARTORI:  Yes.

10          JUDGE LEE:  Where is it in your spec?

11          MR. SARTORI:  Electronic intermediary, referring back to column 4,

12   is the same term used consistently throughout the specification and the claims.

13          JUDGE LEE:  I know.   But where is it telling me that in the

14   alternative embodiment, the electronic intermediary is a computer in my tax

15   preparer's office?

16          MR. SARTORI:  I think you have to read the specification together,

17   the definitional section on column 4 for electronic intermediary is used consistently

18   in column 5, in the paragraph on column 5, line 17, and on line 27.  The electronic

19   intermediary is a computer, your personal computer at your desk in your home.

20   And otherwise, it's the personal computer on the desk at the tax preparer's office,

21   at H&R Block's brick and mortar office.  And the program --

22          JUDGE LEE:  I don't know.  If you're trying to invoke paragraph 6

23   of Section 112, don't you need to be specific as to what structure you're referring

24   to, instead of letting us imply or assume that structure?

25          MR. SARTORI:  Yes.  The structure is the personal computer with

26   the software.

13

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1            JUDGE LEE:  Personal computer.  Why can't it be a --

2            MR. SARTORI:  Oh, I'm sorry.  I'm sorry.  Let me just -- I'm sorry.

3  Let me use the language in the specification.  We're getting a little too loose here.

4  "A data processing system comprising a general purpose computer and a computer

5  program."

6          The examiner has basically two sets of rejections, the 112 rejections

7  and the prior art rejections.  As to the prior art rejections, I'd like to discuss two

8  points around the prior art rejections, the first being that the examiner has

9  completely ignored Federal Circuit cases we've cited that are on point, both in the

10  prosecution and in the briefs.  The cases go to the recitation of "automatic" in all

11  the claims in the '052 and in most of the claims in the '787.  And "automatic" is

12  not defined anywhere in the specification, so it must be given its ordinary meaning

13  per the Phillips case.  In addition, it should be given weight for the Federal Circuit

14  cases.

15         The three cases I'd like to discuss are the Space Systems v. Lockheed

16  Martin case and the Mercantile Exchange v. E-Bay case, both of which are cited in

17  the briefs.  The third case I'd like to bring to the Board's attention is the College

18  Net v. Apply Yourself case, which we found after we filed the briefs, but is also a

19  Federal Circuit decision on point.

20         As to the first case, in the Space Systems v. Lockheed Martin case,

21  the invention was for a navigation control of a satellite.  And the claims at issue in

22  that case were cited automatically in the body of the claim.  And the Federal

23  Circuit construed the term "automatically" to have its ordinary meaning, and

24  looked to a dictionary definition for it, looked to the New Webster's -- the

25  Webster's II New University of Riverside dictionary for the definition of

26  "automatic," which is to -- acting or operating in a manner that is essentially

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    independent of external influence or control.  And the Federal Circuit took that

2    claim construction and gave the recitation of "automatically" weight, and used it,

3    actually, in its infringement analysis.

4              In the same sense here in the two cases before the Board, we have

5    provided numerous dictionary definitions in the briefs and to the examiner, and

6    those dictionary definitions are all in line and in sync with the definition provided

7    by the Federal Circuit in the Space Systems case.

8              JUDGE MEDLEY:  So "automatic," what does that

9    -- what is your position?  What does that mean?

10             MR. SARTORI:  It should mean acting or operating in a manner that

11   is essentially independent of external input or control.

12             JUDGE MEDLEY:  So not manual.

13             MR. SARTORI:  Not manual, yes.

14             JUDGE MEDLEY:  So if you have any kind of manual input from

15   start to end, then, it's no good.

16             MR. SARTORI:  It's no good in the sense of the comprising

17   language, and no good in the sense of the limitations we have in the claims must be

18   performed automatically.

19             JUDGE MEDLEY:  But somewhere along the line, some data has to

20   be put in somewhere manually.

21             MR. SARTORI:  You are correct.  In fact, in step 11 of the

22   application, we talked about you have to initiate the system.  You have to, you

23   know, tell the software that you have account fidelity.  Tell the software what your

24   account number is, or your pass code, or whatever.  That's done in step 11.  That

25   feature of the invention is not recited in the claims.  The claims are all limited to

26   what's performed automatically by the electronic intermediary or by the computer

15

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1   with the software.  And the --

2                    JUDGE LEE:  What about in column 5 where you say, "The tax return

3   preparer controls the electronic intermediary and ensures that the electronic

4   intermediary receives the appropriate information required"?  Well, how does he

5   ensure that that happens?

6                    MR. SARTORI:  I'm sorry.  Could you give me the line site on

7   column 5 you're referring to?

8                    JUDGE LEE:  Lines 45 to 46.

9                    MR. SARTORI:  Okay.

10                   JUDGE LEE:  "The tax return preparer ensures that the electronic

11  intermediary receives the appropriate information required."  How can you do that

12  without intervention?

13                   MR. SARTORI:  This is all referring to step 11 in the application, in

14  the patent, which goes to how do you start the process?  How do you initiate the

15  software from going forward?  It can be analogized to an automatic dishwasher,

16  where you load the dishes up, and you close the door and you press start, and the

17  dishwasher, off it goes.  It's automatic.  You don't add the water.  You don't tell it

18  when to start the rinse cycle.

19                   JUDGE LEE:  Well, that's what makes it hard.  See, some manual

20  intervention is okay, by your standard, but some are not.  Right?  Apparently, it's

21  okay for someone to turn it on.

22                   MR. SARTORI:  Yes.

23                   JUDGE LEE:  But somehow, it's not okay for someone to manually -

24  - well, perhaps it's okay for someone to even pour in the detergent.

25                   MR. SARTORI:  Yes.

26                   JUDGE LEE:  But it's not okay for someone to take a piece of

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1   clothing out and rub it.  That would be like washing, so that would be no good.

2   MR. SARTORI:  That's right.  That would be outside the scope.

3   JUDGE LEE:  So it's hard for me to tell what manual intervention is

4   okay and what manual -- which type of manual intervention is not okay.

5   MR. SARTORI:  Well, I think clearly, the kind that is okay is the kind

6   that initiates the process.  Another good definition for "automatic" is from the

7   College Net case, which is another case that -- this Federal Circuit case.  In that

8   case, the Federal Circuit affirmed the construction of the District Court, and they

9   said the word "automatic" means once initiated, the function is performed by a

10  machine without the need to perform the function manually.

11  So once initiated -- so whether or not you're pouring the detergent on

12  there or rubbing it in there, and then you toss it in the washer, that's all pre-

13  initiation.  But once you start that dishwasher or that washing machine,

14  it's going to town.

15  JUDGE LEE:  Okay.  That, I can understand.  But let's say something

16  goes wrong.  The preparer initiates, makes the call.  Something goes wrong.  Our

17  computers go wrong all the time.

18  MR. SARTORI:  Yes.

19  JUDGE LEE:  You mean this language doesn't cover a case where

20  something goes wrong, and the preparer fixes the computer and reboots the

21  computer and redoes it again?

22  MR. SARTORI:  In that case, if the computer did not complete all the

23  steps in the claim, then no, it would not be covered within the scope of the claim.

24  So the definitions for "automatic" also include the option to interrupt.

25  The Federal Circuit case -- the College Net case talks about the dishwasher, and it

26  also talks about an auto pilot example.  In both of those, you could interrupt the

17

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1   automatic process.  Perhaps that's what you're thinking about, essentially, where

2   you can -- if you forgot a plate in the dishwasher, you open the door, it turns off

3   automatically.  You throw the plate in, close the door, it starts back up

4   automatically.

5              Or, for instance, in auto pilot, you engage the auto pilot -- that's

6   manual -- and the auto pilot is off on its merry way flying the plane.  But if the

7   pilot sees some sort of adverse conditions out there that it needs to assume control,

8   the pilot can assume control of the plane.  Disengage the auto pilot, assume control

9   for as long as needed, and then reengage the auto pilot, and the auto pilot is back

10  on board again.

11             And that's the meaning of "automatic," the definitional meaning, the

12  meaning that we mean, and the same meaning in the claim.

13             JUDGE LEE:  See, you talk like we should be understanding this just

14  by reading the little text you have here.  But don't you need more description in

15  order for us to catch that meaning?  Aren't you asking us to read a lot from just a

16  few words?  You want us to have that specific understanding, that "automatic" just

17  has to mean this but not that.  It covers this but not that.  I mean, where is it coming

18  from?

19             MR. SARTORI:  It's coming from the ordinary meaning of

20  "automatic" inferred.  For the Phillips case and for the Federal Circuit cases on

21  point, "automatic" has been contested previously, and they've given it the

22  dictionary definitions I've discussed here and in the briefs.  And they're all in sync

23  and in line with the use we automatically have here in the patents.

24             JUDGE LEE:  Why isn't the broadest reasonable interpretation simply

25  if the bulk of it is automatic, it's sufficient?

26             MR. SARTORI:  Because it would be outside the definition.  The bulk

18

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1   of automatic doesn't mean, for example, the definition from the College Net case.

2   Once initiated, the function is performed by a machine without the need for the

3   function to be performed manually.

4                   JUDGE LEE:  What if something goes wrong, the connection gets

5   dropped?

6                   MR. SARTORI:  If the connection gets dropped, then it has to be

7   restarted again.

8                   JUDGE LEE:  Right.  By the interceptor.  The preparer.

9                   MR. SARTORI:  Right.  If the connection is dropped, then it's started

10  again.

11                  JUDGE LEE:  So then it's no longer automatic.

12                  MR. SARTORI:  Then it's not within the scope of the claim, then.

13  The machine didn't perform properly.  The entire steps in the claim were not

14  performed automatically.

15                  JUDGE LEE:  So your invention would not work if

16  the connection drops?

17                  MR. SARTORI:  Yes.  You'd have to reconnect it, yes.  That's

18  correct.

19                  JUDGE LEE:  You'd have to reconnect it.  But you just said it's not

20  covered by the claim if there's intervention to reboot it.

21                  MR. SARTORI:  See, I'm talking -- in terms of an infringement

22  analysis or a validity analysis are we talking right now?

23                  JUDGE LEE:  We're talking about claim interpretation.

24                  MR. SARTORI:  Okay, claim construction.  Claim construction.

25                  JUDGE LEE:  I asked you what happens if the connection gets

26  dropped, and you need someone to reboot the computer or to do whatever he needs

19

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    to do to ensure that the thing is received.  And you said well, in that case, then, it

2    isn't covered by the claim.

3        MR. SARTORI:  Right.  Because the rebooting would have -- you

4    have to start -- you'd get halfway through the process.  You may be connected

5    electronically, but you couldn't collect electronically.  So you would stop at the

6    collection point, because there was something at the Internet.  Who knows?

7        JUDGE LEE:  If it isn't covered by the claim, then your invention

8    guarantees that nothing goes wrong?

9        MR. SARTORI:  No.  No, of course not.  You have to restart the

10   computer.  You have to restart the process again.  Go back to your tax software,

11   start -- you know, press "go," try it again.  Reach out to your Fidelity over the

12   Internet, and try to connect it electronically.

13       JUDGE LEE:  But you just told me that's no longer your invention.  It

14   isn't covered by your claim if there is intervention.

15       MR. SARTORI:  You would have to start the process again.  If that

16   happened in terms of claim construction, that would not be how -- that's not how --

17   the invention would not be seen through every single step in the invention.  You

18   would get through 1 1/2 steps, maybe, and you'd have to start over again at step 1.

19       JUDGE MEDLEY:  Where does it describe that that's what -- that

20   that's what's going on in your specification?

21       MR. SARTORI:  Of starting and restarting?

22       JUDGE MEDLEY:  Does it talk about automatic and what it means?

23   I did a text search.  I only got one hit, and that was in your original Claim 15 in the

24   '797 patent.

25       MR. SARTORI:  Yes.  "Automatic" should be construed for its

26   ordinary meaning and relying on dictionary definitions according

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1   to the Phillips case.

2       JUDGE MEDLEY: But do you have a description of once you get

3   started, it runs -- everything runs automatically? You don't have any interruptions.

4   You don't do anything other than just --

5       MR. SARTORI: The hypothetical Judge Lee was posing on the

6   interruption is not mentioned in the specification at all. So it's assumed -- I'm

7   sorry?

8       JUDGE MEDLEY: Because I remember reading somewhere in your

9   spec that you can prompt the user to input data.

10      MR. SARTORI: Yes.

11      JUDGE MEDLEY: So why is that not manual? They have to click on

12  a mouse. They have to input numbers, let's say my account number. That's

13  manual, according to what you're saying is manual.

14      MR. SARTORI: We completely agree with that. That is manual.

15  And that is step 11 in the patent. Step 11 talks about the manual part of it. It's the

16  engaging part, it's the initiation, the starting of it. You need to tell the software

17  what your account number is, what your pass code is. And then once it receives

18  the information, it automatically goes through all the steps in the process. It goes

19  out to the tax data provider, collects the tax data, processes the tax data, and

20  prepares the electronic tax return.

21          The second case we'd like to talk about is the Mercantile Exchange v.

22  E-Bay case. And in this case, "automated" was recited in the preamble, and the

23  Federal Circuit was faced with the question as to whether or not "automatic"

24  should apply to every limitation in the body. And the invention in the Merc

25  Exchange case involved an on-line auctioning system, basically E-Bay system, in

26  which a bidder could buy an auction item at a fixed price.

21

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    And the Federal Circuit looked at the limitations in the claims in the

2    Merc Exchange case and found that two of the limitations actually were performed

3    manually.  One limitation required that the bidder manually enter into the computer

4    their bid.  Another limitation required that the seller manually enter into the

5    computer information on the auction item.

6    And the Federal Circuit decided that because those two limitations in

7    the claim were performed manually, "automatic" that's recited in the preamble

8    does not flow into the body for those two limitations.

9    Similar to the claim in the Merc Exchange case, the claims in the '052

10   and the '787 patents recite "automatic" in the preamble.  So we need to look at

11   each claim limitation to see if that's performed automatically and each of the

12   limitations in the claims at issue here are performed automatically.

13   JUDGE LEE:  I tell you, let me try to probe this a little more.

14   MR. SARTORI:  Okay.

15   JUDGE LEE:  What's really bothering me is this language in column

16   5 of the '052 patent where it says the tax preparer ensures that the electronic

17   intermediary receives the appropriate information required.  That seems very broad

18   to me.  The tax preparer essentially is going to fix everything.

19   Let's say you have a disaster or catastrophe.  It's still making the

20   connection.  Whatever the client is sending through is not coming through.  So

21   according to this, the way I read it, the tax preparer can exercise discretion and say,

22   "Oh, forget this."  You know, the electronic connection, forget it.  Pick up the

23   phone, call the client, gets all the information verbally, puts it on the phone, and

24   manually enter all that information into the computer.

25   That would be within "The tax preparer ensures that the electronic

26   intermediary receives the appropriate information required."  That's what that

22

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    means to me, because it's broad and it's vague.  Ensures.  So he's going to fix

2    whatever problem that comes up, even if that includes calling up the guy, getting

3    the information on the phone, and manually entering it, simply because the

4    connection isn't worth it.  If that doesn't mean that, what does it mean?  Where do

5    you draw the line?

6           MR. SARTORI:  The discussion here of the embodiment for the tax

7    preparer is in the context of step 11.  Step 11 talks about -- step 11 is providing the

8    electronic intermediary with information on the tax data providers.  And this is the

9    information that's being provided by the tax preparer.

10          So instead of the tax payer entering and saying, "Hey, I have an

11   account with Fidelity and here's my account number," the tax preparer receives

12   that information from the taxpayer, enters it into the software themselves.  That's

13   what's being discussed here.

14          If you're reading it out of context, it may sound that way.  But, you

15   know, turning back to column 4, this is all discussing step 11 and the following

16   paragraph on line 50 talks about step 12.  Step 12 is where the "automatic" kicks

17   in.

18          To discuss the Beamer article, which was cited by the examiner in all

19   the rejections of the two patents, the Beamer article -- the Beamer system requires

20   that the -- it requires two pieces of software, at least two pieces of software, a

21   personal finance software and a tax preparation software.

22          The personal finance software first downloads a bank record, and then

23   the Beamer system requires the taxpayer, the user of the system, to monthly

24   manipulate the data, the bank records and whatnot, to get ready for tax season.

25   And the Beamer system then requires the taxpayer, the user, at the end of the year

26   to put together their own template, their own form, for the data that will be used for

23

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    the tax returns, and then to go through that template or form line by line to ensure

2    that every single thing is correct and no mistakes were made, because it was all

3    done manually.

4              And the third thing that the Beamer system requires is for that

5    template from the tax preparation software to be imported into -- I'm sorry -- from

6    the personal finance software to be imported into the tax preparation software.

7    And that's done by having the user point and click from the personal finance

8    software to the tax preparation software.

9              JUDGE MEDLEY:  Let me go back to what Judge Lee had said

10   earlier.

11             MR. SARTORI:  Sure.

12             JUDGE MEDLEY:  You have several claims that don't require this

13   automatic limitation.

14             MR. SARTORI:  Yes.

15             JUDGE MEDLEY:  But yet, when I look through your arguments, it

16   seems like you're equating electronic, automatic, and no manual input all to be the

17   same.  I could put equal signs in between.  But that's not -- but at least, like, for

18   example, Claim 1 of the --

19             MR. SARTORI:  The '787?

20             JUDGE MEDLEY:  Yeah.

21             MR. SARTORI:  Yes.

22             JUDGE MEDLEY:  It doesn't have any impact.  It doesn't have the

23   "without manual entry."  It doesn't have "automatic."  It's just means for

24   electronically collecting, or means for collecting electronically, means for

25   processing electronically.  So if the Beamer reference is doing these things

26   electronically, why does it matter that there is some manipulation going on, or

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1   some manual input going on?

2         MR. SARTORI:  You are correct.  Independent Claims 1 and 10 of

3   the '787 patent do not recite "automatic" or "automatically."  In the briefs, we set

4   forth two reasons why those claims are not anticipated by the Beamer reference,

5   the first one being that it does not teach collecting electronically tax data from a tax

6   data provider, which we've discussed.

7         The second reason we set forth is that the Beamer reference does not

8   teach tax data.  Tax data is defined as tax information that is relevant to the tax

9   liability of the taxpayer.  The Beamer talks about the bank records coming in and

10  focuses on expressly the salary of the user that's in the bank record and the salaries

11  being used to compute the tax information.  Well, that's what Beamer says.  But

12  that's never going to happen.

13        The salary that you receive or that I receive, the government, the IRS,

14  doesn't care how much you take home.  The IRS cares about how much you're

15  paid, what's your gross pay, and they care about your withholdings.  How much

16  was withheld for your taxes, withheld for parking, withheld for transportation, for

17  your retirement, for your health spending account.  All that information is taken

18  out of your gross.  And what you receive in your bank statement is your net, is

19  your take-home.

20        But you can't go back from your net and figure out your gross or your

21  withholdings.  None of that information is there at all in the Beamer system.

22  And, so Beamer needs to actually add that information back into those records, that

23  information, manually typing that in.  You cannot obtain that in any stretch of the

24  imagination from your salary information.

25        JUDGE MEDLEY:  Why can't the Dollars and Cents Software be the

26  tax data provider?

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    MR. SARTORI: Because of the definition of a tax data provider. A

2    tax data provider is defined in the '052 -- I'm sorry -- in both patents as -- excuse

3    me a moment -- in column 4, lines 42 to 50, as referring to each party that has tax

4    information relevant to the taxpayer's tax liability or tax reporting obligations. The

5    personal finance software is not a party.

6        The examples given in the specification are for an employer, a

7    partnership, a bank, a savings and loan institution, a mortgage institution, credit

8    card bureau, thrift institution, security brokerage firm, mutual fund holding

9    institution, charity, and federal, state, local, and foreign taxing authorities.

10       JUDGE MEDLEY: Why are we limited? Was it --only can be those

11   things?

12       MR. SARTORI: No. Those are the parties. The tax software is not a

13   party.

14       JUDGE MEDLEY: No. Well, I'm just saying why can't a tax data

15   provider be -- I'm the tax data provider. I'm inputting all of this stuff into the

16   Dollars and Cents software.

17       MR. SARTORI: Oh, the user? The user is?

18       JUDGE MEDLEY: Yes.

19       MR. SARTORI: Oh. The user is -- that would be the manual entry.

20   That's not collecting electronically. That's --

21       JUDGE MEDLEY: No. I'm talking about if I enter all the data --

22       MR. SARTORI: Into the personal finance? Like Dollars

23   and Cents, right?

24       JUDGE MEDLEY: Right, Dollars and Cents.

25       MR. SARTORI: Right.

26       JUDGE MEDLEY: And then I get my year-end. Everything is ready

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1   to go, and then I transfer it.  It says you can transfer it automatically to the Mac &

2   Tax.  Why doesn't that meet the limitations here?

3          MR. SARTORI:  For two reasons.  One, the Dollars and Cents

4   Program is not a party per this definition.  The second reason is that I suppose the

5   automatic transfer that Beamer talks about in his article does not actually happen

6   automatic at all.  There is a manual point and clicking.

7          What's interesting is that we actually provided the --

8          JUDGE MEDLEY:  Why?  It says it's automatic.

9          MR. SARTORI:  It says it's automatic.  Actually -- I'm sorry.

10          JUDGE MEDLEY:  If you look at paragraph 10 of the Beamer

11   article, it says, "Next year, several companies expect to have new versions of their

12   products that will invisibly tag files.  In this way, data from the year-end report can

13   be transferred automatically to Mac & Tax."

14          MR. SARTORI:  That's right.   But if you read on further in the

15   article, actually what that means is it means that it's actually -- it's a point-and-

16   click operation that the user must go through by manually showing -- by manually

17   clicking on "Here's my entry in my Dollars and Cents program, and here's my

18   entry in Mac & Tax, and these two match up."

19          And then what Beamer does -- in fact, Beamer actually wrote a book

20   called "Mac & Tax Made Easy" in 1991, four years after the '87 article.  We

21   provided a copy of the book to the examiner and excerpts in here.  Actually, in this

22   book, Beamer talks about more explicitly what does that mean?  What does this

23   importing actually mean?  And it means that there's a lot of manual input.

24          In fact, in one section of the book, Beamer actually says, "Don't even

25   bother doing it."  He says, "Mac & Tax will import it, but you must cut and paste

26   each member to its appropriate line in Mac & Tax.  The amount of manual effort

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    this entails largely negates the advantage of importing."

2                He further on says that "Mostly you'll find that the easiest approach is

3    to print out your year-end report from your Dollars and Cents in the personal

4    finance management software and type the relevant information into Mac & Tax."

5    So he's even suggesting this import function is so manually intensive, don't do it.

6    Simply print out your year-end report from your personal finance software.  Type

7    it back in.  This is manual.  This is outside the scope of the claims.  This is not

8    automatic.  Beamer does not anticipate --

9                JUDGE MEDLEY:  But you don't claim automatic everywhere.

10                MR. SARTORI:  We do not claim -- that's right.  We do not claim --

11    I'm sorry.  I'm sorry.

12                JUDGE MEDLEY:  So electronic -- see, that's why I'm kind of

13    having a problem.  Because I read your

14    brief --

15                MR. SARTORI:  I thought you were on the '052 for a second.  You're

16    on the '787.  I'm sorry.

17                JUDGE MEDLEY:  But you do.  You sort of mix the issues.  I read

18    what you say, and it seems like you're saying automatic is electronic, is not

19    entering manually information.  You're equating all three.

20                MR. SARTORI:  That's right.  In the context of the '052 patent,

21    which recites "automatic" in all the claims, "automatic" needs to be given its

22    ordinary meaning and weight.  In those ones, I think it's clear with regard to the

23    Beamer reference.

24                In the '787, we have two independent claims, 1 and 10, which do not

25    recite "automatic."  The rest of the independent claims recite "automatic."  And so

26    those ones, I think it's clear that the Beamer doesn't teach it.  We're focusing on

28

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    Claims 1 and 10.

2           And there are two reasons that I said previously that the Beamer

3    article does not teach it. One is they're connecting electronically. And yes, we are

4    saying electronically means that there's no manual input. You have to -- we're

5    saying you need to read it in light of the specification.

6           The second reason we're saying is that Beamer does not teach tax

7    data in the sense that he receives -- the salaries are not tax data. They don't tell

8    you anything about what should go on your tax return, how much tax do you owe.

9           JUDGE LEE: Isn't the way you're interpreting it contrary to just

10   logic or common sense? You know, simply saying this is made of wool doesn't

11   mean it doesn't have other components.

12          MR. SARTORI: I'm sorry. You lost me, sir.

13          JUDGE LEE: Saying something is electronic doesn't necessarily

14   exclude any kind of manual contribution.

15          MR. SARTORI: The claim recites connecting electronically to a tax

16   data provider, and then collecting electronically from a tax data provider. And that

17   needs to be done electronically. The --

18          JUDGE LEE: Yeah. But why does that exclude any kind of manual

19   input? I mean, that's crux to the issue.

20          MR. SARTORI: Yes, for Claims 1 and 10 of the '787 patent.

21          JUDGE LEE: You just say that it does, but I don't get it.

22          MR. SARTORI: In the context of the step which refers to -- that

23   recitation of collecting electronically refers to step 12 of the patent. And there it

24   talks about, as I said before, the invention eliminates the current requirement that a

25   taxpayer manually collect the tax data, and that the taxpayer -- it eliminates the

26   current requirement that the taxpayer manually enter the tax data onto the tax

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1   return or into the computer.  And by collecting electronically, you're eliminating

2   those requirements.  And to the extent that Beamer makes you do those things, or

3   the system requires you do those things, it doesn't anticipate the claim.

4                    JUDGE LEE:  All right.  What about how does the tax preparer make

5   sure that information is collected to determine whether the taxpayer has a special

6   tax case?

7                    MR. SARTORI:  I'm sorry.  Could you repeat that again?

8                    JUDGE LEE:  The tax preparer ensures that information is collected to

9   determine whether the taxpayer has a special tax case.

10                   MR. SARTORI:  Oh, on column 5.  Okay, I got you.  I'm sorry.

11                   JUDGE LEE:  Can you explain that?

12                   MR. SARTORI:  Sure.

13                   JUDGE LEE:  That sounds like manual intervention.

14                   MR. SARTORI:  That is manual intervention.  And that has to do with

15  step 11, which is the manual step required to initiate it, to initiate the automatic

16  process.  That's taken from column 5, line 45, what you've been focusing on, sir,

17  Your Honor.  And that has to do with step 11, which is the manual stuff.

18                   JUDGE LEE:  I see.  So you're allocating all of these manual input to

19  the category of initiating the process.

20                   MR. SARTORI:  Yes, yes.

21                   JUDGE LEE:  If there's any manual input outside of initiation, then

22  it's not covered by the claim.

23                   MR. SARTORI:  It's not covered by the claim and it does not

24  anticipate the claim.

25                   The second point we'd like to discuss today regarding the prior art

26  rejections is the taxing authority recitation.  In the claims of the '052 patent, the

30

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1   claims recite "connecting electronically to a taxing authority." In rejecting the

2   claims, the examiner has misinterpreted the phrase "taxing authority." The '052

3   patent provides the definition for "taxing authority" on column 7, line 1 to 2. "The

4   taxing authority is the IRS, or a state, local, or foreign taxing authority. One of

5   ordinary skill would recognize that taxing authority refers to a government entity

6   that has the authority to levy or collect taxes."

7          The examiner, in rejecting the case, has said that the taxing authority

8   is your tax preparer, your tax accountant, or the IRS. The examiner -- it's saying

9   that the tax preparer is the taxing authority is inconsistent. We provided

10  substantial evidence in the prosecution and the briefs to say from certain

11  government agencies -- the IRS, the State of New York, the State of Florida -- the

12  taxing authority, giving definitions for it, and using it in its proper context.

13         We've also provided evidence from five EDGAR filings with the

14  SEC as to the definitional use of taxing authority. All this evidence has not been

15  addressed at all by the examiner. These definitions and use of it are all consistent

16  with taxing authority as used in the patent and the claims. Thus, the Beamer for

17  another reason does not anticipate the claims in the '052 patent.

18         JUDGE MOORE: So you think it's unreasonable to say that my CPA

19  who does my taxes is an authority on taxing, and therefore not a taxing authority.

20         MR. SARTORI: Maybe authority on taxes, yes. The inventor David

21  Miller is a tax lawyer. He's an authority on taxes, but he's not a taxing authority.

22  He does not have the power to levy and collect taxes from any one of us here.

23         The examiner also, in addition, rejected the claims under 112

24  rejections. We would like to rely on our briefs for response to those -- for those

25  rejections, we believe the examiner is incorrect. I'll ask the Board if there's any

26  questions on those at all.

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1    JUDGE MEDLEY:  I have a question on that.  Your '787 patent --

2    MR. SARTORI:  Yes --

3    JUDGE MEDLEY:  came later.

4    MR. SARTORI:  The '787 patent is a continuation of the '052, yes.

5    It's the same specification.

6    JUDGE MEDLEY:  But those claims are broader than the claims in

7    the earlier patent; is that correct?

8    MR. SARTORI:  They're of different scope.  Claim 20 of the original

9    '052 patent recites the steps of connecting electronically, collecting electronically,

10   preparing the tax return and filing it.  And the other independent claims -- oh, I'm

11   sorry.  Preparing it.  And the other electronic talks about filing.  I'm sorry.  Just a

12   second.

13   JUDGE MEDLEY:  It seemed to me that the later patent was just

14   focusing on tax collecting, whereas the claims in the earlier patent were collecting

15   and reporting.

16   MR. SARTORI:  Exactly.  The first patent includes two limitations of

17   interacting with the taxing authority:  connecting to the taxing authority and filing

18   the return with the taxing authority.  Those two steps are not recited in Claim 20 of

19   the '052 patent, which are the original claims.  And then in -- I'm sorry?

20   JUDGE MEDLEY:  I'm sorry.  Was there a TD filed in the '787

21   patent?

22   MR. SARTORI:  Yes, there was.  It was filed on July 22 -- July 29,

23   2002.  July 29, 2002, there was a terminal disclaimer filed in the '787 patent.

24   JUDGE LEE:  Had the rejections been 103, would you have evidence

25   of secondary consideration?

26   MR. SARTORI:  Yes, we have evidence of secondary consideration

Appeal 2007-0712
Reexamination 90/006,713
Patent 6,202,052

1   for three of the independent claims in the '787 patent.  The claims in the '052

2   patent are only rejected 1 or 2 as anticipated by the Beamer article.  And in the

3   second case, the '787 patent, we have -- we actually will argue long-felt need as a

4   secondary consideration to overcome the obviousness rejection by the examiner.

5           JUDGE MEDLEY:  For the dependent claims.

6           MR. SARTORI:  For the independent claims.  Well, independent

7   claims and dependent claims.  The examiner lumped them all together, and we

8   address only the independent claims.

9           JUDGE MEDLEY:  I thought she applied the art as anticipation with

10  respect to all the independent claims.

11          MR. SARTORI:  Not in the second patent.  Not in the second patent.

12  In the second patent, she rejected claims 4, 6 to 9, 11 to 18, 33 and 36 under 103.

13  And of that group of claims she rejected, claims 15, 33, and 36 are independent

14  claims that she rejected under 103.  And so we put forth the Webber article as an

15  example of secondary considerations of long-felt need.

16          JUDGE MEDLEY:  Any other questions?

17          JUDGE LEE:  No.

18          JUDGE MEDLEY:  Okay, thank you.

19          MR. SARTORI:  Thank you for your time.

20          (Whereupon, the proceedings at 1:45 p.m. were concluded.)